UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES),

and

CAVENDISH SQUARE HOLDING B.V.,

     Plaintiffs/Counterclaim
     Defendants,

     - against -

TRA GLOBAL, INC. (d/b/a TRA, INC.),

     Defendant/Counterclaim
     Plaintiff.

------------------------------------------------- X

<u>OPINION AND ORDER</u>

11 Civ. 4039 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/22/11

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Plaintiffs TNS Media Research, LLC d/b/a Kantar Media Services ("Kantar") and Cavendish Square Holdings B.V. ("Cavendish") bring this action against TRA Global, Inc. ("TRA") seeking a declaratory judgment that Kantar's RapidView for Retail product ("RVR") did not infringe on U.S. Patent No. 7,729,940 ("'940 Patent"), which TRA owns. Cavendish also brings a claim

against TRA for breach of contract.[1]  TRA asserts various affirmative defenses and brings counterclaims for patent infringement, breach of fiduciary duty, misappropriation of trade secrets, and breach of contract.

Currently before the court is TRA's motion for a preliminary injunction requiring Kantar to cease making RVR, and to cease selling it or offering it for sale, on the basis that it infringes Claim 71 of the '940 Patent.  For the reasons set forth below, the motion is denied.

## II.   BACKGROUND[2]

TRA is a media research company that began operations in 2007. Cavendish invested in TRA in August of that year, and, in return, received TRA stock and the right to a seat on TRA's board of directors.[3]  Near the end of 2008, Cavendish filled that seat with a senior vice president from WPP PLC, the parent company to both Cavendish and Kantar.[4]

In June 2010, the Patent and Trademark Office issued the '940 Patent,

---

[1]      See Complaint ¶¶ 17-21.

[2]      The facts in this case are contested and presented here based on the limited record available at this stage in the litigation.

[3]      See Answer and Counterclaim ("Answer") ¶¶ 46, 56-59.

[4]      See 8/2/11 Declaration of Sheila Spence, Cavendish's Representative on TRA's Board of Directors, in Opposition to TRA's Motion for Preliminary Injunction ("Spence Decl.") ¶¶ 3-4.

with TRA designated as the sole assignee.[5]  Shortly thereafter, TRA created Media

TRAnalytics ("MTRA"), a product based on the '940 Patent.  MTRA collects and

matches four kinds of data: data from cable and satellite set-top boxes to determine

what channel a household is watching ("clickstream data");  programming data that

allows it to determine what show was on that channel;  advertising data that allows

it to determine what ads ran during that show;  and, finally, data about what the

household purchases.  These data are then anonymously analyzed and used to

generate reports to help advertisers determine the return on their investment in

previous ads ("ROI reports") and how to invest their future advertising dollars

("planning reports"), as well as second-by-second TV ratings  reports ("ratings

reports").[6]  TRA claims that Kantar approached it about licensing the '940 Patent

in August 2010;[7]  Kantar denies this and states instead that TRA made repeated

efforts to license Patent '940 to it for a substantial fee.[8]  The parties never agreed to

a license.

---

[5]        *See* Answer ¶ 106.

[6]        *See* 7/1/11 Declaration of Mark Lieberman, CEO of TRA, in Support
of TRA's Motion for Preliminary Injunction ("Lieberman Decl.") ¶¶ 8-13.

[7]        *See* Answer ¶ 95.

[8]        *See* Spence Decl. ¶ 10.

Kantar released RVR in March 2011.[9]  Kantar claims that RVR is based on its own technology and does not infringe the '940 Patent, while also pointing out differences between RVR and MTRA.[10]  Kantar also argues that the '940 Patent is invalid as obvious.[11]  For its part, TRA claims that Kantar obtained its confidential information from Cavendish's representative on the TRA board of directors, that Kantar used this information to develop RVR, and that RVR in fact infringes on Claim 71 of the '940 Patent.[12]

The parties have submitted expert declarations regarding the technical merits of TRA's motion for a preliminary injunction.  The experts disagree about whether RVR infringes on Claim 71 of the '940 Patent, and whether Claim 71 is valid.

### A.    Expert Declarations on Infringement

----

[9]     See 6/28/11 Press Release from Kantar, Ex. A to Delcaration of Stu Gray, Independent Consultant to TRA, at 1.

[10]     For example, Kantar states that RVR does not create ROI reports.  See Plaintiffs' Reply Memorandum of Law in Opposition to Defendant's Motion for Preliminary Injunction ("Opp. Mem.") at 23.

[11]     See 8/2/11 Declaration of George Shabab, President of Kantar, in Opposition to TRA's Motion for Preliminary Injunction ("Shabab Decl.") ¶ 26; Complaint ¶ 18.

[12]     See Answer ¶¶ 105-129.  While the Answer claims that RVR directly infringes Claims 1 and 71, this opinion only discusses Claim 71 because that is the only claim contested by either side in this motion.

TRA's expert splits Claim 71 into five steps – collecting data, matching it on a computer, storing the matched data electronically, applying a cleansing and editing algorithm, and calculating a "true target index metric" – and states that RVR "literally infringes" each step.[13]  Kantar's expert asserts that RVR does not infringe on Claim 71 for two reasons.  *First*, he claims that RVR collects "market-level data" on programming and advertising, whereas Claim 71 contemplates collecting "household level data associated with multiple households" for programming and advertising.[14]  *Second*, he asserts that RVR applies a "cleansing and editing algorithm" to its input data sets before matching them, whereas Claim 71 applies the algorithm to the data post-matching.[15]

TRA's expert makes two points in rebuttal.  *First*, he states that "market-level data" is synonymous with "household level data associated with multiple consumer households" for purposes of Claim 71.[16]  *Second*, he asserts that

---

[13]    6/28/11Declaration of Richard Fenwick, Expert for TRA, in Support of TRA's Motion for Preliminary Injunction ("Fenwick Decl.") ¶ 6.

[14]    8/1/11 Declaration of Michael I. Shamos, Ph.D., J.D., Expert for Kantar and Cavendish, in Opposition to TRA's Motion for Preliminary Injunction ("Shamos Decl.") ¶¶ 6-12.

[15]    *Id.* ¶¶ 13-15.

[16]    8/10/11 Supplemental Declaration of Richard Fenwick,  Expert for TRA, in Support of TRA's Motion for Preliminary Injunction ("Fenwick Supp. Decl.") ¶¶ 26-27.

RVR "appl[ies] at least one cleansing and editing algorithm to the matched and stored data" by editing its raw clickstream data prior to matching, and by converting the matched data sets into user-friendly form.[17]

### B.   Expert Declarations on Validity

Kantar's expert argues that Claim 71 is "invalid because it covers subject matter that would have been obvious at the time of the invention."[18]  He states that with two exceptions, Claim 71 was taught by prior art as early as 1985.[19]  As to the first exception – that the 1985 prior art did not teach the use of a set-top box to collect clickstream data – he claims that "artisans would substitute the [now] commonplace set-top boxes" for older external meters. and that a 2002 patent intimated such a substitution.[20]  He claims that the second exception – that the 1985 prior art did not teach the use of a trusted third party to group and match the collected data sets "without processing any personally identifiable information associated with the consumer household" to which an account identifier has been

---

[17]     *Id.* ¶¶ 30-44.  Plaintiffs filed a sur-reply to the memorandum of law to which the Fenwick Supplemental Declaration was attached, but did not submit a supplemental declaration from their own expert.

[18]     Shamos Decl. ¶ 16.

[19]     *See id.* ¶ 20.

[20]     *Id.* ¶¶ 23-25.

assigned – was taught by prior art from 2000, and that privacy protection was required by Federal law.[21]  As a result, he concludes that the method of matching and grouping data required by Claim 71 "would have been obvious to try. . . ."[22]

TRA's expert responds in three ways.  *First*, he asserts that the 1985 prior art made use of a supplemental data collection device to obtain purchase data, the need for which was eliminated by Claim 71.[23]  *Second*, he asserts that prior art did not teach matching of purchase and media-exposure data.[24]  *Third*, he notes that Kantar previously offered a product without Claim 71's privacy protections.[25]

## III.   LEGAL STANDARDS

### A.    Patent Validity

Patents are presumptively valid by statute.[26]  Nonetheless, they may be deemed invalid if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have

---

[21]    *See id.* ¶¶ 27-30.

[22]    *Id*. ¶ 32.

[23]    *See* Fenwick Supp. Decl. ¶ 4.

[24]    *See id*. ¶ 15.  Kantar claims that the same prior art does in fact teach such matching.  *See* Plaintiffs' Sur-Reply Memorandum of Law in Opposition to Defendant's Motion for Preliminary Injunction ("Supp. Opp. Mem.") at 2.

[25]    *See* Fenwick Supp. Decl. ¶13.

[26]    *See* 35 U.S.C. § 282.

been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[27]

### 1.      Claim Construction

The court must construe claim terms before determining whether a patent is obvious in light of prior art.[28]  *First*, the court should look at the actual claim language.  Absent "an express intent to impart a novel meaning to claim terms," the claim language is given its "ordinary and customary meaning. . . ."[29] During this process, the court may look to the claim and the specification, the prosecution history, and dictionaries, amongst other things.  While a novel or unique definition in the specification is "usually . . . dispositive,"[30] "[t]he claim is the measure of [the patentee's] right to relief, and while the specification may be referred to to limit the claim, it can never be made available to expand it."[31]

### 2.      Comparing Claim to Prior Art

---

[27]      *Id.* § 103.

[28]      *See Telflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

[29]      *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004).

[30]      *Telflex, Inc.*, 299 F.3d at 1324-25.

[31]      *Johnson & Johnson Assoc. Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (quotation marks and citations omitted).

Once the court has construed the claim terms, it proceeds to determine whether a patent claim is obvious by looking at "the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art."[32]   Additionally, a court may find a patent obvious "if it would have been obvious to a person having ordinary skill to try a course of conduct. . . ."[33]   At trial, the alleged infringer must make a showing of obviousness by clear and convincing evidence.[34]

### 3.   Secondary Factors of Non-Obviousness

Once the alleged infringer has made out a prima facie case that a patent is obvious, a court must consider secondary factors of non-obviousness before reaching its final decision.[35]   The patentee bears the burden of demonstrating a nexus between any secondary factor of non-obviousness and the

---

[32]   *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009).

[33]   *Id.* at 1348 (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 402 (2007)).

[34]   *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

[35]   *See Bayer Schering Pharma AG*, 575 F.3d at 1348.  Indeed, when the patentee presents such factors, it is legal error for a court not to consider them.  *See In Re Huai-Hung Kao*, 639 F.3d 1057, 1067 (Fed. Cir. 2011) (citations omitted).

patent claim.[36]  Therefore, if a secondary factor arises from something beyond the claim or something that is taught by prior art, it is insufficient to overcome a prima facie case of invalidity.[37]

### B.    Patent Infringement

If the court finds that a patent is valid, the court should proceed to analyze infringement claims.[38]  Analysis of patent infringement involves two steps. *First*, as in the validity analysis, the court must construe the patent claims.  *Second*, the court must compare "the properly construed claims to the device accused of infringing."[39]  If the patentee can then "show the presence of every element or its equivalent in the accused device," the court should find that the accused device

---

[36]    *See J.T. Eaton & Co, Inc. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

[37]    *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006).  For example, if a patentee raises the commercial success of his patented device as a secondary factor, but that success is in fact due to excellent salesmanship unrelated to the patent claim, it is not pertinent to the non-obviousness analysis.  *See id*.

[38]    The analysis proceeds in this sequence because "a judgment of invalidity necessarily moots the issue of infringement."  *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir. 2004).

[39]    *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).

infringes the patent.[40]

## C.    Preliminary Injunction

Injunctive relief in patent cases is authorized by statute.[41]  A preliminary injunction, however, is "an extraordinary remedy never awarded as of right."[42]  A party seeking a preliminary injunction must therefore establish "[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest."[43]  A movant seeking a preliminary injunction that would alter the status quo must establish the same factors by a "clear showing" that it is entitled to the relief it requests.[44]

In order to show a likelihood of success on the merits in a patent case, the patentee "must show that it will likely prove infringement, and that it will

---

[40]    *Uniloc USA, Inc, v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).

[41]    *See* 35 U.S.C. § 283.

[42]    *Winter v. Natural Res. Def. Council, Inc.*, 557 U.S. 7, 24 (2008).

[43]    *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375-76 (Fed. Cir. 2009) (quotation marks and citations omitted).

[44]    *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., f/k/a CDO Plus Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

likely withstand challenges, if any, to the validity of the patent."[45]  This means that "[a] preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement *or* validity."[46]  Raising such a question requires  "more than a scintilla but less than a preponderance of the evidence."[47]

Once the accused infringer has made its required showing, "the burden shifts to the patentee to show that the defense lacks substantial merit."[48]  A patentee who does not meet this burden "is not entitled to a preliminary injunction," regardless of the weight of the other factors, because it has not shown a likelihood of success on the merits.[49]

---

[45]     *Titan Tire Corp.*, 566 F.3d at 1376.

[46]     *AstraZeneca LP v. Apotex Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (emphasis added).

[47]     *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1364 (Fed. Cir. 2008). The showing required at the preliminary injunction stage is lower than at trial because the essential issue at the preliminary injunction stage is vulnerability, not validity.  *See Atlanta Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1006 (Fed. Cir. 2009).

[48]     *Atlanta Pharma AG*, 566 F.3d at 1006.

[49]     *National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004).  This is in marked distinction to older case law that holds that none of the preliminary injunction factors are dispositive.  *See*, *e.g.*, *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988) (citing *Roper Corp. v. Litton Sys. Inc.*, 757 F.2d 1266, 1269 n.2 (Fed. Cir. 1985)).

## IV.   DISCUSSION

### Validity of Claim 71 of the '940 Patent

### A.   Claim Construction

As a threshold matter, I must construe the disputed language in Claim 71.  The parties dispute the meaning of the phrases "household level data associated with multiple consumer households" and "[applying] a cleansing and editing algorithm to the matched and stored data."

### 1.   "Household Level Data Associated with Multiple Consumer Households"

TRA's expert asserts that the market-level programming and advertising data used by RVR falls within the meaning of "household level data associated with multiple consumer households" because "each set of this data. . . discloses. . . what show each of multiple consumer households in a given area is watching, and what advertisement they saw in that area."[50]  There are several problems with this assertion.

As a preliminary matter, TRA's expert misstates the way RVR works, as explained by Kantar's expert.  According to Kantar's expert, the programming and advertising data sets that RVR uses do not, and alone cannot, reveal what any individual consumer household has seen by way of programming or advertisement.

---

[50]   Fenwick Supp. Decl. ¶ 27.

Instead, RVR uses these data sets to determine what the raw clickstream data it obtains from set-top boxes actually means.[51]

Furthermore, "household level data associated with multiple consumer households," when given its ordinary meaning, would not cover a data set simply because it could be used to determine something about multiple households on a household-by-household basis. Instead, when given its ordinary meaning, that phrase would require that there be some household level data to begin with, and that the same be later aggregated into a data set including multiple consumer households.

Claim 71 attaches this phrase to each of the four sets of data its proposed system collects. The specification and description, however, do not contemplate that each data set would be of the same kind or collected in the same way. The claim contemplates that clickstream data will be collected from each individual household via set-top boxes, and provided to the proposed system by a third-party data vendor;[52] likewise, the claim contemplates that purchase data will

---

[51]     *See* Shamos Decl. ¶ 9. By way of example, raw clickstream data would indicate that Household A watched Channel X at Time Y, whereas the programming and advertising data would indicate what shows and ads ran on Channel X at Time Y, and thus enable one to determine what Household A actually saw.

[52]     *See* '940 Patent col. 20 ll. 13-17.

be collected from each individual household by means of a unique store discount card, also provided by a third-party data vendor.[53]  Programming data, however, would come directly from cable operators or a third-party data vendor without ever being collected on the household-level, and advertising data would come either directly from the television networks or the advertisers seeking to make use of the proposed system.[54]

It appears, then, that "household level data associated with multiple consumer households" is to have different meanings in different contexts.  In the context of clickstream and purchase data, its meaning is the ordinary meaning explained above.  In the context of programming and advertising data, however, the inventors of the '940 Patent appear to have intended a specialized meaning of "usable to determine what programs and advertising each of multiple consumer households saw."  I therefore construe the phrase according to its ordinary meaning when applied to the former data sets, and according to its specialized meaning when applied to the latter.

### 2. Applying a "Cleansing and Editing Algorithm to the Matched and Stored Data"

Kantar and Cavendish assert that "[applying] a cleansing and editing

---

[53]    *See id.* col. 3 l. 66 - col. 4 l. 4 and col. 20 ll. 43-44.

[54]    *See id.* col. 20 ll. 17-42.

algorithm to the matched and stored data" requires the algorithm to be applied *after* the relevant data sets are matched and stored in a computer system.[55]  Relying on the specification accompanying Claim 71, TRA's expert asserts that the algorithm may be applied *before* any matching of the data sets occurs, and that the term "matched and stored" "is a descriptive reference to the data to which the algorithm is applied" that "does not impose a sequential limitation. . . ."[56]  This interpretation does violence to the ordinary grammatical understanding of the past tense in a manner that would expand the coverage of the claim rather than limit it.  Because the specification cannot, as a matter of law, expand the claim, I find that "[applying] a cleansing and editing algorithm to the matched and stored data" means "applying a cleansing and editing algorithm to the data after it is matched and stored."

### B.    Comparison of the Prior Art and the '940 Patent

Having construed the disputed portions of Claim 71, I must now determine what differences, if any, exist between Claim 71 and the prior art.  At the preliminary injunction stage, this effectively means that I must determine whether Kantar and Cavendish have raised substantial questions of obviousness

---

[55]    Supp. Opp. Mem. at 4.

[56]    Fenwick Supp. Decl. ¶¶ 39-41.

and whether TRA has shown that those questions lack substantial merit.

I must first examine Claim 71, so that I may compare it to the prior art.  Claim 71 consists of five basic steps.  *First*, the proposed system collects clickstream, advertising, programming, and purchase data without the use of supplemental data collections devices.  *Second*, the proposed system matches the data on a household-by-household basis, without using personally identifiable information.  *Third*, the proposed system stores the matched data on a computer. *Fourth*, the proposed system applies a "cleansing and editing algorithm" to the data stored on the computer after it is matched.  *Fifth*, the proposed system generates a planning report based on the matched data.[57]

After a careful review of the record currently before me, I conclude that Kantar and Cavendish have shown the prior art to teach six things.  *First*, I find that prior art taught the use of a set-top box –which is not a "supplemental data collection device" – to collect clickstream data.[58]  *Second*, I find that one of Kantar's own products taught the collection and use of programming and advertising data from third parties without the use of a supplemental data collection device, in a manner consistent with the specialized meaning of "household level

---

[57]     *See* '940 Patent col. 46 l. 33 - col. 48 l. 9.

[58]     *See* 9/19/02 United States Patent Application of Conkwright, Vinson, and Foster ("CVF App."), Ex. 4 to Shamos Decl., ¶ 21.

data associated with multiple consumer households" noted above.[59]  *Third,* I find

that the same Kantar product taught to match programming and advertising data

with clickstream data to determine what programs and advertisements individual

households actually saw.[60]  *Fourth*, I find that prior art taught to compare

information about what programs and advertisements households actually saw with

purchasing data, said purchasing data being "household level data associated with

multiple consumer households" consistent with the ordinary meaning of that

phrase noted above;[61]  particularly, it taught the use of household-specific cards to

track buying behavior at the point of purchase.[62]  *Fifth*, I find that prior art taught

the use of a trusted third-party "matcher" to protect the personal information of

households whose behavior is analyzed.[63]  *Sixth*, I find that prior art taught the

---

[59]     *See* Shabab Decl. ¶ 22.

[60]     *See id.*

[61]     *See* March 1985 Tracking Advertising and Promotion Performance with Single-Source Data by Gerald J. Eskin ("Eskin"), Ex. 3 to Shamos Decl., at 37.  *See also* CVF App. ¶ 19.

[62]     *See* Eskin at 31.  The specifications of the '940 Patent expressly state that the use of a card in this way "[is] not considered within the scope of the term 'supplemental data collection' device as applied herein."

[63]     *See* 1/2/00 European Patent Application of Kohan and Langer, Ex. 8 to Shamos Decl., ¶ 5.

generation of planning reports.[64]

Comparing these findings to Claim 71, I find that the prior art substantially taught all of the limitations in Claim 71.  I further find that it would have been obvious to a person reasonably skilled in the art to attempt to combine these teachings, even though no single device embodied them all.  I therefore conclude that, on the record currently before me, Kantar and Cavendish have met their burden of raising a substantial question about the validity of Claim 71 by "more than a scintilla" of evidence.

### C.  Whether the Question of Claim 71's Validity Lacks Substantial Merit

I must now consider whether TRA has shown that the substantial question of validity that Kantar and Cavendish raise lacks substantial merit.  While the Federal Circuit has not clearly stated what kinds of evidence a court may consider in this regard, I must, at the very least, consider the secondary factors of non-obviousness that TRA raises.[65]  As noted above, however, if  TRA cannot

---

[64]     *See* Eskin at 39-40.  The article refers to the creation of "leverage indexes," which can be used to determine when an advertisement for a given product would be most effectively placed, both generally and on a show-by-show level.  *Id.*  I note that this is substantially similar to the meaning that the specification gives to the phrase "true target index" report, the name TRA gives to planning reports.  *See* '940 Patent col. 26 ll. 46-60.

[65]     *See* Defendant's Reply Memorandum in Support of Motion for Preliminary Injunction at 4-5.

demonstrate a "nexus" between these factors and its patent, it is legally inappropriate for me to consider them.

Amongst the secondary factors TRA raises, only the allegation of copying is supported with the required nexus.  TRA argues that the similarities between RVR and MTRA are most likely explained by copying, and that Claim 71 is therefore not obvious.  TRA presents the following four facts as evidence of copying: *first*, that Kantar and Cavendish were investors in TRA; *second*, that Cavendish's duly appointed member of TRA's board of directors had access to inside information; *third*, that RVR and MTRA provide similar reports to their users; and *fourth*, that RVR and MTRA use many of the same data vendors.[66]

Kantar and Cavendish dispute each of these arguments.  *First*, Cavendish's representative on TRA's board denies sharing any confidential information with Kantar or Cavendish, or knowing of RVR before its release.[67] *Second*, Kantar and Cavendish flatly deny that RVR produces ROI reports.[68] *Third*, Kantar and Cavendish point out that Kantar used the data vendors common

---

[66]     *Id.*

[67]     *See* Spence Decl. ¶¶ 6-8.

[68]     *See* Opp. Mem. at 23.  Plaintiffs do not, however, deny producing planning and ratings reports.

to RVR and MTRA since before TRA entered the market.[69] Because I find these arguments approximately equal in persuasive value to TRA's arguments, I find that TRA has not shown by even a preponderance of the evidence that the obviousness defense raised by Kantar and Cavendish lacks substantial merit.[70]

## V.   CONCLUSION

Kantar and Cavendish have raised a substantial question about the validity of Claim 71 of the '940 Patent. Because TRA has not shown that said question lacks substantial merit, TRA's motion for a preliminary injunction is denied. The Clerk of Court is directed to close this motion (docket #11). A conference is scheduled for October 20 at 3:30 PM.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      September 22, 2011
            New York, New York

---

[69]     *See* Supp. Opp. Mem. at 3.

[70]     Because I find that Kantar and Cavendish have raised substantial questions regarding the validity of Claim 71 of the '940 Patent, I need not reach the question of infringement at this time. *See TypeRight Keyboard Corp.*, 374 F.3d at 1157.

-21-

**- Appearances -**

**For Plaintiffs:**

Marc Joseph Rachman, Esq.
Christopher Andrew Keisner, Esq.
Davis & Gilbert, LLP
1740 Broadway
New York, NY 10019
(212) 468-4800

Charles Thomas Steenburg, Esq.
John L. Strand, Esq.
Michael A. Albert, Esq.
Robert M. Abrahamsen, Esq.
Wolf, Greenfield, & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8265

**For Defendant:**

Matthew Russell Maron, Esq.
Ira Brad Matetsky, Esq.
Ganfer & Shore, LLP
360 Lexington Avenue
New York, NY 10017
(212) 922-9250

Richard P. Doyle, Esq.
Janssen Doyle LLP
140 Brookwood Road
Suite 102
Orinda, CA 94653
(925) 295-1805