UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES) and
CAVENDISH SQUARE HOLDING B.V.,

                Plaintiffs,

                - against -

TRA GLOBAL, INC. (d/b/a TRA, INC.),

                Defendant.

------------------------------------------------------- X

TRA GLOBAL, INC. (d/b/a TRA, INC.),

                Counterclaim-Plaintiff,

                - against -

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES),
CAVENDISH SQUARE HOLDING B.V.,
WPP PLC, WPP GROUP USA, INC.,
KANTAR GROUP LTD., KANTAR
RETAIL AMERICA, INC.,

                Counterclaim-Defendants.

------------------------------------------------------- X

**OPINION AND
ORDER**

11 Civ. 4039 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/29/12

SHIRA A. SCHEINDLIN, U.S.D.J.:

**I.      INTRODUCTION**

TNS Media Research, LLC d/b/a Kantar Media Audiences and Cavendish Square Holding, B.V. (collectively "Kantar") bring this action against TRA Global, Inc. ("TRA") seeking a declaratory judgment that Kantar's RapidView for Retail product ("RVR") did not infringe on U.S. Patent No. 7,729,940 ("the '940 Patent"), owned by TRA. Cavendish also brings a claim against TRA for breach of contract.[1] TRA has asserted various affirmative defenses and counterclaims.

Claim construction – the process wherein the court determines, as a matter of law, the meaning of disputed claim terms – is a task preferably tackled early on in a patent infringement action. A *Markman* hearing – which provides the parties the opportunity to argue for, and introduce evidence in support of, their proposed constructions – was held on July 6, 2012. The parties dispute the meaning of three phrases appearing throughout the '940 Patent. For ease of reference, a list of the constructions I have adopted is included at the conclusion of this Opinion.

## II.    BACKGROUND

### A.    The Invention

On June 1, 2010, the Patent and Trademark Office ("PTO") issued the

---

[1]      *See* Complaint and Jury Demand ("Compl.") ¶¶ 17-21.

'940 Patent with TRA designated as the sole assignee.[2]  The claimed invention is a method for collecting, matching, and analyzing television viewing and consumer purchasing data to generate reports that help advertisers get the most bang for their advertising bucks.  Further, the claimed invention does this without the need for supplemental equipment in homes or retail locations, without the need for the consumer's "opt-in" permission, and with measures designed to protect the privacy of the consumer.[3]  Media TRAnalytics ("MTRA") — TRA's product based on the '940 Patent — collects and matches four kinds of data: (1) data from cable and satellite set-top boxes to determine what channel a household is watching ("clickstream data"); (2) general programming data from third-party providers that allows it to determine what show was on that channel; (3) general advertising data from third-party providers that allows it to determine what ads ran during that show; and (4) household purchasing data collected based on frequent shopper or "loyalty" cards from supermarkets and other sources.[4]  Using a combination of outside vendors and proprietary algorithms, TRA matches individual viewer data

---

[2]     *See* '940 Patent, Ex. B to 1/20/12 Declaration of Richard Fenwick (TRA's expert) in Support of Claim Construction (Markman Hearing) ("Fenwick Decl.").

[3]     *See* Defendant/Counterclaim-Plaintiff TRA Global, Inc.'s Responsive Claim Construction Brief ("TRA Reply Mem.") at 4.

[4]     *See* 7/6/12 Markman Hearing Transcript ("Tr.") at 4:14-7:20.

with individual purchase data while anonymizing the data to protect the privacy rights of television viewers.[5]  TRA then generates reports that help advertisers: (1) measure the return on their investment for previous ads; and (2) how best to invest their future advertising dollars.[6]

### B.    Claim Language

While the phrases at issue are found in more than one patent claim, Claim 71 is illustrative of the invention, and both parties make their arguments using Claim 71 as a reference.  The claimed method is made up of five steps:  (1) collecting data; (2) matching with a centrally located electronic computer processor; (3) storing the matched data in at least one centrally located electronic data storage media; (4) applying at least one "cleansing and editing algorithm"; and (5) calculating at least one true target index matrix.  The full text of Claim 71 follows, with the disputed phrases emphasized:

> A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:
>     collecting in an advertising measurement system:
>         (i)   clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection

---

[5]     *See TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2011 WL 4425415, at *1 (S.D.N.Y. Sept. 22, 2011).

[6]     *See* Tr. at 7:21-8:5.

device, and also wherein the collected clickstream data includes *household level data associated with multiple consumer households*;

(ii)   advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes *household level data associated with multiple consumer households*;

(iii)   program data associated with the program delivered on the program delivery source, wherein collecting the program data is not dependent on a supplemental data collection device, and also wherein the collected program data includes *household level data associated with multiple consumer households*;

(iv)   purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes *household level data associated with multiple consumer households*;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with a centrally located electronic computer processor configured for centrally processing data received from the program delivery source, the advertising data source, the program data source, and the purchase data source, wherein the matching further includes:

(i)   grouping the collected data in association with an account identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

(ii)   matching each account identifier associated with each consumer household with other account identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

> storing the matched advertising data, clickstream data,
> purchase data, and program data in at least one centrally
> located electronic data storage medium operatively
> associated with the computer processor;
> applying at least one *cleansing and editing algorithm* to the
> matched and stored data; and,
> calculating at least one true target index metric based on the
> matched and stored data.[7]

The parties seek construction of the phrases "household level data associated with
multiple consumer households" and "cleansing and editing algorithm."[8]  Kantar
additionally seeks construction of the sub-phrase "household level data."

## C.   Procedural History

Kantar commenced this suit on June 15, 2011, by filing a complaint
seeking a declaratory judgment that the RVR does not infringe the '940 Patent.[9]
Kantar further alleged that TRA breached the terms of a Voting Agreement when it
excluded a senior vice president from WPP PLC — the parent company of Kantar
— from attending a meeting of TRA's Board of Directors.[10]  TRA answered on
July 5, 2011, and asserted four counterclaims:  (1) patent infringement; (2) breach
of fiduciary duty; (3) misappropriation of trade secrets; and (4) breach of contract

---

[7]      '940 Patent col. 46 l. 33 – col. 48 l. 9.

[8]      *See* Parties Joint Claim Construction Statement ("Joint St.") at 3-4.

[9]      *See* Compl. ¶¶ 16-18, 22.

[10]      *See id.* ¶¶ 19-21.

relating to the terms of certain non-disclosure agreements.[11]

With the filing of its Answer, TRA moved for preliminary injunctive relief.  I denied injunctive relief on September 22, 2011, and, on the record then before me, made the following determinations:  (1) that the phrase in Claim 71 of the '940 Patent — "household level data associated with multiple consumer households" — had different meanings in different contexts; (2) that because Claim 71  would have been obvious to a person reasonably skilled in the art, Kantar met its burden of raising a substantial question about the patent's validity; and (3) that TRA had not shown by a preponderance of the evidence that the obviousness defense raised by Kantar lacked substantial merit.[12]  On June 4, 2012, I granted TRA leave to amend its counterclaims by: (1) asserting additional claims of patent infringement based on U.S. Patent Nos. 8,000,993 and 8,112,301, both of which were issued to TRA after the date it filed its original counterclaims; (2) clarifying that its breach of fiduciary duty claim was actually an aiding and abetting breach of fiduciary duty claim; and (3) joining additional Kantar entities

---

[11]    *See*  Answer, Defenses, and Counterclaims for Patent Infringement, Breach of Fiduciary Duty, Misappropriation of Trade Secrets, and Breach of Contract ¶¶ 105-129.

[12]    *See TNS Media Research*, 2011 WL 4425415, at *5-6.

as counterclaim-defendants.[13]

On February 3, 2012, the parties stipulated as to the appropriate construction for many terms in the '940 patent.[14]  Disputes remain as to three phrases, each of which appears in every one of TRA's asserted claims.[15]  A *Markman* hearing was held on July 6, 2012.

## III.   APPLICABLE LAW

Before a fact-finder can determine whether an accused device infringes a patent, the terms of the asserted claims must be construed to determine their scope.  Because the proper interpretation of words in a patent claim is a question of law, claim construction is a task for judges, not juries.[16]  Judges should carry out this task with the goal of "'elaborating the normally terse claim language

---

[13]     *See  TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2012 WL 2052679, at *2 (S.D.N.Y. June 4, 2012); Answer, Defenses, and Supplemental and Amended Counterclaims for Patent Infringement, Aiding and Abetting Breach of Fiduciary Duty, Misappropriation of Trade Secrets, and Breach of Contract ¶¶ 104-151.

[14]     *See* Joint St.

[15]     *See* Plaintiffs' Opening Claim Construction Statement ("Kantar Mem.").

[16]     *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 390-91 (1996).

in order to understand and explain, but not to change, the scope of the claims.'"[17] That said, "[c]laim interpretation is not always an exact science, and it is not unusual for parties to offer competing definitions of even the simplest claim language."[18]

Although there are several canons of construction used by courts in interpreting claim terms, the Federal Circuit has made clear that "there is no magic formula or catechism for conducting claim construction."[19] Thus, "while these interpretive tools can be indispensable aids to a federal district court tasked with construing the meaning of a patent claim,"[20] courts must nonetheless be mindful that "applying [the substantive precepts of patent claim interpretation] to the facts of a case can be . . . perplexing, particularly where precepts can be in opposition to one another and district judges cannot always tell which one(s) apply in a

---

[17]     *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001) (quoting *Embrex, Inc. v. Services Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)).

[18]     *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1301 (Fed. Cir. 2004).

[19]     *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).

[20]     *Medisim Ltd. v. BestMed LLC*, No. 10 Civ. 2463, 2011 WL 2693896, at *3 (S.D.N.Y. July 8, 2011).

-9-

particular case."[21]   Mindful of this challenge, the Federal Circuit has attempted to

give district courts some guidance as to where to begin:

> [T]he ordinary and customary meaning of a claim term is the
> meaning that the term would have to a person of ordinary skill in
> the art in question at the time of the invention, i.e. as of the
> effective filing date of the patent application. . . . [This inquiry]
> provides an objective baseline from which to begin claim
> interpretation. . . .   Importantly, the person of ordinary skill in the
> art is deemed to read the claim term not only in the context of the
> particular claim in which the disputed term appears, but in the
> context of the entire patent, including the specification.[22]

To determine how a person skilled in the art would have understood the meaning

of a disputed claim term, courts should look to publicly available sources,

including both intrinsic evidence — such as "'the words of the claims themselves,

the remainder of the specification, the prosecution history'" — and "'extrinsic

evidence concerning relevant scientific principles, the meaning of technical terms,

and the state of the art.'"[23]

### A.   Intrinsic Evidence

---

[21]      Edward D. Manzo, *Claim Construction in the Federal Circuit* § 1.2
(2009).  It is perhaps for this reason that the Federal Circuit's reversal rate has
hovered between 20 and 45 percent over the last twenty years.  *See* David L.
Schwartz, *Pre-Markman Reversal Rates*, 43 Loy. L.A. L. Rev. 1073, 1075, 1091-
93 (2010).

[22]      *Phillips*, 415 F.3d at 1313 (citations omitted).

[23]      *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water
Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

-10-

The Federal Circuit views intrinsic evidence as "a more reliable guide to the meaning of a claim term than are extrinsic sources."[24]   Thus, district courts should use the intrinsic record as "the primary tool to supply the context for interpretation of disputed claim terms."[25]

### 1.    Claim Language

Although there is no rigid formula to claim construction, "[j]udicial interpretation must begin with and remain focused upon the 'words of the claims themselves . . . to define the scope of the patented invention.'"[26]   On occasion, "the ordinary meaning of claim language as understood by a person of skill in the art" will be so apparent from the claim language itself that no further inquiry is needed.[27]   However, even when the terms in a claim are not self-explanatory, "[t]he context in which a term is used in the asserted claim can be highly instructive.   To

---

[24]     *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008) (citing *Phillips*, 415 F.3d at 1318-19).

[25]     *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

[26]     *Investment Tech. Group, Inc. v. Liquidnet Holdings, Inc.*, No. 07 Civ. 510, 2010 WL 199912, at *2 (S.D.N.Y. Jan. 10, 2010) (quoting *Vitronics*, 90 F.3d at 1582).  *Accord Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) ("[T]he claims perform the fundamental function of delineating the scope of the invention . . . .").

[27]     *Phillips*, 415 F.3d at 1314.

take a simple example, [the use of the term] 'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel."[28]  Thus, "the most important indicator of the meaning of [a disputed claim term] is its usage and context in the claim itself."[29]

### 2.    The Specification

In addition to the claim itself, a patent is required by statute to "contain a written description of the invention . . . ."[30]  This is often called the specification,[31] and it typically includes: "an abstract of the invention; a description

---

[28]    *Id.*

[29]    *Middleton, Inc. v. Minnesota Mining and Mfg. Co.*, 311 F.3d 1384, 1387 (Fed. Cir. 2002).

[30]    35 U.S.C. § 112 ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.").  The Federal Circuit has also explained that courts should rely on intrinsic evidence because a person of ordinary skill in the field would use "the patent specification and the prosecution history" to understand the invention claimed by the patent.  *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).  *Accord Phillips*, 415 F.3d at 1311-14.

[31]    *See Medisim*, 2011 WL 2693896, at *3 n.28 ("The terminology used to describe the parts of a patent can be slightly confusing.  Technically, the specification includes both the claims and the written description.  However, courts typically use the term specification to refer to the written description on its own and as distinct from the claims.  For purposes of consistency, I adopt this common usage.").

of the invention's background; a summary of the invention; patent drawings; and a detailed description that discusses preferred embodiments of the invention."[32]  The Federal Circuit has said that specifications are "always highly relevant to the claim construction analysis" and therefore "claims must be read in view of the specification, of which they are a part."[33]  However:

> Adverse parties often hold significantly different views on how to harmonize statements about the invention, its objects, or examples of the invention in the "written description" with the claim language, and probably the most difficult and frequently-litigated issues of claim interpretation result from the inevitable differences between statements in the written description as compared to the words of the claims.[34]

Courts must be mindful that while "using the specification to interpret the meaning of a claim" is permissible, "importing limitations from the specification into the claim" is not.[35]  Because the words of the claim — and only the words of the claim — "define the scope of the right to exclude,"[36] the specification should generally

---

[32]   *Id.* at *3.

[33]   *Phillips*, 415 F.3d at 1315 (quotation marks and citations omitted).  In fact, a claim interpretation that excludes a preferred embodiment described in the specification is "rarely, if ever, correct."  *Vitronics*, 90 F.3d at 1583.

[34]   Manzo § 2.44.

[35]   *Phillips*, 415 F.3d at 1323.

[36]   *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

be used to limit a claim only:

> (1) if the claim "explicitly recite[s] a term in need of definition"; or (2) if the specification unambiguously defines a term, *i.e.*, if "a patent applicant has elected to be a lexicographer by providing an explicit definition in the specification for a claim term."[37]

Even then, "there will still remain some cases in which it will be hard to determine whether a person of skill in the art would understand the embodiments to define the outer limits of the claim term or merely to be exemplary in nature."[38]

### 3.   Prosecution History

The prosecution history of a patent is part of the "intrinsic evidence" and "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."[39]  "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."[40] Nonetheless, "[l]ike the specification, the prosecution history provides evidence of

---

[37]   *Medisim*, 2011 WL 2693896, at *4 (quoting *Renishaw*, 158 F.3d at 1248-49).

[38]   *Phillips*, 415 F.3d at 1323.

[39]   *Id.* at 1317 (citation omitted).

[40]   *Id*.

how the PTO and the inventor understood the patent," and accordingly, "can often inform the meaning of the claim language."[41]  Further, despite the lack of clarity inherent in the prosecution history, it "may be given substantial weight in construing a term where that term was added by amendment."[42]  This is because changes made to the claim terms during the prosecution history "demonstrat[e] how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[43]

### B.   Extrinsic Evidence

The extrinsic record "'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'"[44]  Previous district court opinions — such as this Court's preliminary injunction opinion — are also considered extrinsic evidence.[45]

---

[41]   *Id.*

[42]   *Board of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1369 (Fed. Cir. 2008).

[43]   *Phillips*, 415 F.3d at 1317.

[44]   *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).

[45]   *See MEMS Tech. Merhad v. ITC*, 447 Fed. App'x 142, 153 (Fed. Cir. 2011) ("Related judicial holdings can be an appropriate form of non-binding

Although the Federal Circuit has explicitly "authorized district courts to rely on extrinsic evidence," it has also made clear that it views "extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms."[46]  This is for many reasons:  (1) extrinsic evidence was not created at the time of the patent for the purpose of explaining the patent's scope and meaning; (2) external publications "may not reflect the understanding of a skilled artisan in the field of the patent"; (3) expert reports and testimony are created at the time and for the purpose of litigation and may suffer from bias; (4) "there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question"; and (5) unlike intrinsic evidence, extrinsic evidence is not necessarily part of the public record, and therefore undue reliance on it undermines the public notice function of patents.[47]

> Expert reports and expert testimony can be helpful to a court by:
>
> [providing] background on the technology at issue, [explaining] how an invention works, [ensuring] that the court's understanding of the technical aspects of the patent is consistent with that of a

---

extrinsic evidence in a claim construction analysis.").

[46]     *Phillips*, 415 F.3d at 1317-18.

[47]     *Id.* at 1318-19.

person of skill in the art, or [establishing] that a particular term in the patent or the prior art has a particular meaning in the pertinent field.[48]

In contrast, it is unhelpful to a court if an expert "simply recites how [he or she] would construe [a disputed term] based on his own reading of the specification."[49] Further, "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'"[50]

## C.  Relevant Canons for Construing Claim Language

### 1.  Each Word Should Have a Distinct Meaning

Generally, "claims are interpreted with an eye toward giving effect to all terms in the claim."[51]  Thus, courts should avoid constructions which render certain terms superfluous.[52]  And because "different claim terms are presumed to

---

[48]    *Id.* at 1318.

[49]    *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008).

[50]    *Phillips*, 415 F.3d at 1318 (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

[51]    *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2010).

[52]    *See Phillips*, 415 F.3d at 1314.

have different meanings,"[53] each word should be given a *distinct* meaning.  Still, although different words usually carry different meanings, any such presumption is rebuttable.[54]

### 2.   Internal Consistency

Just as different words are presumed to have different meanings, the same words are presumed to have the same meaning each time they appear, absent special circumstances.[55]  This is true not just for words that appear multiple times, but also for phrases that are used in a consistent fashion.[56]  This presumption is

------

[53]   *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).  *Accord Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[U]se of two terms in a claim requires that they connote different meanings.").

[54]   *See Baran v. Medical Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) (construing two different terms to have the same meaning because "[the] implication [that the use of different terms implies that they have different meanings] is overcome where, as here, the evidence indicates that the patentee used the two terms interchangeably") (citing *Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1361 (Fed. Cir. 2003)).

[55]   *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

[56]   *See Phonometrics, Inc. v. Northern Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently.").

likewise rebuttable,[57] at least to give the same phrase a different meaning in different claims (as opposed to giving the same phrase a different meaning in different parts of the same claim).[58]

## IV.    DISCUSSION

The first of the three phrases in dispute is "household level data associated with multiple consumer households."  Kantar's proposed construction of the phrase is "household level data that has later been aggregated into a data set including multiple consumer households."[59]  With regard to clickstream and purchase data, TRA proposes the following similar but distinct construction of the disputed phrase:  "data about the household that can later be aggregated into a data set including multiple consumer households."[60]  With regard to advertising and program data, TRA proposes that the phrase should be construed as "data related to advertising/programming tuned to by multiple consumer households."[61]

---

[57]    *See Felix v. American Honda Motor Co., Inc.*, 562 F.3d 1167, 1177-78 (Fed. Cir. 2009).

[58]    *See Haemonetics*, 607 F.3d at 783 (holding that a disputed phrase consistently had the same meaning in one claim, irrespective of its different meaning in a different claim).

[59]    Joint St. at 3.

[60]    TRA Reply Mem. at 9.

[61]    *Id.* at 9-10.

The second phrase at issue is "household level data." Kantar argues that this sub-phrase must be construed separately to address TRA's overly broad proposed construction of the longer phrase — which, according to Kantar, eliminates the "household level" requirement.[62] Kantar proposes that the phrase be construed as "data from a single residential address or other individual consumer location."[63] Although TRA believes that the Court need not separately construe this sub-phrase, it proposes "data about a household."[64]

The third dispute centers on step 4 of the claimed method, which involves applying at least one "cleansing and editing algorithm" to the matched and stored data. Kantar proposes that the phrase be construed as "an algorithm to remove inconsistencies in, correct, or otherwise improve the reliability of data collected from a program or delivery source," whereas TRA proposes the following construction: "[f]ormulas and calculations to remove inconsistencies in, correct, or otherwise improve the reliability and/or utility of data."[65] For reference, the disputes are summarized in the following table:

---

[62]    *See* Kantar Mem. at 18.

[63]    Joint St. at 3.

[64]    TRA Reply Mem. at 12.

[65]    Joint St. at 4.

| Parties' Disputed Constructions | | |
|---|---|---|
| **Term** | **TRA's Proposed Construction** | **Kantar Media's Proposed Construction** |
| "household level data associated with multiple consumer households" | When used with regard to "clickstream" and "purchase" data: data about a household that can be later aggregated into a data set including multiple consumer households<br><br>When used with regard to "advertising" and "program" data: data related to advertising/programming tuned to by multiple consumer households | household level data that has later been aggregated into a data set including multiple consumer households |
| "household level data" | TRA does not believe that this phrase requires a separate definition.  However, if it must be given an out-of-context definition, it asks that the phrase be defined as:  *data about a household.* | data from a single residential address or other individual consumer location |
| "cleansing and editing algorithm" | Formulas and calculations to remove inconsistencies in, correct, or otherwise improve the reliability and/or utility of data | an algorithm to remove inconsistencies in, correct, or otherwise improve the reliability of data |

A. **"Household Level Data Associated with Multiple Consumer Households" When Used with Regard to Clickstream and Purchase Data**

With regard to clickstream and purchase data, the parties do not entirely agree on the appropriate construction of the disputed phrase. The parties agree that in both of those contexts, the phrase refers to data collected from individual households. However, Kantar's proposed construction refers to "data that *has later been* aggregated," whereas TRA's definition refers to data "that *can be later* aggregated." The distinction is entirely temporal. TRA argues that the method in the claim has distinct sequential steps, and that "Kantar's definition improperly collapses the *collecting* step and the *matching* step by requiring the data to be aggregated before the [collecting step] is completed."[66]

Kantar's proposed construction — which includes the phrase "data that has later been aggregated" — is somewhat ambiguous, but it does imply that the data must be aggregated before it is matched. TRA's proposed construction has the advantages of being not only less ambiguous but also more consistent with the step-by-step sequence implied by the claim's paragraph structure. Thus, with regard to clickstream and purchase data, I adopt TRA's proposed construction of "household level data associated with multiple consumer households" as "data

---

[66]    TRA Reply Mem. at 10.

about a household that can be later aggregated into a data set including multiple consumer households."

### B.    "Household Level Data Associated with Multiple Consumer Households" When Used with Regard to Advertising and Program Data

#### 1.    The Claim Language

The parties agree with this Court's prior holding that the ordinary meaning of "household level data associated with multiple consumer households" involves data from individual households.[67]   TRA argues, however, that when used in the context of advertising and program data, a person of ordinary skill in the art would understand the disputed phrase to refer to *general* data regarding which programs and advertisements were playing on a channel at a given time — *not* data from individual households.[68]   Under Kantar's proposed construction, the claimed method covers only the collection of *individual* household data on program and advertising viewership *directly* from individual homes, not the collection of general programming and advertising data from advertisers and content-providers.

---

[67]    *See TNS Media Research*, 2011 WL 4425415, at *5; Kantar Mem. at 12; Defendant TRA Global, Inc.'s Claim Construction Brief (Markman Hearing) ("TRA Mem."), at 8; Fenwick Decl. at 7.

[68]    General programming and advertising data can be matched with clickstream data to then determine which programs and ads an individual household watched, and indeed, this is what both MTRA and RVR do.

TRA argues that the disputed phrase should be interpreted in light of the full and distinct contexts in which it appears.  In particular, TRA highlights the contextual clues from the language of the patent as to the *source* of the various types of data:

> collecting in an advertising measurement system:
>
> (i)   clickstream data *from a program delivery source of a consumer*, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;
>
> (ii)  advertising data *associated with delivery of the program by the program delivery source*, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;
>
> (iii) program data *associated with the program delivered on the program delivery source*, wherein collecting the program data is not dependent on a supplemental data collection device, and also wherein the collected program data includes household level data associated with multiple consumer households;
>
> (iv)  purchase data *from a purchase data source*, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households;[69]

---

[69]   '940 Patent col. 46 ll. 36-60 (emphasis added).

-24-

Whereas the *clickstream* and *purchase* data are described as coming "from a" type of source, the *advertising* and *program* data are referred to as being "associated with . . . the program delivery source."[70]  TRA argues that this distinction makes all the difference, and that by using the words "associated with" instead of the word "from," the claim contemplates that the advertising and program data could come *not only* from program delivery sources such as digital set-top boxes ("DSTBs"), *but also* "'from the television networks or the advertisers seeking to make use of the proposed system.'"[71]  According to TRA, this is the only construction of the full claim language that makes sense, and "'claim language should be read in a manner that causes the claim to make sense.'"[72]  Further, "different claim terms are

---

[70]    The parties made the following stipulations: (1) "clickstream data from a program delivery source of a consumer" should be construed as "data describing a consumer's exposure to content delivered from a program delivery source"; (2) "advertising/program data associated with delivery of the program by the program delivery source" should be construed as "data describing advertisements/media content delivered from a program delivery source"; and (3) "purchase data from a purchase data source" should be construed as "data describing the purchase of a particular product at a given time, obtained from a purchase data source, such as a shopping loyalty card, point of sale collection means, or other record of a sale of a product or service."  Joint St. at 2.

[71]    TRA Reply Mem. at 10-11 (quoting *TNS Media Research*, 2011 WL 4425415, at *4).

[72]    *Brassica Prot. Prods. LCC v. Caudill Seed & Warehouse Co., Inc.*, 591 F. Supp. 2d 389, 395 (S.D.N.Y. 2008) (quoting *Joao v. Sleepy Hollow Bank*, 418 F. Supp. 2d 578, 581 (S.D.N.Y. 2006)).

presumed to have different meanings,"[73] and Kantar's proposed construction fails to address the differing language used to describe the source of each type of data.

Kantar argues that TRA's proposed construction of the disputed phrase violates the claim construction canon that "[t]he words of a claim are generally given their ordinary and customary meaning," unless either "a patentee sets out a definition and acts as his own lexicographer," or "the patentee disavows the full scope of a claim term either in the specification or during prosecution."[74] Kantar argues that neither exception applies, and that the disputed phrase must therefore be given its ordinary meaning in all contexts.  However, the Federal Circuit has explained that "the most important indicator" of a term's meaning — as would be understood by a person skilled in the art — is the "usage and context in the claim itself."[75]  The disputed phrase is used four times to describe four different *types* of data.  Each description must be read as an integrated whole to determine what type of data is being described, and each description *begins* by indicating the source of the data.  The clickstream and purchase data descriptions begin "clickstream/purchase data *from a* [program delivery/purchase data] source"

---

[73]     *Helmsderfer*, 527 F.3d at 1382.

[74]     *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

[75]     *Phillips*, 415 F.3d at 1314.

whereas the advertising and programming descriptions begin

"advertising/programming data *associated with* [delivery of the program by/the

program delivered on] the program delivery source."[76]  These phrases inform how

the disputed phrase should be read[77] and TRA's proposed construction makes sense

in that it varies to match the different descriptions of the sources of the data, while

Kantar's does not.[78]  Thus, I find that in the full context of the claim language, one

skilled in the art would ordinarily understand the disputed phrase to have different

---

[76]     '940 Patent col. 46 ll. 37-51 (emphasis added).

[77]     *See Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1088
(Fed. Cir. 2009) (construing the phrase "real-time data" — used to describe several
types of data — in the context of the invention and the surrounding claim
language).

[78]     Kantar argues, that by failing to give a distinct effect to the sub-
phrases "household level data" and "associated with multiple consumer
households," TRA's construction violates the canon that each word or phrase
should have a role to play.  *See Bicon*, 441 F.3d at 950. Yet Kantar's proposed
construction also fails to give a role to each word and phrase — Kantar proposes
that the sub-phrase "household level data" be construed as "data from a single
residential address or other individual consumer location."  Joint St. at 3.  Were
this construction substituted into the claim language, the full text of the description
of clickstream data would read "clickstream data *from a program delivery source
of a consumer*, wherein collecting the clickstream data is not dependent on a
supplemental data collection device, and also wherein the collected clickstream
data includes data *from a single residential address or other individual consumer
location* associated with multiple consumer households."  Thus, Kantar's proposed
construction would insert a second description of the source of the data, making
the claim language redundant.  *See Phillips*, 415 F.3d at 1314.

-27-

meanings in different contexts.[79]

## 2.       The Specification

The specification describes the source of program data as follows:

> Program data supplied to the advertising measurement system
> may originate from cable operators, advertising media firms, and
> other third-party data providers who communicate daily or
> periodic data feeds of scheduled television program data, for
> example.  Such data may identify what was scheduled to air on
> each television channel.[80]

Likewise, advertising data is described in the specification as coming directly from

television networks or the advertisers seeking to make use of the proposed

system.[81]  Another embodiment in the specification describes assessing the

effectiveness of "addressable" commercials — commercials targeted and sent to

the DSTBs of a small subset of households within a market.[82]  While these

embodiments describe a system in which neither program nor advertising data are

collected on the household-level, at least one embodiment describes a household-

---

[79]     Although  phrases are presumed to have a consistent definition each
time they appear, *see Rexnord*, 274 F.3d at 1342, TRA has rebutted the
presumption by demonstrating that the contexts in which the phrases appear are
distinct.

[80]     '940 Patent col. 20 ll. 17-22.

[81]     *See id.* col. 20 ll. 29-42.

[82]     *Id.* col. 9 ll. 48-67.

based device communicating "program viewing data" to the system.[83]

Although a court may not "[import] limitations from the specification into the claim," it is appropriate to "[use] the specification to interpret the meaning of the claim."[84]  TRA's proposed construction of the disputed phrase is:  "data related to advertising/programming tuned to by multiple consumer households."  This construction is sufficiently broad to include all of the embodiments in the specification.  Kantar's proposed construction would construe the claim so as to *exclude* the collection of program and advertising data from third-party providers; the Federal Circuit has stated that claim interpretations that exclude the preferred embodiment described in the specification are "rarely, if ever, correct."[85]

Kantar argues that TRA is attempting to use the specification to give the disputed phrase a different meaning than its ordinary one, and that the specification may only do so if it "clearly set[s] forth" a special definition.[86]  While the specification does not act as "a lexicographer by providing an explicit

---

[83]     *See* '940 Patent col. 7 ll. 1-5 ("[P]rogram viewing data . . . may be communicated from the DSTB to an advertising measurement system configured to receive and process such program data.").

[84]     *Phillips*, 415 F.3d at 1323.

[85]     *Vitronics*, 90 F.3d at 1583.

[86]     *Thorner*, 669 F.3d at 1365.

definition" of the disputed phrase, it both "unambiguously defines" the various types of data and lists the potential sources of program and advertising data.[87] Thus, I find that TRA's proposed construction of the disputed phrase is more consistent with the specification than Kantar's.

### 3.    The Prosecution History

Claim 1 of TRA's original patent application describes the data collection step of the claimed method as follows:

> [R]eceiving at least advertising data, clickstream data, and program data in an advertising measurement system, wherein at least the clickstream data are obtained from a program delivery source located in a household of a consumer, wherein the program delivery source is not dependent on a supplemental data collection device in the household for data collection.[88]

In June 2009, the PTO rejected the claims containing the above language, finding them to have been anticipated by another patent application which described "receiving at least advertising data, clickstream data, and program data in an advertising measurement system."[89]  TRA responded by revising its claim language — structuring the collection step in a manner that separately described

---

[87]     *Renishaw*, 158 F.3d at 1248-49.

[88]     3/7/12 Declaration of Charles Steenburg in Support of Plaintiffs' Opening Claim Construction Statement ("Steenburg Decl."), Ex. B at 78.

[89]     *Id.*, Ex. C at TRA 0000351.

the four different types of data and for the first time adding the phrases "from a," "associated with" and "household level data associated with multiple consumer households."[90]   The result became the '940 patent.

Kantar argues that by clarifying that the claimed method would collect "household level data associated with multiple consumer households," TRA narrowed its claim and added limitations to which it should now be bound.  The Federal Circuit has held that the prosecution history merits "substantial weight" when construing terms which were added by amendment, as the disputed phrase was.[91]   Disregarding such additional language "would render claim examination in the PTO meaningless."[92]

TRA agrees that a proper construction will exclude interpretations disavowed during prosecution.  However, TRA asserts that "the disavowal must be both clear and unmistakable to one of ordinary skill in the art."[93]  Here, the patentee's amendment to the claim deleted 58 words and added 335 words.[94]  TRA

---

[90]      *See* Tr. 67:2-14.

[91]      *Board of Regents*, 533 F.3d at 1369-70.

[92]      *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1576 (Fed. Cir. 1987).

[93]      *Liquidnet*, 2010 WL 199912, at *4.

[94]      *See* TRA Reply Mem. at 5.

argues that these sweeping changes do not demonstrate any clear and unmistakable disavowal — that because the claim language bears little resemblance to the originally submitted claim, the prosecution history sheds little light on the meaning of terms for claim construction purposes.  I agree.  The prosecution history reveals that the PTO found the initial patent application to lack sufficient specificity, and indeed, the approved patent describes the types of data to be collected in far more detail than the denied application, thereby adding limitations to win the PTO's approval.  However, given the extent to which the claim language was rewritten, it is unclear whether the added limitations are those that Kantar suggests.  Because the "from" and "associated with" language was only added in the final and approved claim language,[95] it is plausible that TRA's proposed construction was both sufficiently specific to win the PTO's approval and in accordance with the PTO's understanding of the claim language.  Thus, the prosecution history does not provide clear guidance as to how the disputed phrase should be construed.[96]

### 4.    Extrinsic Evidence

#### a.    The Preliminary Injunction Decision

---

[95]    *See* Tr. 67:2-14.

[96]    *See Phillips*, 415 F.3d at 1317 ("[The prosecution history] often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

Although "[r]elated judicial holdings can be an appropriate form of non-binding extrinsic evidence in a claim construction analysis,"[97] I am now conducting a full claim construction analysis, taking into consideration all of the facts and law presented at the *Markman* hearing and in the claim construction briefing.  As such, I have no need to rely on my earlier decision.

### b.    Expert Testimony of Richard Fenwick

TRA has submitted a declaration from Richard Fenwick, its expert witness, who also testified at the *Markman* hearing.  Fenwick is well-qualified to opine on the technology at issue,[98] and indeed, Kantar cites to statements made by Fenwick to support its assertion that collection of program and advertising data from the DSTBs is theoretically possible.[99]  At the *Markman* hearing, Fenwick testified as follows:

> THE COURT:  [Is it] also possible to get [program data] from the set top box in the home?
>
> [FENWICK]:  It's certainly possible to do that.  It would require a set top box with some intelligence that knows channel 2 is playing *The Simpsons* right now.
>
> THE COURT:  Does that exist?

---

[97]    *MEMS Tech.*, 447 Fed. App'x at 153.

[98]    *See* Fenwick Decl., Ex. A.

[99]    *See* Kantar Reply Mem. at 8.

> [FENWICK]:  I'm not aware of any that exist.
>
> THE COURT:  You're still saying it's not possible to get that data from the set top box today?
>
> [FENWICK]:  I don't know whether anybody is doing that or not. It is certainly possible.  Whether anybody is doing it or not, I do not know. . . .  I am aware of no [application as of yet] — DirecTV, Comcast cable, they don't do it.[100]

Both sides ultimately argue that it is irrelevant whether or not Kantar's proposed construction describes a device that is theoretically possible.[101]  The Federal Circuit has repeatedly held that it is impermissible to redraft claims during litigation even where the literal scope of those claims makes them inoperable in practice.[102]

Kantar argues that it would be improper for this Court to consider Fenwick's opinions on the appropriate construction of the disputed phrase because: (1) the intrinsic evidence is so clear that extrinsic evidence such as expert testimony need not be considered;[103] and (2) Fenwick's declaration and testimony

---

[100]    Tr. at 64:4-23.

[101]    *See* Kantar Reply Mem. 11-13; TRA Reply Mem. at 15-16.

[102]    *See Chef Am. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373-74 (Fed. Cir. 2004) (holding that claim language that required heating "dough to a temperature in the range of about 400° F. to 850° F." meant exactly what the ordinary meaning suggested even though all agreed that heating dough itself — rather than the oven — to that temperature would burn the dough to a crisp and leave it as inedible as a "charcoal briquet").

[103]    *See Phillips*, 415 F.3d at 1317-18 ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in

-34-

are not helpful to the Court because they merely set forth his opinions on how the

claim terms should be construed.[104]  Because I agree with both arguments, I did not

consider Fenwick's opinion regarding the appropriate construction of "household

level data associated with multiple consumer households."

### 5.    Claim Construction

With regards to program and advertising data, I adopt TRA's

proposed construction of "advertising/programming tuned to by multiple consumer

households."  This construction is the correct one because, as set forth above: (1) it

is the most consistent with the claim language; (2) it is supported by the

specification; and (3) the prosecution history is ambiguous.[105]

### B.    "Household Level Data"

Whereas Kantar requests that this Court construe the sub-phrase

"household level data," TRA argues that the claim language should not be parsed

----

determining how to read claim terms.").

[104]    *See Symantec*, 522 F.3d at 1291 (clarifying that it is unhelpful to a
court if an expert "simply recites how [he or she] would construe [a disputed term]
based on his own reading of the specification").

[105]    Because I find the intrinsic evidence as to the appropriate construction
of this phrase to be sufficiently clear, I need not consider the extrinsic evidence.

out into sub-phrases.[106]  Because my construction of the longer phrase has already resolved all relevant questions as to the meaning of the claim words, I decline to construe the sub-phrase.

### C.   "Cleansing and Editing Algorithm"

Under the claimed method, once the various types of data are collected, stored, and matched, at least one "cleansing and editing algorithm" is applied to the matched and stored data.[107]  Following the "cleansing and editing" of the data, at least one "true target index metric based on the matched and stored data" is calculated.[108]  Thus, the purpose of these algorithms is to prepare the data for the calculation step.  The parties' dispute centers on whether the word "utility" has any place in a proper description of what a "cleansing and editing algorithm"

---

[106]   *See Liquidnet*, 2010 WL 199912, at *13 (declining to construe sub-phrases when the construction of the larger phrases had already resolved all relevant questions as to the meaning of the claim words).

[107]   During the preliminary injunction phase, TRA argued that "applying at least one cleansing and editing algorithm to the matched and stored data" did not impose a sequential limitation regarding when the data must be matched and stored.  *See* Reply Memorandum in Support of Preliminary Injunction Against Plaintiff/Counterclaim-Defendant TNS Media Research, LLC d/b/a Kantar Media Audiences, at 7-8.  I rejected that argument, explaining that TRA's suggestion "did violence to the ordinary grammatical understanding of the past tense." *TNS Media Research*, 2011 WL 4425415, at *5.

[108]   '940 Patent col. 48 ll. 8-9.

does.  In its original claim construction brief, Kantar proposed that the phrase be

construed as "an algorithm to remove inconsistencies in, correct, or otherwise

improve the reliability of data *from a program delivery source*."  At TRA's

request, Kantar dropped the "from a program delivery source" requirement "to

promote judicial economy and narrow the claim construction issues in dispute."[109]

### 1.    Claim Language

Kantar argues that the word "utility" is so broad that TRA's proposed

construction encompasses "virtually anything."[110]  Kantar defines utility as "the

condition or quality of being useful,"[111] and argues that because anyone who

applies an algorithm to data "plainly" does so to make the data more useful, TRA's

proposed construction makes the phrase "cleansing and editing" superfluous.[112]

Kantar further argues that TRA's construction is so broad that it would include the

generation of reports and the calculation of metrics,[113] and that such a construction

---

[109]    Kantar Mem. at 20 n.38.

[110]    *Id.* at 24.

[111]    The American Heritage Dictionary, Second College Edition, Steenburg Decl., Ex. K.

[112]    Kantar Mem. at 21.

[113]    In his deposition, Fenwick — TRA's expert — explicitly agreed with Kantar's assertion that TRA's proposed construction of "applying [a] cleansing and editing algorithm" could include the creation of a true target index and return

cannot be correct because the generation of reports and the calculation of metrics is described as a separate and distinct step in the claimed method.

TRA responds that "utility" is not an overly broad word and that it can be defined as "actionability for the user's intended purposes,"[114] with the user's intended purpose being defined by the rest of the claim. Even were "cleansing and editing" given a broad definition, "[t]he patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."[115] TRA also argues that Kantar's proposed construction improperly limits the claim to covering only those algorithms which improve the "reliability" of data — and that the word "reliability" (or "reliable) is found nowhere in the specification.[116]

---

on investment reports. *See* Steenburg Decl., Ex. J at 36-39. Fenwick testified similarly at the *Markman* hearing. *See* Tr. 91:14-16 ("I believe that part of generating various reports can utilize editing algorithms as well as cleansing algorithms.").

[114]    TRA Reply Mem.. at 18.

[115]    *Thorner*, 669 F.3d at 1367.

[116]    TRA Reply Mem. at 17. Even though the word "reliable" does not appear in the specification, the parties agreed that a portion of the definition *should* reference reliability based on the intrinsic evidence. *See* Fenwick Decl. at ¶¶ 38-44. TRA's argument is that while "reliability" does have a proper place in the definition of a "cleansing and editing algorithm," the phrase should be construed to cover algorithms which improve both the reliability *and the utility* of data.

## 2.    Specification

The specification refers to "algorithms" as "formulas and calculations."[117]  According to both proposed constructions, the following algorithms which are described in the specification can properly be considered "cleansing and editing" algorithms:

- An algorithm that corrects for the "false positive" problem of data collected from a set-top box that remains on even though the associated television has been turned off.[118]

- An algorithm that determines whether to exclude a particular household's data entirely because it is "insufficiently complete" — due to, for example, cable malfunctions.[119]

- An algorithm that ensures that a household containing multiple DSTBs is not counted more than once.[120]

The distinction between the parties' proposed construction is that TRA's proposed

---

[117]    TRA Mem. at 11 (citing '940 Patent col. 4 ll. 51-56, col. 27 ll. 44-45, col. 28 ll. 23-29, col. 38 ll.1-3).

[118]    '940 Patent col. 5 ll. 43-46.

[119]    *Id.* col. 5 ll. 46-49.

[120]    *See id.* col. 14 ll. 43-47.

construction would also include an algorithm described in the specification as "geographic and demographic weighing."  Such a weighting algorithm would not improve the reliability of the data, but it would improve the data's utility.

### 3.    Prosecution History

The claim language in TRA's original application referred only to "calculating at least one metric based on the cross-correlated data" — it did not include the step of applying algorithms to the data (nor did it mention the word "algorithm" at all).[121]  This was rejected by the PTO as anticipated by prior art.[122] TRA amended the claim to require applying an "algorithm" to "facilitate" the calculation of the metric.[123]  This, too, was rejected by the PTO, which then discussed with TRA possible amendments to "specify the applied algorithm and the calculated metric."[124]  The "cleansing and editing" language was added in TRA's subsequent revision and incorporated into the approved patent.

### 4.    Claim Construction

A person of ordinary skill in the art would not apply an algorithm to

---

[121]    Steenburg Decl., Ex. B.

[122]    *See id.*, Ex. C.

[123]    *Id.*, Ex. D.

[124]    *Id.*, Ex. E at 2.

data unless doing so served a purpose.  Thus, the ordinary meaning of an "algorithm" implies something that it is used to improve the utility of data.  The words "cleansing and editing" must be understood as words of limitation, which limit the patent to algorithms which improve the data's utility *in specific ways*.  Kantar's proposed construction captures this by including only algorithms that improve the reliability of data.  In contrast, TRA's proposed construction does not give any independent meaning to the words "cleansing and editing."  Moreover, by proposing a construction so broad as to include the calculation of metrics, TRA ignores the context of the full claim, which sets out calculation as a distinct and separate step.

TRA's proposed construction would also render meaningless the amendments TRA added after the PTO rejected the original versions of the claim language.  In making its amendments and incorporating the "cleansing and editing" language, TRA gave notice that only the application of "cleansing and editing" algorithms were covered by its patent.  TRA should not now be permitted to adopt a construction that undoes this prosecution history.  Thus, I adopt Kantar's proposed construction of "cleansing and editing algorithm" as "an algorithm to remove inconsistencies in, correct, or otherwise improve the reliability of data collected from a program delivery source."

## V.    ADDENDUM

In my preliminary injunction ruling, based on some ambiguous wording in a declaration, I incorrectly implied that Kantar's DirectView was prior art.[125]  At the *Markman* hearing, TRA asserted that this was in error, as the patent application predated DirectView, which launched in 2009.[126]  Kantar concedes that this was "an inaccuracy."[127]  Although I am not revisiting my preliminary injunction ruling, I now clarify for the record that Kantar's DirectView was not prior art.

## VI.    CONCLUSION

For the aforementioned reasons I construe the disputed terms within claim one as follows:

When used with regard to clickstream and purchase data, "household level data associated with multiple consumer households" means "data about a

---

[125]    *See* 2011 WL 4425415, at *5 (citing 8/2/11 Declaration of George Shabab, President of Kantar, in Opposition to TRA's Motion for Preliminary Injunction [Docket No. 35] ¶ 22).

[126]    *See* Tr. at 95:20-97:7.

[127]    *See* 8/27/12 Letter from Michael A. Albert, counsel for Kantar, to the Court, at 1.  Kantar argues that the statement "one of Kantar's own products taught [a specific prior art]," 2011 WL 4425415, at *5, was accurate and that only its citation was in error.  As I am not revisiting my prior ruling, I see no reason to consider whether a different Kantar product taught the relevant prior art.

household that can be later aggregated into a data set including multiple consumer households."

When used with regard to advertising and program data, "household level data associated with multiple consumer households" means "data related to advertising/programming tuned to by multiple consumer households."

"Cleansing and editing algorithm" means "an algorithm to remove inconsistencies in, correct, or otherwise improve the reliability of data collected from a program delivery source."

A status conference is scheduled for September 19, 2012 at 3:00 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 29, 2012
            New York, New York

-43-

**- Appearances -**

**For Plaintiffs/Counterclaim-Defendants:**

Marc Joseph Rachman, Esq.
Christopher Andrew Keisner, Esq.
Davis & Gilbert, LLP
1740 Broadway
New York, NY 10019
(212) 468-4800

Charles Thomas Steenburg, Esq.
John L. Strand, Esq.
Michael A. Albert, Esq.
Robert M. Abrahamsen, Esq.
Wolf, Greenfield, & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8265

**For Defendant/Counterclaim-Plaintiff:**

Shireen Anneke Barday, Esq.
John Paul Del Monaco, Esq.
Jay Philip Lefkowitz, Esq.
Kirkland & Ellis LLP
601 Lexington Ave
New York, NY 10022
(212) 446-4800

Richard P. Doyle, Esq.
Jaime B. Herren, Esq.
Janssen Doyle LLP
140 Brookwood Road
Suite 102
Orinda, CA 94653
(925) 295-1805

Matthew Russell Maron, Esq.
Tannenbaum Helpern Syracuse & Hirschtritt LLP
900 Third Avenue
New York, NY 10022
(212) 508-6700