**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES) and
CAVENDISH SQUARE HOLDING, B.V.,

         Plaintiffs,

    - against -

TRA GLOBAL, INC. (d/b/a TRA, Inc.),

        Defendant.

--------------------------------------------------------X

TRA GLOBAL, INC. (d/b/a TRA, Inc.),

        Counterclaim-Plaintiff,

    - against -

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES);
CAVENDISH SQUARE HOLDING, B.V.;
WPP PLC; WPP GROUP USA, INC.;
KANTAR GROUP LTD.; and KANTAR
RETAIL AMERICA, INC.,

        Counterclaim-Defendants.

---------------------------------------------------------

SHIRA A. SCHEINDLIN, U.S.D.J.:



**OPINION AND ORDER**

**11 Civ. 4039 (SAS)**

# I.    INTRODUCTION

This is a dispute over intellectual property pertaining to marketing and advertising analytics.  Plaintiffs TNS Media Research, LLC (d/b/a Kantar Media Audiences) ("Kantar Media")—a market research company—and Cavendish Square Holding B.V. ("Cavendish")—Kantar Media's affiliate—commenced this action on June 14, 2011 against defendant TRA Global, Inc. ("TRA").  Kantar Media seeks a declaration that it has not infringed United States Patent No. 7,729,940 (the "'940 Patent"), of which TRA is the sole assignee.  Cavendish alleged in the complaint that TRA breached a contract entitling Cavendish to place a member on TRA's board, but subsequently dropped this claim.

Kantar Media and Cavendish are indirect subsidiaries of WPP PLC, the United Kingdom-based parent company of the largest advertising agency group in the world by revenue.  WPP PLC (hereafter, "WPP Parent") also maintains WPP Group USA, Inc. ("WPP USA"), Kantar Group Ltd. ("Kantar Group"), and Kantar Retail America, Inc. ("Kantar Retail") (collectively with WPP PLC, Kantar Media and Cavendish, the "WPP Companies") as subsidiaries.

TRA asserts the following six counterclaims against Counterclaim-Defendants the WPP Companies (singly or in combination): (1) patent infringement of the '940 Patent (against Kantar Media); (2) patent infringement of

United States Patent No. 8,000,993 (the "'993 Patent") (against Kantar Media and Kantar Retail); (3) patent infringement of United States Patent No. 8,112,301 (the "'301 Patent") (against Kantar Media and Kantar Retail); (4) aiding and abetting breach of fiduciary duty (against Kantar Media, Cavendish, WPP Parent, WPP USA, and Kantar Group); (5) misappropriation of trade secrets (against the WPP Companies); and (6) breach of contract (against Kantar Retail, Kantar Media, and WPP USA).

Discovery is complete.  Presently before the Court is the WPP Companies' motion for summary judgment.  The WPP Companies argue that TRA cannot satisfy its burden of proving: (1) cognizable trade secrets or the misappropriation thereof; (2) non-patent damages; or (3) infringement of any of the patent claims it asserts.[1]  The WPP Companies further argue that the patents alleged by TRA are invalid, on various grounds.

The WPP Companies allege that this motion would "dispose of the case as a whole" if granted.[2]  Because TRA has potentially viable theories of damages for its non-patent claims that are not addressed in the WPP Companies' motion, this is in fact only a partial motion for summary judgment.

---

[1]     Counterclaim-Defendants' Memorandum in Support of Their Motion for Summary Judgment ("WPP Mem.") at 1.

[2]     *See id.*

For the following reasons, the motion is granted as to non-infringement, trade secrets, and non-patent damages, and moot as to invalidity.

## II.   BACKGROUND[3]

### A.   Overview

TRA—a nested acronym[4] meaning "True ROI for Media"[5]—was founded in 2007 with the goal of using modern data-mining techniques to determine the cost-effectiveness of advertisements.[6]  It soon embarked upon an enviable growth trajectory.  After its first financing round in August 2007, its post-money valuation was roughly ten million dollars; after its second round in May 2009, roughly twenty-seven million dollars; and after its third round in May 2010,

---

[3]      The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the affidavits submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.

[4]      A nested acronym is an acronym that contains another acronym; in this case, TRA contains the acronym "ROI," which means "return on investment."

[5]      2/23/09 Press Release Announcing TRA's Partnership with Kognitio (a hardware neutral data warehousing firm), Ex. E to Declaration of Eric Rutt (counsel for the WPP Companies) in Support of Counterclaim-Defendants' Motion for Summary Judgment ("Rutt Decl."), at SPENCE_006020.

[6]      *See* Answer, Defenses, and Supplemental and Amended Counterclaims for Patent Infringement, Aiding and Abetting Breach of Fiduciary Duty, Misappropriation of Trade Secrets, and Breach of Contract ("Ans.") ¶ 22.

roughly fifty-four million dollars.[7]

The WPP Companies—through their investment arm, Cavendish—got in on the ground floor, investing a substantial sum in each of TRA's first three financing rounds.[8]  The companies even engaged in merger talks—about which more below—but these negotiations fell through shortly after the WPP Companies spent over a billion dollars acquiring Kantar Media, a competing market analytics provider.  Subsequently TRA's value dropped precipitously, and it was purchased by TiVo for approximately $20 million in July 2012.[9]

Before delving into the summary judgment record in greater detail, it is helpful to sketch out the contrasting versions of events urged by the parties. TRA alleges that the WPP Companies engaged in merger negotiations solely for the purpose of learning its trade secrets and copying its now-patented technologies; that the WPP Companies used this knowledge to release a competing product; and

---

[7]     *See* Counterclaim-Plaintiff's Response to L.R. 56.1 Statement of Material Facts and Statement of Additional Material Facts ("TRA 56.1") ¶ 71 (citing TRA Schedule 3.2(c) (table listing initial equity of TRA's founders, as well as shares issued and valued received during TRA's three financing rounds), Ex. 15-10 to Declaration of Trevor V. Stockinger (counsel for TRA) in Support of TRA's Opposition to Counterclaim-Defendants' Motion for Summary Judgment ("Stockinger Decl.")).

[8]     *See id*.

[9]     *See id*. ¶ 73.

that these actions froze the market, causing its value to take a nosedive.  The WPP Companies counter that the merger negotiations failed because TRA had nothing of value to offer; that it developed its products independently over a period of years; and that TRA's value declined because overeager initial investors eventually began to question TRA's lack of sales.

TRA alleges the infringement of fifteen patent claims, five alleged trade secrets, and the non-patent claims identified above.  *First*, I lay out the evidence pertaining to the patent claims; *second*, to trade secrets; and *finally*, to non-patent damages.

### B.    The Patent Claims Asserted by TRA

#### 1.    The '940 Patent

##### a.    Claim Asserted

The '940 Patent—titled "Analyzing Return on Investment of Advertising Campaigns by Matching Multiple Data Sources"—issued on June 1, 2010 with TRA designated as the sole assignee.[10]  As the title suggests, the claimed invention relates to a method for correlating the ads that consumers view with their purchasing behavior.  Claim 71 is illustrative of the invention, and is the only claim of the '940 Patent asserted by TRA.  It is set forth in full below.

---

[10]    *See* '940 Patent, Ex. S to Rutt Decl.

A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

collecting in an advertising measurement system:

(i)  clickstream data [a recording of the user's input into a media device, such as a computer or television set-top box] from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

(ii)  advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)  program data associated with the program delivered on the program delivery source, wherein collecting the program data is not dependent on a supplemental data collection device, and also wherein the collected program data includes household level data associated with multiple consumer households;

      (iv)    purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with a centrally located electronic computer processor configured for centrally processing data received from the program delivery source, the advertising data source, the program data source, and the purchase data source, wherein the matching further includes:

      (i)    grouping the collected data in association with an account identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

      (ii)    matching each account identifier associated with each consumer household with other account identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

storing the matched advertising data, clickstream data, purchase data, and program data in at least one centrally located electronic data storage medium operatively associated with the computer processor;

-8-

applying at least one cleansing and editing algorithm to the matched and stored data; and,

calculating at least one true target index metric based on the matched and stored data.[11]

In sum, the '940 patent teaches a method for: (1) using a computer to collect data about (i) commands that viewers input into, *e.g.*, a television; (ii) the advertisements that they view; (iii) the programs they watch; and (iv) the products they go on to purchase; (2) grouping these data with a unique identifier that does not personally identify the viewer/purchaser, and transmitting it to a central database; (3) storing this grouped, 'blinded' data in the centrally located database; (4) cleansing and editing the data (*e.g.*, deleting information that is irrelevant to the advertiser using the invention, or repeated); and (5) using the data to generate granular statistical inferences about the cost-effectiveness of advertisements. For example, TiVo might collect data about the programs and advertisements its users watch, while Walgreens collected their purchasing information from customer loyalty cards; the companies might then group this data together and transmit it—without any personally identifying information—to TRA, which could use it to advise Proctor & Gamble whether to run ads for Tide Detergent during America's Got Talent.

---

[11]     '940 Patent at cols. 46:33-48:8.

### b.       Claim Construction Proceedings

A *Markman* hearing was held on July 6, 2012, and I subsequently

issued an Order construing the two phrases in dispute as follows.[12]

| Disputed Phrase | Construction |
|---|---|
| "household level data associated with multiple consumer households" | "data about a household that can be later aggregated into a data set including multiple consumer households" |
| "cleansing and editing algorithm" | "an algorithm to remove inconsistencies in, correct, or otherwise improve the reliability of data collected from a program delivery source" |

The  parties stipulated to the following claim term constructions,

which were entered as an Order.[13]

| Term | Stipulated Construction |
|---|---|
| "clickstream data from a program delivery source of a consumer" | "data describing a consumer's exposure to content delivered from a program delivery source" |
| "advertising data associated with deliver of the program by the program delivery source" | "data describing advertisements delivered from a program delivery source" |

---

[12]       *See TNS Media Research, LLC v. TRA Global, Inc.* ("*Markman* Op."), No. 11 Civ. 4039, 2012 WL 3756325, at *14 (S.D.N.Y. Aug. 29, 2012).

[13]       *See* 4/9/12 Stipulation and Order, Doc. No. 65.

| Term | Stipulated Construction |
| --- | --- |
| "program data associated with the program delivered on the program delivery source" | "data describing media content delivered from a program delivery source" |
| "purchase data from a purchase data source" | "data describing the purchase of a particular product at a given time, obtained from a purchase data source, such as a shopping loyalty card, point of sale collection means, or other record of a sale of a product or service" |
| "supplemental data collection device" | "a piece of hardware that is separate from the program delivery source or purchase data source and is used for the exclusive purpose of recording data that facilitates analysis of consumer behavior" |
| "return on investment metric" | "a measurement of the benefit that a particular past investment (*e.g.*, an advertisement) has produced in terms of changed purchasing behavior" |
| "true target index report" | "a report that allows users to compare different media environments (*e.g.*, particular programs, networks, or dayparts) based on the likelihood that consumers who meet a particular profile will be exposed to such media" |
| "demographics weighting algorithm" | "a process to account for differences between the composition of the sample from which data is drawn and the composition of the larger population that one wants to study" |

### 2.    The '993 Patent

The '993 Patent—titled "Using Consumer Purchase Behavior for Television Targeting"—issued on August 16, 2011, and lists TRA as the sole assignee.[14]  TRA asserts that Kantar Media and Kantar Retail have infringed claims 1, 2, 3, 7, 8, and 9.  These claims are quoted in full below.

[Claim 1]:

A computer-implemented system for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the system comprising:

an advertising measurement system including at least one electronic computer processor configured for:

[(i)]    collecting clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

(ii)    collecting advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)    collecting programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a

---

[14]    *See* '993 Patent, Ex. T to Rutt Decl.

supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households;

(iv)    collecting purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households; and

(v)    matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected programming data at a household data level;

wherein the collected data include a first identifier associated with the household assigned to the program delivery source;

a module configured to use a thesaurus for:

(i)    producing data from the collected data without personally identifiable information, and

(ii)    indexing the produced data with a second identifier, wherein the thesaurus relates each first identifier of each household to the second identifier;

at least one electronic data storage medium operatively associated with the computer processor, the data storage medium configured for storing the matched advertising data, clickstream data, purchase data, and programming data;

a module programmed for applying at least one cleansing and editing algorithm to the matched data or the stored data; and

a module programmed for calculating at least one return on investment metric or true target index metric based on the

matched or stored data.[15]

**[Claim 2]**

The system of claim 1, further comprising:

> a list matcher configured to:
>
> > receive data communicated in parallel from the one or more data sources, the communicated data comprising at least personally identifiable information associated with the household and the first identifier associated with the household assigned by the data source;
> >
> > generate the thesaurus relating each first identifier associated with the household to the second identifier; and
> >
> > send the thesaurus to the module configured to use the thesaurus.[16]

**[Claim 3]**

The system of claim 1, wherein the thesaurus is configured for relating an account number identifier to at least one other account number identifier associated with the same household across multiple data sources.[17]

**[Claim 7]**

A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

---

[15]   *Id*. at cols. 42:16–43:3.

[16]   *Id*. at col. 43:4-15.

[17]   *Id*. at col. 43:16-19.

-14-

collecting in an advertising measurement system:

(i)     clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

(ii)     advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)     programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households; and,

(iv)     purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected programming data in the advertising measurement system at a household data level with at least one electronic computer processor configured for

processing data received from the program delivery source, the advertising data source, the programming data source, and the purchase data source, wherein the matching further includes:

[(i)]    receiving data including a first identifier associated with the household assigned by the data source, and

(ii)    electronically using a thesaurus for: producing data without personally identifiable information, and indexing the produced data by a second identifier, wherein the thesaurus relates each first identifier of the household to the second identifier; storing the matched advertising data, clickstream data, purchase data, and programming data in at least one electronic data storage medium operatively associated with the computer processor; applying at least one cleansing and editing algorithm to the matched data or the stored data; and, calculating at least one return on investment metric or true target index metric based on the matched or stored data.[18]

**[Claim 8]**

The method of claim 7, further comprising:

receiving data communicated in parallel from the one or more data sources, the communicated data comprising at least personally identifiable information associated with the household and the first identifier associated with the household assigned by the data source; and,

generating the thesaurus for relating each first identifier associated with the household to the second identifier.[19]

---

[18]    *Id*. at cols. 43:28-44:14.

[19]    *Id*. at col. 44:15-22.

**[Claim 9]**

The method of claim 7, further comprising using the thesaurus for relating an account number identifier to at least one other account number identifier associated with the same household across multiple data sources.[20]

### 3.    The '301 Patent

The '301 Patent—titled "Using Consumer Purchase Behavior for Television Targeting"—issued on February 7, 2012, and lists TRA as the sole assignee.[21]   TRA asserts that Kantar Media and Kantar Research have infringed claims 1, 23, 42, 47, 49, 63, 108, and 109, which are set forth in full below.

**[Claim 1]**

A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

collecting in an advertising measurement system:

> (i)    clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household data;

---

[20]    *Id*. at col. 44:23-26.

[21]    *See* '301 Patent, Ex. U to Rutt Decl.

(ii)    advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)    programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households; and,

(iv)    purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household data;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with at least one electronic computer processor configured for processing data received from the program delivery source, the advertising data source, the programming data source, and the purchase data source, wherein the matching further includes:

(i)    grouping the collected data in association with an identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

     (ii)    matching each identifier associated with each consumer household with other identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

storing the matched advertising data, clickstream data, purchase data, and programming data in at least one electronic data storage medium operatively associated with the computer processor;

applying at least one cleansing algorithm or editing algorithm to the collected data, the matched data or the stored data; and,

calculating at least one return on investment metric or true target index metric based on the collected data, the matched data or the stored data.[22]

**[Claim 23]**

The method of claim 1, further comprising receiving clickstream data derived from a program delivery source comprising a television set-top box operatively associated with a television distribution system.[23]

**[Claim 42]**

The method of claim 1, further comprising using at least a portion of the matched data to drive at least one addressable commercial to the household.[24]

---

[22]    *Id*. at cols. 51:23-52:11.

[23]    *Id*. at col. 53:9-12.

[24]    *Id*. at col. 54:28-30.

**[Claim 47]**

The method of claim 1, wherein the purchase data are associated with product purchase records of a discount card associated with the consumer.[25]

**[Claim 49]**

The method of claim 1, further comprising generating a true target index report in the advertising measurement system.[26]

**[Claim 63]**

A system for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the system comprising:

an advertising measurement system including an electronic computer programmed for:

    (i)    collecting clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household data;

    (ii)    collecting advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

---

[25]    *Id.* at col. 54:47-49.

[26]    *Id.* at col. 54:53-55.

(iii)    collecting programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households; and,

(iv)    collecting purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household data;

(v)    matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with at least one electronic computer processor configured for processing data received from the program delivery source, the advertising data source, the programming data source, and the purchase data source, wherein the matching further includes:

(i)    grouping the collected data in association with an identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

(ii)    matching each identifier associated with each consumer household with other identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

at least one data storage medium operatively associated with the computer processor, the data storage medium configured for storing the matched advertising data, clickstream data, purchase data, and programming data;

a module programmed for applying at least one cleansing algorithm or editing algorithm to the collected data, the matched data or the stored data; and,

a module programmed for calculating at least one return on investment metric or true target index metric based on the collected data, the matched data or the stored data.[27]

### 4.    Overview of Patent Claims

As set forth by Charles F. Thomas, the WPP Companies' technical expert, all of the patents in suit require five basic steps:

(1)    "collecting" four different types of household-level data (*i.e.*, "clickstream data," "advertising data," "program" (or "programming") data, and "purchase data") without relying on "supplemental data collection devices;"

(2)    "matching at least portions of the [data] at a household data level" by means of a blind-matching technique, in which:

   (A)    the collected data is grouped together by means of an account identifier without processing any personally identifiable information and

   (B)    different account identifiers corresponding to a single household are associated together, also without processing any personally identifiable information;

---

[27]    *Id*. at cols. 55:28-56:18.

(3)     "storing" the matched data;

(4)     "applying" at least one "cleansing and editing algorithm" (or a "cleansing algorithm" or an "editing algorithm" in the case of the '301 Patent) to the data; and,

(5)     "calculating" at least one metric (with a "true target index metric" always one of the possible options) based on the data.[28]

## 5.     Evidence Pertaining to Infringement

TRA alleges that five products—falling into one of two product categories—infringe its patents: (1) the Auto Products (comprising RapidView Auto and Charter with Auto); and (2) the Consumer Packaged Goods ("CPG") Products (comprising RapidView Retail, RapidView for Retail, and Charter with CPG).[29]  The Auto Products match information about motor vehicle registrations maintained by J.D. Power & Associates with television viewing data, while the CPG Products match television viewing data to data gleaned from supermarket loyalty cards.[30]

---

[28]     6/4/13 Declaration of Charles J. Thomas in Support of Counterclaim-Defendants' Motion for Summary Judgment ("Thomas Decl.") ¶ 26.

[29]     *See* Counterclaim-Defendants' L.R. 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("WPP 56.1") ¶¶ 28-29 (citing 6/4/13 Declaration of George Shababb (president of Kantar Media) in Support of Counterclaim-Defendants' Motions for Summary Judgment ("Shabbab Decl.") ¶¶ 2, 17, 21).

[30]     *See id.*

In support of their motion for summary judgment of non-infringement, the WPP Companies allege that:

> (1)   the CPG Products do not collect "purchase data," as all fifteen claims require;

> (2)   the Auto Products do not perform double-blind matching of data, as all fifteen claims require;

> (3)   none of the Accused Products apply a "cleansing and editing algorithm to the matched and stored data," as [] claim 71 [of the '940 Patent] requires;

> (4)   none of the Accused Products use matched data to drive an addressable commercial, as [claim 42] of the '301 [Patent] . . . requires; and

> (5)   TRA has waived any argument under the doctrine of equivalents.[31]

Because I conclude that summary judgment is warranted based on arguments (1), (2), and (5), only the evidence supporting these arguments is summarized below.

---

[31]   WPP Mem. at 19.

### a.    Evidence Pertaining to Whether the CPG Products Collect "Purchase Data"

All of the asserted claims contain the limitation "[collect] purchase data from a purchase data source" (the "Purchase Data Limitation").  The stipulated construction of this limitation is "data describing the purchase of a particular product at a given time, obtained from a purchase data source, such as a shopping loyalty card, point of sale collection means, or other record of a sale of a product or service."

Based on the declaration of Kantar Media's president—George Shabbab—the WPP Companies allege that the CPG Products do not practice this limitation, because they collect information only about user types—*e.g.*, whether a user is a heavy, medium, or light user of a product or product category—but not information about *when* a particular purchase is made.[32]  Specifically, Shabbab declares that although the CPG Products receive purchase information from consumer surveys and use it to place consumers into "user types"—*e.g.*, "Yogurt Category – Heavy," "Yogurt Category – Medium" and "Yogurt Category – Light"—these user types (and the information from which they are generated)

---

[32]    *See* WPP 56.1 ¶¶ 30-31 (citing Shabbab Decl. ¶ 17).

"convey[] nothing about the given time when any actual purchase(s) occurred."[33] In sum, the WPP Companies acknowledge that the CPG Products utilize information from "purchase data source[s]," but argue that they do not receive or utilize "data describing the purchase of a particular product at *a given time*. . . ."

In opposition to the WPP Companies' argument that the CPG Products do not practice the Purchase Data Limitation, TRA alleges that: (1) multiple Kantar witnesses have admitted that the CPG Products collect "purchase data," and the WPP Companies have admitted the same in Court filings; (2) the CPG Products utilize data from customer loyalty cards; (3) the CPG Products utilize survey information collected over "a given time," even if they do not utilize the precise time of a particular sale; and (4) the CPG Products practice collecting "purchase data" as taught by the patents in suit.[34]  The evidence submitted by TRA in support of these allegations is summarized below.

*First*, TRA presents the testimony of various Kantar witnesses who

---

[33]     Shabbab Decl. ¶ 17 (citing Yogurt-data format.xls (a spreadsheet showing the consumer purchase information inputted into the CPG Products), Ex. E to Rutt Decl.).

[34]     *See* Counterclaim-Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Opp. Mem") at 20-25.  TRA also argues that the CPG Products infringe its patents under the doctrine of equivalents.  *See id*. at 25-26. The record related to this argument is discussed below.

have testified that the CPG Products use "purchase data."[35]  However, none of

these witnesses state that this purchase data includes "data describing the purchase

of a particular product at a given time," as the stipulated construction requires;

instead, these witnesses all acknowledge that the CPG Products utilize 'purchase

data' in the ordinary sense of 'data about purchases,' a proposition that is not in

dispute.  Likewise, TRA's citation to Kantar's brief in opposition to TRA's motion

for a preliminary injunction is not relevant to the Purchase Data Limitation at this

juncture, because this brief makes no mention of purchase data "at a given time."[36]

　　　　　*Second*, the evidence presented by TRA that the CPG Products utilize

---

[35]　　*See* TRA 56.1 ¶ 31 (citing 5/17/12 Deposition of Kathryn Casavant (Managing Director of Kantar Retail), Ex. 15-4 to Stockinger Decl., at 249:8-11 (affirming that "RapidView for Retail [one of the CPG Products] [] utilize[s] purchase data that comes from Kantar Retail"); 8/2/11 Declaration of George Shababb in Support of Plaintiffs' Opposition to Defendants' Motion for a Preliminary Injunction ("Shabbab Inj. Decl."), Doc. No. 35, ¶ 37 ("This is exactly how [RapidView Retail] works as well.  Based on the cross reference provided by Experian, anonymous household-level clickstream data (received from DirecTV) is matched with anonymous household-level *purchase data* (received from Kantar Retail).") (emphasis added); 10/16/12 Deposition of Andrew J. Brown (market research director at Kantar Media), Ex. 2-1 to Stockinger Decl., at 43:5-20 (acknowledging that the CPG Products "collect[] purchasing information" from Kantar Retail)).

[36]　　*See* Plaintiffs' Opposition to Defendant's Motion for a Preliminary Injunction, Doc. No. 31, at 2 (arguing, among other things, that TRA's patents are obvious, and alleging that the CPG Products "incorporate[] a simple 'blind matching' technique that is a staple of market research, allowing [Kantar Media] to match viewer data and purchase data. . . .").

data from customer loyalty cards is inapposite, as these cards are used in the stipulated construction as an example of a "purchase data *source*," not as purchase data themselves.[37]  Wine may flow from a bottle, but not everything from a bottle is wine.  Similarly, the undisputed fact that the CPG Products utilize data from customer loyalty cards, a "purchase data source," does not imply that the CPG Products utilize purchase data within the meaning of the stipulated construction.

TRA's *third* contention—that the consumer survey data utilized by the CPG Products must be collected over a "given time"—is more to the point.  In support of this contention, TRA offers the declaration of its expert Carl F. Mela, Ph.D., who opines that:

> "[A]t a given time" is not meant to refer necessarily to the purchase of a particular product at a particular moment in time, but can refer to a period of time, such as a month, during which purchase events may occur.  Kantar notably submits no expert opinions in support of its theory, and Dr. Madansky [the WPP Companies' Expert] voices agreement with my position on this point.  The patents also support this position, for they define purchase data broadly to include data of various timeframes and aggregations.[38]

---

[37]     *See* TRA 56.1 ¶ 31 (citations omitted).

[38]     Declaration of Carl F. Mela, Ph.D. (TRA's trade secrets, infringement, and validity expert) in Support of Counterclaim-Plaintiff's Memorandum in Support of Its Opposition to the Motion for Summary Judgment ("Mela Decl.") ¶ 14 (citing '940 Patent at cols. 17-18; 3/6/13 Deposition of Michelle Madansky, Ph.D.(the WPP Companies' patent expert), Ex. 7 to Stockinger Decl., at 100-101, 204 (acknowledging that purchase data is most useful for market research when

TRA's *final* contention is that "the CPG products collect data that include information on when a particular product or product category was purchased. . . ."[39]  The basis for this assertion is Mela's opinion that "[t]o determine whether households are 'heavy,' 'medium,' or 'light' purchasers of a product, it is necessary to define a period of time over which purchases are made."[40]  In short, based on Mela's declaration, TRA asserts that the CPG Products necessarily collect "data describing the purchase of a particular product at a given time" in classifying households as heavy, medium, or light purchasers of a product, because these terms are meaningless without reference to a period of time, even if that period of time is not reflected in the data used by the CPG Products.

In response, the WPP Companies submit Shabbab's declaration alleging that, although the consumer surveys used by the CPG Products "are obviously based on a certain window over which household behavior is observed[,] . . . the information received by the CPG Products conveys nothing about the given time when any actual purchase(s) occurred.  Nor do the CPG Products perform any

---

aligned with a particular time period, and further testifying that a "given time" under the stipulated construction of the Purchase Data could be measured in months, quarters, years, or decades, *e.g.*, for infrequently-purchased durable goods)).

[39]     TRA 56.1 ¶ 76 (citing Mela Decl. ¶ 16).

[40]     Mela Decl. ¶ 16.

sort of analysis that depends on the length of the observation window."[41]

### b. Evidence Pertaining to the Auto Products

### i. Double-Blind Matching of Data

All of the asserted patents require double-blind matching, *i.e.*, using a trusted intermediary that does not receive any operative data to match two sets of identifiers, *e.g.*, clickstream data and data about automobile purchases.[42]  Based on Shabbab's declaration, the WPP Companies allege that the Auto Products do not utilize double-blind matching, because: (1) Experian—Kantar Media's third-party partner— uses the same account identifier (set-top box information from, *e.g.*, DirecTV) to match auto registration data that Kantar Media ultimately uses; and (2) J.D.Power sends automobile registration data *as well as* personally identifying information to Experian.[43]  In particular, Shabbab alleges that "Experian. . . appends J.D. Power[s] purchase attribute data to the DirecTV [identifier], removes

---

41      Shabbab Decl. ¶ 17.

42      *Cf.* '940 Patent at col. 9:26-34 (household purchase and viewing behavior is matched without any single participant gaining "access to both household identity and household purchase or viewing behavior"); Thomas Decl. ¶¶ 20-22 (describing blind-matching generally).  It is not disputed that the patents-in-suit all require double-blind matching.  *See* Opp. Mem. at 28 (stating that the "patents[] require[] [] matching multiple account identifiers for the same household").

43      *See* WPP 56.1 ¶¶ 30, 36, 32-38 (citing Shabbab Decl. ¶ 21).

all [personally identifying information], and sends the data to [Kantar Media].

[Kantar Media]  uses the same DirecTV [identifier] to correlate [set-top box] data

with J.D. Power[s] purchase attribute data."[44]  In other words, Experian allegedly

learns both personally identifying information *and* purchase attribute data.

Based on an unsigned draft contract (the "Experian Contract")

between J.D. Power and Experian, TRA contends that J.D. Power does not send

personally identifying information to Experian, and further contends that Experian

matches a DirecTV identifier to a unique identifier provided by J.D. Power, as

opposed to the names of users.[45]  The contract states in pertinent part:

> WHEREAS, J.D. Power and Associates ("Advertiser") is interested in having J.D. Power's data file matched to Kantar Media's [] ("Client") data file; . . . .
>
> J.D. Power will deliver to Experian, through Experian's secure data transfer site, J.D. Power's data file, which include [sp] the following data fields: Unique Key [identifier], last name, address, city, state, zip code ("J.D. Power Data") on the condition that:
>
> > 1.   Experian will use the J.D. Power Data solely for the purpose of performing anonymous, blind matching of it to certain Client data ("KM Data") provided to Experian by Client.  Experian will run a process to associate the names and addresses from Client with

---

[44]      Shabbab Decl. ¶ 21.

[45]      *See* TRA 56.1 ¶ 32 (citing 4/11 Match Agreement (unsigned contract between J.D. Power and Experian Marketing Solutions, Inc.), Ex. 9-6 to Stockinger Decl.).

> the names and address[es] from Advertiser and
> create a unique identification number that
> anonymously links common names and addresses
> (the "MatchedID Service").

Additionally, TRA argues that Shabbab lacks personal knowledge to testify as to what information J.D. Power sends to Experian.[46]

### ii.       Whether the Auto Products Use a 'Thesaurus'

The asserted claims of the '993 Patent require the use of a "thesaurus" for matching one household identifier to a second household identifier.  The specification of the '993 Patent teaches that a "thesaurus" is a table that "relates, on a company-by-company basis, each account number to other account numbers associated with the same household and the [unique key] [] generated in response to the data package" received by the network operator.[47]  In sum, the thesaurus relates two sets of private/public key pairs, such that no module in the system—saves the thesaurus—receives personally identifiable information that may be matched to operative data.[48]

---

[46]        *See id.*

[47]        '993 Patent at col. 10:47-51.

[48]        *See id.* at col. 10:52-67; *id.* at col. 11:26-30 ("Thus, embodiments of the invention overcome privacy issues by separating PII from other data and information (*e.g.*, media, purchase, etc.); no single party has access to both household identity and household purchase or viewing behavior.").

The WPP Companies argue that the Auto Products do not employ a thesaurus, and therefore do not literally infringe the claims of the '993 Patent.[49] TRA counters this argument by once again citing the Experian Contract.

### c.   Evidence Pertaining to the Doctrine of Equivalents

TRA's sole evidence that the CPG Products infringe under the doctrine of equivalents is Mela's declaration alleging that: (1) "[the] same evidence of literal infringement [set forth in Mela's expert report] helps support [the] conclusion of infringement under the doctrine of equivalents[;]"[50] and (2) the CPG Products' collection of purchase data inevitably evidences purchases of a particular product over a given time period.[51]  The WPP Companies object that this theory was not disclosed in Mela's expert reports.[52]

### C.   TRA's Alleged Trade Secrets

TRA alleges the following five trade secrets:

(1)   Media TRAnalytics'—TRA's product—speed, reliability, scalability and performance;

---

[49]   *See* WPP Mem. at 25-26.

[50]   Mela Decl. ¶ 17.

[51]   *Id.* ¶ 18.

[52]   *See* Counterclaim-Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment ("Reply Mem.") at 13-14.

(2)     TRA's client lists and client interactions,

(3)     TRA's strategic plans,

(4)     TRA's product positioning; and,

(5)     TRA's capital structure, financials, financing proposals target

         investor list, and offers to acquire or merge the company.[53]

The WPP Companies argue that the trade secrets alleged by TRA: (1) are insufficiently detailed to merit trade secret protection; (2) have been publicly disclosed; and (3) have not been used by the WPP Companies.[54]  One of the bases for the WPP Companies' motion is that, rather than identifying its trade secrets with specificity, TRA instead cited to vast page-ranges in its omnibus discovery materials.  In its opposition to this motion, TRA has narrowed the scope of its trade secrets to a more limited set of documents.  These documents are set forth below.

1.     **Evidence Presented by TRA**

    a.     **The Creation of TRAnalytics**

Based on Mela's declaration, TRA alleges that it "created the first economically viable single-source data system."[55]  Mela's opinion is based on the

---

[53]     *See* TRA Supplemental Response to Interrogatories No. 7 ("TRA Interrog. Resp."), Ex. D to Rutt Decl.

[54]     *See* WPP Mem. at 6.

[55]     TRA 56.1 ¶ 84 (citing Mela Decl. ¶¶ 30-41).

contention that TRA's Media TRAnalytics platform, unlike prior-art single-source solutions, employs: (1) passive data collection—with no need for survey participants to push buttons—permitting a larger sample, and reducing the cost of paying survey participants; and (2) efficient techniques for handling the large sample-sizes enabled by passive data collection.[56]  According to a memorandum submitted by TRA, TRAnalytics took thirty-five thousand person-hours and twenty-three million dollars to develop.[57]

The WPP Companies deny that TRA created the first economically viable single-source solution.  They present Shabbab's declaration that Kantar Media's SkyView service—a predecessor to the accused products, predating Media TRAnalytics—is an 'economically viable' single-source solution that remains profitable to this day.[58]  In further support of this point, the WPP Companies submit an internal TRA document dated September 1, 2009 that, in evaluating the pros and cons of various strategic partnerships, states: "Sky already has a 'TRA'

---

[56]     *See* Mela Decl. ¶¶ 30-41.

[57]     *See* Attachment to 5/1/09 Email from Terry Kent (of TNS) to Dean DeBiase (of TNS) Describing TRA Investment Opportunity (the email, "Kent Email"), Ex. 4-4 to Stockinger Decl.

[58]     *See* Counterclaim-Defendants' Reply to TRA's L.R. 56.1 Statement of Additional Facts ("Reply 56.1") ¶ 84 (citing Shabbab Decl. ¶ 4; Shabbab Inj. Decl. ¶¶ 16-18).

with TNS called SkyView . . . they use it to boost ad sales by leveraging it as an ad premium. . . which could foul up any future negotiations with them as partner."[59] In short, the memorandum acknowledges that SkyView is similar to TRAnalytics, and accurately speculates that this could scotch partnership talks with Kantar.

###### b.    The Relationship Between Kantar and TRA

The following documents submitted by TRA evidence how TRA was perceived by the WPP Companies during the early years of TRAnalytics:

- A memorandum sent to Brian Sullivan—of WPP—on October 4, 2008 by Bill McKenna—Kantar Media executive and TRA board member—for the purposes of providing a recommendation on TRA's request for a bridge loan between its first and second rounds of financing states that: "TRA provides global marketers and media owners with the continuous single source media measurement service that Arbitron, Nielsen, IRI, GFK, TNS and other media research service providers have unsuccessfully pursued for the better

---

[59]    9/1/09 Internal TRA Memorandum, Ex. A to Rutt Decl., at HARVEY_0000039.

part of the past three decades."[60]

- A November 28, 2008 email to Mark Read—a WPP director—from Sheila Spence—then SVP of Corporate Development at WPP—states that Bill McKenna then felt that extending a pro-rata stake of a one million dollar bridge loan to TRA was good business for WPP, because although TRA was losing money, this would prevent TRA from competing more strenuously with TNS.[61]  The email further states that McKenna "want[s] to keep the TRA team and assets close and friendly because [he] believe[s] that the TNS offering is fundamentally flawed and will not succeed unless TNS teams up with a TRA-type advanced offering (TRA is the only one right now)."[62]

- A memorandum attached to the just-mentioned Spence email lists "Purchase data matching at the individual [household] level for targeting and ROI" under "TRA Strengths[,]" and

---

[60]     TRA Update – Executive Summary (memorandum attached to 10/4/08 Email from McKenna to Sullivan et al.) ("McKenna Memo"), Ex. 1-7 to Stockinger Decl., at 2.

[61]     *See* 10/28/08 Email from Spence to Read, Ex. 6-1 to Stockinger Decl.

[62]     *Id*.

states that "no one else is doing this."[63]

- Through a March 25, 2009 email, Bill Lederer—COO of Kantar Media—advised a Kantar Media employee to "[s]tarve TRA for cash if you can, then offer hope in the form of a very short, secured convertible bridge loan[]" if a certain client delayed making a decision between TRA, Kantar Media, and another vendor.[64]

- On March 19, 2010, Eric Salama—Kantar Group's CEO—sent an email to various Kantar and WPP officers and directors (the "March Salama Email") stating that "TRA has got something going for it and some momentum with clients and[,] [] crucially, it 'owns' a space [that] links [return path data] [(*i.e.*, set-top box data)] and consumption[,] which is critical to us. Could we own it through a combination of our own resources – yes?  Is it likely we can get there ourselves in the next couple of years – not unless we do something very different."[65]

---

[63]    Spence Memo, Exs. 6-2 to 6-5 to Stockinger Decl.

[64]    Ex. 3-14 to Stockinger Decl.

[65]    3/19/10 Salama Email, Ex. 15-14 to Stockinger Decl.

All in all, the documents above show that Kantar Media was interested in TRA's ability to link consumer data with set-top box data in the consumer products sphere, but was skeptical of Kantar Media's lack of revenue traction.

### c.    Lieberman's Declaration Regarding Trade Secrets

Regarding its alleged trade secrets and the measures it took to keep them confidential, TRA submits the declaration of its CEO, Mark S. Lieberman. Lieberman describes TRA's five alleged trade secrets as follows:

a.    Strategic Plans: detailed information regarding the markets TRA is focused on and the timing of entry into new markets, and the details of conversations with potential strategic partners.

b.    Customers and Customer Interactions: information on customer contract terms and pricing; customer negotiations and the stage of negotiations; customer proposals; detailed information about customers in the pipeline and detailed information about potential deals with potential customers.

c.    Speed, Reliability and Performance of Media TRAnalytics®: detailed information including the specifications relating to speed of report generation; combinations for ensuring reliability; the structure of the system; the data ingestion process; the secure hosted infrastructure; the number and capabilities of the servers; and the combination of these elements of the system.

d.    Product Positioning: detailed internal analysis that compares TRA to other advertising measurement companies; internal comparison of product data; specific or technical information relating to targeting swing purchasers; and internal analysis on ROI.

e.   Financial Information: TRA's detailed capital structure, financial statements and projections, including TRA's income statement, profit & loss, balance sheet (actual and projected, Capex and cash flow (actual and projected); information costs; financing proposals; target investor lists and offers to acquire or merge the company.[66]

Lieberman further alleges that the WPP Companies were provided with documents disclosing these trade secrets at various times between 2007 and 2010, with the expectation of confidentiality, and for the purposes of either financing or merger negotiations.[67]  Specifically, Lieberman alleges that: (1) pursuant to a March 2009 NDA between Kantar Media and TRA, confidential TRA information received by Kantar Media was not to be shared with Kantar Media executives Dean DeBiase, Lederer, or Shabbab, because they were directly involved with Kantar Media's strategic planning and product development, but confidential information was transmitted to them nevertheless; and (2) TRA provided Kantar Media with confidential demonstrations of the capabilities of TRAnalytics in 2009 and 2010; and (3) Kantar Retail—a separate division of the Kantar family—was provided with access to TRAnalytics as part of a purchase data licensing agreement, and is governed by an end user license agreement

---

[66]   Declaration of Mark S. Lieberman in Support of TRA's Opposition to Counter-Defendants' Motion for Summary Judgment ("Lieberman Decl.") ¶ 6.

[67]   *See id.* ¶ 7.

("EULA") requiring users to maintain confidentiality.[68]

### d. Documents Identified by TRA Regarding the Description of Its Trade Secrets

This section identifies the documents alleged by TRA in opposition to the WPP Companies' argument that it has failed to point to evidence of specificity and use, and the WPP Companies' reply.  In brief, the WPP Companies object to all of the documents submitted by TRA in support of its trade secrets, on the grounds that it is too late now for TRA to finally describe its trade secrets with specificity.  The WPP Companies separately maintain that the documents alleged by TRA do not describe protectable trade secrets, because they are too vague, and/or because they have been publicly disclosed.

(1)    TRAnalytics' speed, reliability, scalability and performance (hereafter, the "TRAnalytics Secret")

a.    Material facts alleged by TRA

TRA has never publicly disclosed the following: specific technical information re Media TRAnaltytics' speed, performance and reliability, including information on the specifications relating to speed of report generation, combinations for ensuring reliability, methods for allowing scalability, structure of the system, its data ingestion process, information about the secure hosted infrastructure; information about the number and capabilities of the servers; and information about how these elements combine

---

[68]    *See id.* ¶¶ 8-9.

to achieve certain results.[69]

### b. The WPP Companies' Reply

Denied, and immaterial on the issues of specificity and use. TRA publicly disclosed the identified information. The identified information was also publicly known as TRA borrowed its technical solution from a loyalty card data analytics company in the UK. There is a fundamental mismatch between TRA's characterization of its one remaining "technical" supposed trade secret (now, too late, defined narrowly) and its claim that Kantar somehow "used" that supposed secret (i.e., based on the "two week" theory and backed only by attorney speculation, notwithstanding TRA's prior representation to the Court that expert testimony was necessary to establish use given the nature of TRA's claims and the available evidence). Separately, Rule 37 bars TRA from now identifying for the first time a small number of pages as its supposed trade secrets, in contrast to the hundreds of pages identified during discovery.[70]

### c. The Documentary Record

TRA submits the following documents in defining the TRAnalytics Secret.

• A March 3, 2009 non-disclosure agreement (the "March 2009 NDA") entered into between TRA and the WPP Companies, and signed by

---

[69]     TRA 56.1 ¶ 64 (citing Lieberman Decl. ¶¶ 6, 9-10; Ex. 10-12; Ex. 14-15; Ex. 10-10; Exs. 14-5, 14-6; Exs. 4-13 to 4-15; Exs. 5-1 to 5-3).

[70]     Reply 56.1 ¶ 64 (citing Ex. A, TRA0000828; Ex. E, SPENCE_006020-22.; Ex. A, TRAE0021330 at TRAE0021330 and TRAE0021338; Ex. R (Feb. 2008 Kognitio press release); Ex. D (Trade Secret No. 6)).

Spence—in her capacity as Senior Vice President of the WPP Group. DeBiase, Shabbab, and Lederer are explicitly named as people to whom the information conveyed by TRA may not be transmitted.[71]

- An EULA for TRAnalytics dated January 6, 2009. It provides that "[e]ach party agrees that the Confidential Information of the disclosing party is the property of the disclosing party at all times during the performance of this contract and after the termination of this contract and in perpetuity that users of the system. . . ."[72]

- A table dated February 15, 2009 (the "Due Diligence Table") comparing the features of TRAnalytics with Kantar Media's InfoSys product, attached to due diligence materials produced by TRA to the WPP Companies on March 3, 2009. For example, it reveals that TRAnalytics is faster, better able to scale with a larger data set, etc.[73]

- A memo dated May 18, 2010 summarizing the technical capabilities of TRAnalytics. The memo reveals anodyne features of TRAnalytics,

---

[71]   *See* Ex. 10-12 to Stockinger Decl.

[72]   Ex. 14-15 to Stockinger Decl.

[73]   *See* Ex. 10-10 to Stockinger Decl.

-43-

*e.g.*, that it employs "enterprise grade firewalls. . . ."[74]

- Excerpts from a memo dated March 2009 (the "March 2009 Memo") titled "TRA Overview March 2009 WPP TRA Trade Secret." The portions of the memo cited to by TRA contain high-level statements about TRAnalytics, *e.g.*, that it uses "[c]lustered load balances" and "Raid5 for storage. . . ."[75]

- A network map describing the operation of TRAnalytics on a high level, and list of computer hardware involved.[76]

In reply, the WPP Companies submit:

- TRA's response to their interrogatories, showing that TRA initially designated a vast and undifferentiated group of documents in defining this allege trade secret.[77] The WPP Companies submit a like response to all of TRA's alleged trade secrets.

- A 4/28/08 TRA press release disclosing various features of TRAnalytics on a high level, *e.g.*, that it is compatible with clients'

---

[74]    Exs. 14-5, 14-6 to Stockinger Decl.

[75]    Exs. 4-13 to 4-15 to Stockinger Decl.

[76]    Exs. 5-1 to 5-3 to Stockinger Decl.

[77]    Excerpts from 10/15/12 TRA's Supplemental Responses to Plaintiffs' First, Second, and Third Sets of Interrogatories, Ex. D to Rutt. Decl.

legacy systems through the use of application programming interfaces ("APIs").[78]

- A 2/23/09 TRA press release announcing that TRA chose to use Kognitio as the data warehousing service for TRAnalytics.  In addition to making this announcement, the press release reveals the number of households reached by TRA, and that TRA is ISO 27001 Certified for security.[79]

- A 11/14/08 Email from Brian Canning—a TRA executive—to various TRA employees and officials, sent in the context of selecting a new database solution for TRAnalytics.  It states that Kognitio—the solution ultimately selected by TRA—was then being used by LMG, a United Kingdom company, and that LMG officials praised Kognitio's performance, support, deployment, stability, and consistency.[80]

- A 2/26/08 LMG press release detailing LMG's partnership with

---

[78]    *See* Press Release Introducing TRAnalytics 2.0, Ex. A to Rutt. Decl., at TRA0000828.  An API specifies how one software layer interacts with another.

[79]    *See* Press Release Announcing TRAnalytics Partnership with Kognitio, Ex. E to Rutt Decl., at SPENCE_006020-22.

[80]    *See* Canning Email, Ex. A to Rutt Decl., at TRAE0021330, TRAE0021338.

Kognitio.[81]

(2)     TRA's client lists and client interactions (hereafter, the "Clients Secret")

a.     Material facts alleged by TRA

"TRA has never publicly disclosed the following: its customer contract terms and pricing; Information about customer negotiations and the stage of such negotiations; customer proposals; and detailed information about customers in the pipeline."[82]

b.     The WPP Companies' Reply

Denied, and immaterial on the issues of specificity and use.  TRA publicly disclosed the identified information.  The identified information is dated February or March 2009, more than a year before mid-2010, when TRA alleges Kantar began improperly using TRA information.  The fact that TRA's 2009 pipeline included 62 companies and $24 million of potential business would have been stale and meaningless by 2010, especially since almost none of it became actual revenue.  TRA fails to explain how Kantar could have used this stale information. Two of the cited pages  disclose information about a "'$500k annual deal being negotiated" for BMS [Bristol Meyers Squibb]," a pharmaceutical company.

TRA fails to explain how Kantar could have used such data given that its accused products use only CPG and automotive – not

---

[81]     *See* LMG Press Release, Ex. R to Rutt Decl.

[82]     TRA 56.1 ¶ 62 (citing Leiberman Decl. ¶ 6; Ex. 10-12; Exs. 5-8, 5-10, 5-11 to 5-15; Ex. 1-5).

pharmaceutical – data.

Separately, Rule 37 bars TRA from now identifying for the first time a small number of pages as its supposed trade secrets, in contrast to the hundreds of pages identified during discovery.[83]

   c. Documentary Record

TRA submits the following documents in defining this trade secret.

- The March 2009 NDA.

- A slide from a PowerPoint presentation titled "TRA Overview" and dated March 2009 (the "March 2009 PowerPoint").  It provides CBS, Turner, General Mills, Discovery, MediaVest, and BMS as "customer examples."[84]

- A slide from the March 2009 PowerPoint titled "Sales Pipeline Update" listing networks, advertisers, and agencies in TRA's sales pipeline.[85]

---

[83] Reply 56.1 ¶ 62 (citing WPP Mem. at 8 & nn. 27-28; Ex. A, HARVEY_0004588, May 2010 ARF presentation, slide 14 (disclosing "partial list of customers" including "P&G, Kraft, Mars, Merck, General Mills, Intel, MediaVest, GroupM, Zenith OptiMedia, CBS, Viacom Networks, FX, National Geographic Channel"); Ex. E, KANTAR_0383848 (April 2009 ARF presentation, slide 7); Ex. S, '940 Patent, Fig. Nos. 35A, 35B, 35C, 37A, 38A, 39A and 40A (disclosing General Mills as advertiser in sample reports); Ex. 1-5; Ex. 5-8; Ex. 5-10; Ex. D (Trade Secret Nos. 15 and 22)).

[84] Ex. 5-8 to Stockinger Decl.

[85] Ex. 5-10 to Stockinger Decl.

- Slides from the March 2009 PowerPoint detailing TRA's sales pipeline, *i.e.*, identifying clients it had under contract.[86]

- A memorandum attached to a 10/20/09 Email from Sullivan to Terry Kent—of Kantar Media—Jeff Krentz—of WPP—and Spence (the "Sullivan Email").  The email identifies the number of clients in TRA's pipeline, as well as the value of these clients.[87]

   The WPP Companies submit the following documents in reply.

- A slide from a presentation titled "TRA Executive Summary[,]" presented at the ARF 360 Chicago Workshop on May 25, 2010. (ARF is an advertising industry research/trade group).  The slide discloses a "partial list" of TRA customers, including "P&G, Kraft, Mars, Merck, General Mills, Intel, MediaVest, GroupM, Zenith OptiMedia, CBS, Viacom Networks, FX, National Geographic Channel. . . ."[88]

- Slide seven from a presentation given by TRA to ARF on April 8,

---

[86]    *See* Exs. 5-11 to 5-15 to Stockinger Decl.

[87]    *See* Ex. 1-5 to Stockinger Decl.

[88]    May 2010 ARF Presentation, Ex. A to Rutt Decl. at HARVEY_0004588.

-48-

2009.  It discloses a number of current TRA clients.[89]

- Several figures from the '940 Patent, which disclose General Mills at an advertiser-client.[90]

    (3)    TRA's strategic plans (hereafter, the "Strategy Secret")

        a.    Material facts alleged by TRA

"TRA has never publicly disclosed the following: its strategic plans, including detailed information regarding the markets that TRA is focused on and its plans regarding the timing of entry into new markets."[91]

        b.    The WPP Companies' Reply

> Denied, and immaterial on the issues of specificity and use. TRA publicly disclosed the identified information. Further, TRA fails to explain how Kantar could have used TRA's "plans regarding the timing of entry into new markets," all of which are dated early 2009, to decide over a year later to launch the Accused Products. Separately, Rule 37 bars TRA from now identifying for the first time a small number of pages as its supposed trade secrets, in contrast to the hundreds of pages identified during discovery.  In any event, the disputed fact is immaterial because TRA's

---

    [89]    *See* April 2009 ARF Presentation, Ex. E to Rutt Decl., at KANTAR_0383848.

    [90]    '940 Patent at Fig. Nos. 35A, 35B, 35C, 37A, 38A, 39A and 40A.

    [91]    TRA 56.1 ¶ 65 (citing Lieberman Decl. ¶ 6; Ex. 10-12; Ex. 5-9; Exs. 4-5, 4-11; Ex. 10-11; Exs. 6-8 to 6-15).

identified information is not protectable under New York law.[92]

    c.  Documentary Record

TRA submits the following documents in support of the Strategy

Secret.

- The March 2009 NDA.

- A page from the March 2009 Memo describing TRA's "[s]trategic

  [r]elationships[,]" *e.g.*, its partnership with Experian to receive

  demographic data, and its partnership with Kantar Media to receive

  national and spot advertising schedules.[93]

- Pages from the March 2009 Memo providing (1) a high-level

  overview of TRA's business model; and (2) a balance sheet reflecting

  TRA's staffing plan for the years 2008–2011.[94]

- A table attached to the due diligence materials sent from TRA to the

  WPP Companies in March 2009.  The table reveals that, unbeknownst

  to Kantar Media, TRA was then working with Comcast.[95]

_____

  [92]  Reply 56.1 ¶ 65 (citing Ex. A, TRA_000828-29 (April 2008 TRA press release); Ex. D (Trade Secret No. 18)).

  [93]  Ex. 5-9 to Stockinger Decl.

  [94]  *See* Exs. 4-5,  4-11 to Stockinger Decl.

  [95]  *See* Ex. 10-11 to Stockinger Decl.

- Minutes from two TRA board meetings, held on February 2, 2009 and May 12, 2009.  The only portions of relevance to the alleged Strategy Secret relate to future expectations , *e.g.*, "Theme: course correction; focus[:] build platform for $100mm revenues. . . ."  Based on the minutes, the focus of the board meetings appears to have been launching TRAnalytics 2.0.[96]

In reply, the WPP Companies submit a 4/28/08 TRA press release announcing the launch of TRAnalytics 2.0.[97]

     (4)    TRA's product positioning (the "Positioning Secret")

        a.    Material facts alleged by TRA

"TRA has never publicly disclosed the following: information on product positioning, including a detailed internal analysis that compares TRA to other advertising measurement companies; specific or technical information relating to targeting swing purchasers; and its internal analyses on ROI."[98]

---

[96]    Exs. 6-8 to 6-15 to Stockinger Decl.

[97]    *See* April 2008 TRA Press Release, Ex. A to Rutt Decl., at TRA_0000828-29.

[98]    TRA 56.1 ¶ 63 (citing Lieberman Decl. ¶ 6; Ex. 10-12; Ex. 4-12; Exs. 5-4 to 5-6; Exs. 10-10, 10-11).

b.      The WPP Companies' Reply

Denied, and immaterial on the issues of specificity and use. TRA
publicly disclosed the identified information. Separately, Rule 37
bars TRA from now identifying for the first time a small number
of pages as its supposed trade secrets, in contrast to the hundreds
of pages identified during discovery. This disputed fact is
immaterial because the identified information is not protectable as
a trade secret under New York law.[99]

c.      Documentary Record

In support of the Positioning Secret, TRA submits the following

documents.

•   The March 2009 NDA.

•   A table attached to the March 2009 Memo comparing TRA with four

    competitors with respect to various metrics, *e.g.*, whether they use

    purchase data for household matching, whether they support the use

    of an API for legacy clients, etc.[100]

•   A series of three graphs attached to the March 2009 Memo arguing

    that the use of TRAnalytics leads to a greater marginal increase in

    sales revenue per ad, due to TRAnalytics' superior targeting of "swing

---

[99]     Reply 56.1 ¶ 63 (citing Ex. A, TRA_0000828-30 (April 2008 TRA
press release); Ex. V, KANTAR_0383848, slides 30-31; Ex. W,
http://tinyurl.com/ks6kqtf (Oct. 2009 TRA presentation available online); Ex. D
(Trade Secret No. 21)).

[100]    *See* Ex. 4-12 to Stockinger Decl.

purchasers. . . ."[101]

• The Due Diligence Table comparing Kantar Media's InfoSys product with TRAnalytics.[102]

Because the issue is amenable to resolution as a matter of law based TRA's submission, I will not summarize the documents submitted by WPP.

(5) TRA's capital structure, financials, financing proposals, target investor list, and offers to acquire or merge the company (the "Financial Secret")

a. Material facts alleged by TRA

TRA has never publicly disclosed the following: its detailed capital structure; its financial statements and projections, including its income statements, profit & loss statements, and actual and projected balance sheets; its Capex and actual and projected cash flow; information on its costs; its financing proposals; its target investor lists; and offers to acquire or merge the company.[103]

b. The WPP Companies' Reply

"Denied, and immaterial on the issues of specificity and use. TRA disclosed the identified information without NDAs in place. Separately, Rule 37 bars TRA from now identifying for the first time a small number of pages as its

---

[101]     Exs. 5-4 to 5-6 to Stockinger Decl.

[102]     *See* Exs. 10-10, 10-11 to Stockinger Decl.

[103]     TRA 56.1 ¶ 61 (citing Leiberman Decl. ¶ 6; Ex. 10-12; Exs. 4-4 to 4-10; Ex. 1-4; Ex. 1-9).

supposed trade secrets, in contrast to the hundreds of pages identified during discovery."[104]

        c.      Documentary Record

      In support of the Financial Secret, TRA submits the following documents.

- The March 2009 NDA.

- Portions of the March 2009 Memo disclosing TRA's profit and loss statement, balance sheet, staffing plan, *etc*.[105]

- An attachment to the Sullivan Email prepared by the WPP Companies' corporate development department during TRA and the WPP Companies' merger negotiations.  The Sullivan Email notes that the numbers are "very stale."  The attachment is a "pro forma combination analysis" of TRA and Kantar Media.  It includes summary financials for TRA for the years 2008, 2009, and 2010.[106]

- A document titled "TRA Investment Update – 10-03-08"—and labeled "Restricted to Internal WPP Use on a Need-to-Know

---

[104]    Reply 56.1 ¶ 61 (citing Exs. 11-8 to 11-13; Ex. D (Trade Secret No. 23)).

[105]    *See* Exs. 4-4 to 4-10 to Stockinger Decl.

[106]    *See* Ex. 1-4 to Stockinger Decl.

Basis"—originally attached to an email sent from McKenna to

Sullivan.  Attached to the document is a PowerPoint reflecting TRA's

financials.  The document provides support for TRA's allegation that

the WPP Companies intended to starve TRA for cash; it states that

"[t]he combination of higher expenses and lagging revenues has

shortened by 3-5 months the timing that [Kantar Media] had originally

forecast for TRA to require additional operating funds. . . ."[107]

In reply, the WPP Companies submit a table dated February 19, 2010

disclosing that TRA contacted thirty-seven potential investors in 2010 without

NDAs.  The rightmost column of the table is labeled "Comments[,]" and it

indicates that the contacted investors received the information that TRA now

claims constitutes the Financial Secret: the investors comment on TRA's "negative

gross margin," "2010 plan," "capital raised," etc.[108]

### e.    Evidence that the WPP Companies Received and Used TRA's Alleged Trade Secrets

TRA alleges that its trade secrets were transmitted by three separate

routes.  Specifically, TRA alleges that: (1) in contravention of the March 2009

---

[107]     Ex. 1-9 to Stockinger Decl.

[108]     Venture Capital/Growth Equity Investors Table, Ex. 11-8 to Stockinger Decl.

NDA, Lederer, Shabbab, and DeBiase received information that TRA provided to

Kantar Media during due diligence;[109] (2) Spence used her position on TRA's

board to provide trade secrets to Kantar Media without permission from TRA;[110]

---

[109]    *See* TRA 56.1 ¶ 66 (citing the March 2009 NDA, Ex. 10-12 to 10-15; Kent Email (email from Kent to DeBiase stating that "While Sheila had Brian [Sullivan] give Bill [Lederer] the TRA financials my guess is we are still prohibited from sharing much with [Kantar] Media.  If things go south for Mark [Lieberman] and TRA you can be certain he will look to see what we have violated.  He has already told Sheila that he has heard 'us' say negative things in the market about TRA."), Ex. 4-1; 4/27/09 Email from Sullivan to Lederer (attaching TRA financial information to Lederer at Spence's request), Exs. 14-3 to 14-4; 3/2/09 Email Chain Between Kent (the "March 2009 Kent Emails"), Shabbab, Sullivan, Spence, Krentz and Lederer (stating that Shabbab is to be "kept in the loop" regarding due diligence for TRA/WPP combination), 13-13; 10/28/09 Email Chain Between Lederer and Naresh Durty (Director of Database Administration at Lightspeed Research) (after being sent information about TRA and Kognitio, Lederer responds that "[w]e know TRA VERY well. . . . TRA uses Kantar purchase data and TNS MI spots and ad ex data.  . [M]y business is headed in a remarkably similar direction."), Ex. 16-1; 3/25/09 Emails Between Lederer and Kent (reflecting Lederer's views on TRA, for example that acquiring "TRA would bring [] little to [Kantar Media] in the area of TV ratings, [because] TRA had no proprietary data sources, no ratings pedigree, [and] few customers"), Ex. 3-13, 3-14; Lieberman Decl. ¶ 8; Attachment to 10/20/09 Email from Sullivan to Kent and Spence ("October Sullivan Email") (identifying the "increasingly competitive dynamic" between Kantar Media and TRA, and laying out options), Ex. 1-2).

[110]    *See* TRA 56.1 ¶ 67 (citing 4/27/09 Email from Sullivan to Lederer (attaching TRA financial information to Lederer at Spence's request), Ex. 14-3, 14-4; October Sullivan Email, Exs. 1-1 to 1-5; Document Titled "Sheila Spence 4/27/09 Email on TRA" (evaluating prospect of the WPP Companies making tender offer for TRA) Ex. 1-15; Kent Email, Exs. 4-1 to 4-3 to Stockinger Decl.; 4/27/09 Email from Sullivan to Lederer, Spence and Kent (stating "Hi Bill, hope you are well. Sheila asked me to send over TRA financial information that breaks-out cost and SGA expense details.  Once you have had a chance to review

and (3) "Kantar executive and TRA Board member Bill McKenna

provided trade secrets to Kantar without permission from TRA."[111]  TRA further

alleges that Kantar Media and Kantar Retail used these trade secrets.[112]

_____

the attached, let me know if you have any questions.  During our diligence, Terry
and I spent some time with Mark and the TRA team discussing the general
assumptions behind their forecasts."), Ex. 3-12; 05/23/10 Email from Spence to
Martin Sorrell, Salama, and Read re: TRA / Series C Participation (recommending
that the WPP Companies decline to invest in TRA's Series C funding round,
because investing would do little for the WPP Companies strategically), Ex. 6-7).

[111]     TRA 56.1 ¶ 68 (citing the McKenna Email and McKenna Memo, Exs.
1-6 to 1-10).

[112]     *See* TRA 56.1 ¶¶ 69-70 (citing March 2009 NDA, Ex. 10-12; March
2009 Kent Emails, Ex. 13-13; March Salama Email, Ex. 15-14; 3/18/10
Memorandum Prepared by Richard Marks (CEO of Kantar Media) (stating that
"further investigating possible deals with TRA" is not "of interest," because: (1)
Kantar Media already had a strategic vision for return path / set-top box data,
which TRA did not fit into; (2) TRA was losing money, and Kantar Media had
plans to make money; (3) there would be no synergies with TRA unless TRA had
game-changing software, but Kantar Media was not aware of any 'secret sauce';
and (4) the integration costs of joining the two teams would be high, Ex. 16-4;
Minutes from 5/18/10 TRA-Kantar meeting (discussed above), Exs. 14-4 to 14-6;
Email from Andy Brown (of Kantar Media) to Marks, Shabbab and Krentz (all of
Kantar Media or Kantar Retail) (summarizing 5/18/10 meeting between TRA and
Kantar; present at the meeting for Kantar/WPP were Brown, Marks (via phone),
Shabbab, Krentz, Spence and Sullivan; the summary includes information about
TRAnalytics, and notes that TRA claimed to have received patent protection for
"integrat[ing] either set top box viewing data or internet data . . . with
consumption/sales data"), Ex. 8-13; 6/4/10 Email from Shabbab to Various
Kantar/WPP Employees & Officers (stating that "We have had a chance to assess
our internal capabilities relative to TRA.  Generally speaking TRA demonstrates
three capabilities encompassing targeting (indexing), optimization and ROI.  We
have determined that we have the ability to replicate the targeting and optimization
capabilities in our InfoSysRPD and/or Xpert systems as these exist as modules
today which clients access. . . . We suspect that the greatest revenue opportunity

The WPP Companies deny each of these allegations.  Regarding the

means that the putative secrets were transmitted, they allege that: (1) Lieberman

permitted Lederer, Shababb and DeBiase to receive the identified information;[113]

---

would be targeting[,] . . . followed by optimization, followed by ROI.  This being the case we can move forward independently with our current plans by leveraging InfoSysRPD, subject to a more thorough review of the patent."), Ex. 13-15; 3/7/11 Press Release Trumpeting Kantar Media's Release of Rapidview (stating that RapidView allows ROI targeting based in part on its unprecedented sample sizes), Ex. 15-6; Excerpt from Mela's Amended Expert Report (stating "I have concluded that, within a reasonable degree of expert certainty, Kantar's single-source system utilizes the conceptual and technical/operational trade secrets that TRA has identified and that Kantar utilized TRA's strategic and investment trade secrets in deciding to enter the field with its own single-source product. . . . Kantar had full access to TRA's trade secrets through numerous channels: (i) through the WPP representative on TRA's Board; (ii) during due diligence conducted in connection with a potential combination in 2009 and 2010; and (iii) through Kantar Retail's relationship with TRA as one of TRA's data vendors.  Over that time, Kantar used its position of trust to deepen its understanding of TRA's business but did not take appropriate measures to protect against the improper use of TRA's trade secrets and confidential information.  Less than one year after Kantar completed its due diligence of TRA's technical capabilities in the Spring of 2010, Kantar went to market with a product offering that was similar in most major aspects to TRA's passive, singlesource system.") Ex. 13-3; The Sullivan Email, Ex. 1-1; Lederer's above-mentioned October 28 email exchange with Naresh Adurty, Ex. 16-1; Sullivan's April 27 Email to Lederer Sending TRA Financial Information at Spence's Request, Ex. 3-12; Lederer and Kent's March 25 Email Exchange Regarding TRA, Ex. 3-14; Kent's May 2009 Email Exchange with DeBiase Regarding TRA, Ex. 4-1; 11/30/08 Email from DeBiase to Lederer (stating "[b]e careful,[,] you were not necessarily to see that yet[,]" in response to Lederer Email commenting on WPP Memo generated from TRA Memo provided pursuant to merger negotiations), Ex. 15-15; 3/18/10 Marks Memo, Ex. 16-4; 6/4/10 Email from Shabbab to Kantar Officers, Ex. 13-15) (further citations omitted).

[113]    *See* Reply 56.1 ¶ 66 (citing 3/22/09 Email from Lieberman to Spence (stating that "depending on how the valuation discussion goes tomorrow, it may be

(2) Shababb was present at a TRA meeting where slides detailing TRA's financial condition, etc. were presented;[114] and (3) McKenna was authorized to email the putative trade secrets to the recipients of the email submitted by TRA, as evidenced by the fact that Lieberman thanked him for the email—and, in any event, the information reflected therein was stale by the time of the WPP Companies' alleged use.[115]

Regarding TRA's allegation that the WPP Companies used the alleged trade secrets, the WPP Companies allege that: (1) the WPP Companies plainly did not use the TRAnalytics Secret, as (i) Kantar Media's InfoSys uses an Oracle Database (not Kognitio, like TRA),[116] (ii) Shabbab's June 2010 email states that Kantar Media could "replicat[e]" the "capabilities" of TRAnalytics using pre-

---

unnecessary for [Lederer], [Shabbab] and [DeBiase] to have . . . continued access to . . . diligence information"), Ex. V to Declaration of Eric Rutt in Support of Counterclaim-Defendants' Reply Regarding Their Motion for Summary Judgment ("Rutt Reply Decl."), at SPENCE_006682.

[114]   *See* Lieberman Decl. ¶ 10; Ex. 8-13 (stating Shabbab attended the meeting); Ex. 14-4 (the slides).

[115]   *See* Reply 56.1 ¶ 68 (citing 9/20/08 Email from Lieberman to Lederer (stating "Thanks for making this happen Bill" in response to Lederer's email stating that he had "forwarded the September TRA Board package together with my comments to Jeff Krentz"), Ex. V to Rutt Reply Decl, at TRAE0023309).

[116]   *See* Ex. 10-10 to Stockinger Decl.

existing InfoSys modules;[117] and (iii) the Accused Products, in fact, use Kantar

Media's Charter and DirectView services, which have existed since 2006 and

2006, respectively;[118] and (2) none of the documents identified by TRA regarding

the information transmitted by McKenna and Spence evidences improper use, as

opposed to an evaluation of the potential for a merger with TRA.[119]

### D.    Evidence Relating to Damages for TRA's Non-Patent Claims

The WPP Companies move for summary judgment on TRA's non-

patent claims—namely breach of fiduciary duty, breach of contract, and

misappropriation of trade secrets—on the ground that TRA has insufficient

evidence to prove that the WPP Companies caused its alleged damages.  Because

this motion is based on the lack of evidence allegedly adduced by TRA, I begin

with the evidence TRA presents in opposition to the motion.

TRA alleges—and it is not disputed—that its post-money valuation

rose from ten million dollars (after its first financing round) to fifty-four million

dollars (after its third financing round), but that it was ultimately acquired by TiVo

for a mere twenty million dollars in July 2012 after it was unable to solicit

---

[117]    Ex. 13-15 to Stockinger Decl.

[118]    *See* Reply 56.1 ¶ 69 (citing Shabbab Inj. Decl. ¶¶ 9-10).

[119]    *See id.* ¶ 70.

investors for its fourth financing round.[120]  TRA's non-patent damages theory is

that "[h]ad [its] value continued to grow on the same trajectory it did during its

first three rounds of financing, its expected value in July 2012 was $199

million[,]"[121] but that certain unspecified "bad acts" of the WPP

Companies—presumably, releasing a competing product—"caused [its] diminution

in value."[122]

        In support of its theory of damages, TRA submits: (1) portions of the

expert report of Melissa A. Bennis, its damages expert; (2) excerpts from the

deposition of Naveen Chopra, TiVO's CFO; (3) portions of the declaration of

Stephen B. Morris—another TRA expert—in support of TRA's motion for an

injunction; and (4) portions of Lieberman's deposition.  Bennis' report documents

the fact that, during TRA's Series D financing round, investors declined to invest

for reasons such as "[lack of] revenue traction," "[in]ability to hit projections," and

---

[120]    *See* TRA 56.1 ¶¶ 71-72 (citations omitted).

[121]    *Id*. ¶ 73 (citing excerpts from 1/11/13 Expert Report and Disclosure of Melissa A. Bennis (TRA's damages expert) ("Bennis Rpt."), Ex. 20-13).

[122]    *Id*. ¶ 74 (citing Bennis Rpt., Exs. 20-5 to 20-12; 12/7/12 Deposition of Naveen Chopra (TiVo's CFO) ("Chopra Dep.") (testifying that Kantar releasing a product competing with TRAnalytics "froze the market"), Ex. 2-12 at 83:19-84:5; 6/29/11 Declaration of Stephen B. Morris in Support of TRA's Motion for Preliminary Injunction ("Morris Decl."), Doc. No. 15 ¶¶ 16-19; 5/15/12 Deposition of Mark Lieberman ("Lieberman Dep."), Ex. 7-2 at 168:23-169:22 and Ex. 7-4 at 295:8-13).

"lack of profitability. . . ."[123]  The report continues:

> [t]o the extent that TRA's inability to meet revenue and profit expectations were exacerbated at the time of the Series D round, it is reasonable to believe it was caused by Counterclaim Defendants' alleged actions, which disrupted the market with a new product and froze the market with respect to overall sales. . . .[124]

The idea that the WPP Companies' actions "froze the market" derives from the following testimony of Chopra (which is cited in Bennis' report):

> Q.   Did TRA ever provide any information to TiVo as to what it thought Kantar's market share was in the narrow competitive market it had with TRA?
>
> A.   I don't recall whether there was discussion in terms of quantitative market share. One of the major themes of that issue for TRA was the fact that, you know, they were the original player here – small company trying to develop a market that they and many customers thought was a big opportunity – and they had this big issue where the large entrenched player, TNS, that had deep relationships with a lot of their potential customers was sitting there telling people they were coming out with a product for a long time, and then eventually, obviously, did come out with a product, and that kind of froze the market and made it very difficult for them to compete.[125]

The portions of Morris' declaration submitted by TRA are of limited

---

[123]   Bennis Rpt., Ex. 20-9.

[124]   *Id.* at Ex. 20-10 (quotation marks and citation omitted).

[125]   Chopra Dep. at 83:19-84:5.

interest.  Morris speculates that, if TRA's request for an injunction were not granted, the critical period for TRA to capitalize on its proprietary technology could pass.[126]

Lieberman's testimony does more to flesh out the frozen market theory.  Lieberman testifies to his belief that Casavant's[127] "collaboration with Kantar Media [] led to confusion in the marketplace, misappropriating our trade secrets, infringing our patents, signaling to the marketplace that an investor of ours was now copying what we were doing, affected our ability to raise capital, affected valuation conversations around the value of the company[;]" and that potential TRA investors had raised concerns about this litigation.[128]

It is important to note that TRA's frozen market theory is *not* that Kantar Media poached TRA customers with the Accused Products.  For example, TRA is not seeking lost sales as a measure of damages for its non-patent claims based on the frozen market theory.[129]  Instead, the frozen market theory is that the

---

[126]     *See* Morris Decl. ¶¶ 16-19.

[127]     Casavant was the managing director of Kantar Retail at all relevant times.  *See supra* n.35.

[128]     Lieberman Dep. at 168:23-169:22.  *Accord id.* at 295:8-13.

[129]     *See* 3/13/13 Deposition of Melissa A. Bennis ("Bennis Dep."), Ex. 9-2 to Stockinger Decl., at 87:7-21 (confirming that lost sales are not the basis for TRA's alleged non-patent damages).

WPP Companies, by launching the Accused Products and suing TRA, made investors wary of TRA.  The alleged mechanism is twofold: (1) investors look askance on pumping money into a company embroiled in litigation; and (2) because the WPP Companies are a globe-spanning and powerful conglomerate, potential investors were wary of investing in a less-established, competing company.[130]

Needless to say, the WPP Companies dispute TRA's frozen market theory.  *First*, they allege that Bennis failed to consider that investors were wary of TRA's revenue traction *relative* to the capital that it had raised to date.[131]  On this basis, the WPP Companies allege that the difference between TRA's first three financing rounds and its fourth, unsuccessful, financing round is that, by the fourth round, TRA had already raised substantial capital, without having matching revenue.  *Second*, the WPP Companies argue that, because they have not abused the judicial process, their instituting this suit against TRA cannot constitute a bad act giving rise to TRA's damages.[132]  *Finally*, the WPP Companies allege that "it is

---

[130]     *See id*. at 89:1-24 (testifying, *e.g.*, that "WPP [] was, in effect, acting against TRA, and WPP is a big conglomerate . . . [and] that was concerning to investors who might have had other potential opportunities with WPP.").

[131]     *See* Reply 56.1 ¶ 74 (citing Bennis Rpt. at Ex. 20-9).

[132]     *See id*. (citing *DirecTV, Inc. v. Lewis*, No. 03 Civ. 6241, 2005 WL 1006030, at *5 (W.D.N.Y. Apr. 29, 2005) (collecting cases in which the courts

improper to treat "post-money valuation" as evidence of the fair market value of TRA."[133]

## III.   LEGAL STANDARD

### A.   Summary Judgment Standard[134]

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[135]  "A genuine dispute exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the

---

extended the *Noerr-Pennington* doctrine—that threats to commence suit are outside the scope of the antitrust laws—beyond the confines of antitrust jurisprudence).

[133]     *Id.* ¶ 73 (citing 4/2/13 Deposition of Brent K. Bersin (damages expert for the WPP Companies), Ex. W to Rutt Reply Decl., at 122:1-124:24 (testifying that a company's post-money valuation merely reflects the addition of investment capital to the founder's equity, not a company's fair market value)).

[134]     In a case arising under the patent laws, the rules of the regional circuit govern the standard of review applicable to a motion for summary judgment.  *See, e.g., Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 18 (Fed. Cir. 2012).  Accordingly, the summary judgment standard of the Second Circuit is recited below.

[135]     *Rivera v. Rochester Genesee Regional Transp. Authority*, 702 F.3d 685, 692 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)) (some quotation marks omitted).

suit."[136]

    "The moving party bears the burden of establishing the absence of any genuine issue of material fact."[137]  To defeat a motion for summary judgment, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[138] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[139]

    In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[140]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

---

[136] *Finn v. N.Y. State Office of Mental Health-Rockland Psychiatric Ctr.*, 489 Fed. App'x 513, 514 (2d Cir. 2012) (quotation marks omitted).

[137] *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex Corp. Catrett*, 477 U.S. 317, 322 (1986)).  *Accord Powell v. Donahoe*, 519 Fed. App'x 21, 22 (2d Cir. 2013).

[138] *Gioia v. Forbes Media LLC*, 501 Fed. App'x 52, 54 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

[139] *Robinson v. Allstate Ins. Co.*, 508 Fed. App'x 7, 9 (2d Cir. 2013) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

[140] *Cuff ex rel. B.C. v. Valley Cent. School Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

-66-

of a judge.'"[141]

## B.  Patent Infringement

Section 271(a) of the Patent Act provides that: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."[142]  "To prove infringement, the patentee must show that an accused product embodies all limitations of the claim either literally or by the doctrine of equivalents."[143]

### 1.  Literal Infringement

"Determining literal infringement is a two step process: the "proper construction of the asserted claim and a determination whether the claim as properly construed reads on the accused product or method. The first step is a question of law, [. . .] [while] [t]he second step is a question of fact. . . ."[144]  Literal infringement is established if "every limitation set forth in a claim [] [is] found in

---

[141]  *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

[142]  35 U.S.C. § 271(a).

[143]  *Cephalon*, 707 F.3d at 1340.

[144]  *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012) (quotation marks and citations omitted).

an accused product, exactly."[145]

### 2. The Doctrine of Equivalents

As set forth in a recent Federal Circuit opinion:

> The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes. However, the 'all limitations rule' restricts the doctrine of equivalents by preventing its application when doing so would vitiate a claim limitation. Equivalence is not an absolute to be considered in a vacuum. The essential inquiry is whether "the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention. One way of proving infringement under the doctrine of equivalents is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product.[146]

### C. Trade Secrets Under New York Law

"To establish a claim for misappropriation of trade secrets, plaintiff must show (1) that it possesses a trade secret, and (2) that defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of

---

[145] *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995).

[146] *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1167 (Fed. Cir. 2012) (quotation marks and citations omitted) (brackets in original).

discovery by improper means."[147]  The Court of Appeals of New York has adopted The Restatement of Torts' definition of a trade secret as "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'"[148]  In deciding trade secret claims, New York courts consider the following factors:

> "(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. . . ."[149]

A client list may be a trade secret under New York law; however, "[a] client list created through 'widespread canvassing of an obvious and highly competitive market,' is insufficient to warrant trade secret protection."[150]

---

[147]  *Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd.*, 783 N.Y.S.2d 758, 770-71 (Sup. Ct. N.Y. Co. 2004).

[148]  *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quoting Restatement of Torts § 757).

[149]  *Id.* (quoting Restatement of Torts § 757 cmt. b).

[150]  *Novus Partners, Inc. v. Vainchenker,* No. 11 Civ. 650683, 2011 WL 4031521, at *3 (Sup. Ct. N.Y. Co. Sept. 7, 2011) (quoting *Leo Silfen, Inc. v.*

## IV.   DISCUSSION

### A.   TRA's Misappropriation of Trade Secrets Claim Is Dismissed

TRA identifies a large number of documents in support of its trade

secrets claim, and reviewing these documents has consumed considerable judicial

resources.  In the end, this effort was conducted for little purpose.  TRA's trade

secret claim is dismissed, as: (1) it is impermissible for TRA to wait until summary

judgment to narrow the documents allegedly describing its trade secrets; and (2) in

any event, the documents now identified by TRA fail to evidence protectable trade

secrets, and/or use of those trade secrets by the WPP Companies.

#### 1.   The WPP Companies' Objections Under Rule 37 Are Sustained

At a hearing held on April 23, 2013, I ordered the parties to reduce the

number of asserted patent claims and trade secrets in the case.  As a result, TRA

dismissed twenty of its twenty-five trade secrets.  Prior to that point, TRA asserted

hundreds of pages of documents in support of *twenty-five* alleged trade secrets,

with little to no indication as to *how* these documents combined to form trade

secrets.[151]  It was apparently TRA's intention to wait until it was before a jury to

---

*Cream*, 29 N.Y.2d 387, 394 (1972)).

[151]   *See* TRA Interrog. Resp. at 8-27 (asserting hundreds—or thousands—of documents, "by way of example," for each of the twenty-five trade secrets originally alleged by TRA).

define the precise contours of its trade secrets claim; but, faced with the WPP Companies' motion for summary judgment, it instead narrowed the range of documents in its opposition papers.

Naturally, the WPP Companies object—under Rule 37—to TRA's attempt to "now identify[] for the first time a small number of pages as its supposed trade secrets, in contrast to the hundreds of pages identified during discovery. . . ."[152]  This objection is sustained, as TRA's actions are in contravention of Rule 26(e).[153]  TRA's "Dance of the Seven Veils approach to [its] trade secret claim" is manifestly prejudicial to the WPP Companies, and taxing on the Court.[154]  TRA had ample opportunity to identify its alleged trade secrets with specificity prior to the close of discovery.  Because it failed to do so, its trade

---

[152]    Reply 56.1 ¶ 61.  Rule 37(a)(4) provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."

[153]    Rule 26(e) provides in pertinent part that "[a] party who has . . . responded to an interrogatory . . . must supplement or correct its disclosure or response: in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. . . ."

[154]    *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292, 2008 WL 463884, at *9  (S.D.N.Y. Feb. 20, 2008) (dismissing trade secrets claim on summary judgment for failure to identify trade secrets with specificity in discovery).

secrets claim is dismissed.[155]

### 2. TRA Has Failed to Allege Protectable Trade Secrets and/or Evidence of Use

An alternate ground for my holding is that, even ignoring its

deficiencies in discovery, TRA has not submitted evidence from which a

reasonable jury could find that the WPP Companies have used its protected trade

secrets. Regarding the TRAnalytics Secret, the record shows that TRA disclosed

most of the properties of TRAnalytics that it now apparently claims as a trade

secret—*e.g.*, its use of APIs to handle legacy clients—and there is no evidence in

the record that the Accused Products made use of any of the technical information

alleged by TRA.[156]  For example, the Accused Products make use of an Oracle

---

[155]     *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006) (recognizing that district courts have the authority to exclude evidence for failure to supplement under 26(e)); *Thibeault v. Square D Co.*, 960 F.2d 239, 245 (1st Cir. 1992) ("While Rule 37(b) requires that a court order must be in effect, and then violated, as a prerequisite for the imposition of sanctions thereunder, no such requirement exists under Rule 26(e). The rule itself furnishes fair warning. Thus, when Rule 26(e) is flouted, district courts possess the power to impose sanctions without first issuing a firm discovery deadline or an admonitory order.").

[156]     *See supra* Part I.C.  TRA places heavy reliance on the June 2010 Email from Shabbab to Various Kantar/WPP Employees and Officers stating that "We have determined that we have the ability to replicate the targeting and optimization capabilities in our InfoSysRPD and/or Xpert systems. . . ." *See, e.g.*, Opp. Mem. at 17-18.  However, in context, it is clear that Shabbab is discussing replicating the capabilities of TRAnalytics using Kantar Media's own technology, as opposed to misappropriating TRA's trade secrets in order to speed up its product development.

database, while TRAnalytics uses Kognitio's data warehousing capabilities.

The Clients Secret fares no better.  The WPP Companies have produced abundant evidence that TRA disclosed its clients at every turn.[157]  In any event, it stretches credulity to suggest that TRA's client list is a trade secret.  There is no evidence that TRA undertook the type of effort to develop it that would render such a list proprietary; and "'widespread canvassing of an obvious and highly competitive market' is insufficient to warrant trade secret protection."[158]  Finally, TRA has submitted no evidence indicating that the WPP Companies *used* its client list.  It is doubtful that a world-spanning conglomerate like the WPP Companies would have much use for a list of TRA's clients—in the pipeline or otherwise—and, as the WPP Companies point out, "[t]he identified information is dated February or March 2009, more than a year before mid-2010, when TRA alleges Kantar began improperly using TRA information[,]" such that the Clients

---

[157]    *See, e.g.* Reply 56.1 ¶ 62 (citing WPP Mem. at 8 & nn. 27-28; Ex. A, HARVEY_0004588, May 2010 ARF presentation, slide 14 (disclosing "partial list of customers" including "P&G, Kraft, Mars, Merck, General Mills, Intel, MediaVest, GroupM, Zenith OptiMedia, CBS, Viacom Networks, FX, National Geographic Channel"); Ex. E, KANTAR_0383848, April 2009 ARF presentation, slide 7; Ex. S, '940 Patent, Fig. Nos. 35A, 35B, 35C, 37A, 38A, 39A and 40A (disclosing General Mills as advertiser in sample reports); Ex 1-5; Ex. 5-8; Ex 5-10; Ex. D (Trade Secret Nos. 15 and 22)).

[158]    *Novus Partners*, 2011 WL 4031521, at *3 (quoting *Leo Silfen, Inc.*, 29 N.Y.2d at 394)).

Secret would be stale prior to the WPP Companies' alleged use.[159]

The Strategy Secret fails as a matter of law.  Based on the documents submitted by TRA, the Strategy Secret consists of little more than the aspirations of a company struggling to achieve revenue traction.  For example, TRA accuses the WPP Companies of misappropriating its secret plan to perform a "course correction" with the "focus" of "build[ing] [a] platform for [one hundred million dollars in] revenues. . . ."[160]  This is assuredly a worthy goal.  However, "information consisting simply of business possibilities or goals is not a trade secret."[161]  Thus, the Strategy Secret is not a protectable trade secret.

The Positioning Secret likewise fails as a matter of law.  "Price lists, product samples, and 'marketing plans' are all items that are not, as a matter of law, protected as trade secrets."[162]  The documents that TRA alleges constitute the Positioning Secret fit comfortably within this rule.  For example, the table attached to the March 2009 Memo merely compares pertinent features of

---

[159]    Reply 56.1 ¶ 62.

[160]    Exs. 6-8 to 6-15 to Stockinger Decl.

[161]    *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002) (citation omitted).

[162]    *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 175 (S.D.N.Y. 2006) (quoting *Gemmy Indus. Corp. v. Crisha Creations Ltd.*, No. 04 Civ. 1074, 2004 WL 1406075, at * 12 (S.D.N.Y. June 23, 2004)).

TRAnalytics—that were publicly disclosed[163]—to features of competitors that were public knowledge.  The remainder of the documents submitted by TRA in support of the Positioning Secret are, likewise, either drawn from public information, or merely marketing documents.  As such, the Positioning Secret fails as a matter of law.

Finally, the information that allegedly constitutes the Financial Secret was publicly disclosed by TRA.[164]  Thus, in the end, even if TRA were not now precluded from supplementing its discovery responses in order to add specifics to its trade secrets claims, it would merit dismissal.

## B.    Non-Patent Damages

### 1.    TRA's "Frozen Market" Theory of Non-Patent Damages Is Insufficient to Reach a Jury

As an initial matter, I note that TRA's argument that the WPP Companies "froze the market" by initiating this suit is foreclosed by the *Noerr-Pennington* doctrine.[165]  Section 271(d)(3) of Title 35 excepts from patent misuse claims the actions of a patentee that seeks "to enforce [its] patent rights against

---

[163]    *See* 10/09 TRA Presentation, Ex. W to Rutt Reply Decl.

[164]    Venture Capital / Growth Equity Investors Table, Ex. 11-8 to Stockinger Decl.

[165]    *See DirecTV*, 2005 WL 1006030, at *5.

-75-

infringement or contributory infringement. . . ."[166]  Here, the WPP Companies

instituted suit based on a good faith belief that their products do not infringe

TRA's patents.  It cannot be the case that a party without the monopoly power

afforded by a patent is more constrained in its use of the judicial process than a

patentee.

      The other alleged ground for TRA's frozen market theory of non-

patent damages—that the WPP Companies locked the market up by releasing

competing products—is equally untenable.  TRA's assertion that "[h]ad [its] value

continued to grow on the same trajectory it did during its first three rounds of

financing, its expected value in July 2012 was $199 million" rests on sheer

speculation.[167]  There is no technical or scientific basis for the conclusion that TRA

was predestined to continue growing at the rate suggested by its first three

financing rounds.  As the Second Circuit has noted, "New York law does not

---

[166]    35 U.S.C. § 271(d)(3).  *See also Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) ("A patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers.  Accordingly, a patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction.").

[167]    TRA 56.1 ¶ 73 (Bennis Rpt., Ex. 20-13).

countenance damage awards based on '[s]peculation or conjecture.'"[168]

In addition to providing no scientific basis to suggest that TRA was foreordained to grow exponentially, Bennis' conclusion that the "bad acts" of the WPP Companies caused TRA to lose value has no basis.  To conclude that one event caused another because it preceded it is to commit the fallacy of *post hoc ergo propter hoc*; "'[i]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Federal Rule of Evidence] 702.'"[169] In particular, "[i]t is plain that one cannot determine whether something caused an observed effect without controlling for other equally plausible causes of that effect."[170]

It is undisputed that "[e]leven prospective investors in TRA's failed [fourth] financing round in 2012 identified as a concern TRA's lack of revenue traction given amount of capital raised to date."[171]  Because Bennis fails to rule out

---

[168]   *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991) (quoting *Berley Indus., Inc. v. City of New York*, 45 N.Y.2d 683, 687 (1978)).

[169]   *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010) (quoting *Awad v. Merck & Co.*, 99 F. Supp. 2d 301, 304 (S.D.N.Y. 1999)).

[170]   *Id.*

[171]   WPP 56.1 ¶ 22.

this alternative explanation for TRA's failed financing round, her opinion that the WPP Companies' bad acts caused TRA's decline in value does not satisfy the requirements of Rule 702.

Further, Bennis' theory that the WPP Companies 'froze the market' appears to stem from Chopra's deposition testimony.[172]  Under Federal Rule of Evidence 703, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of [her] testimony."[173]  This rule is particularly applicable here, where the portion of Chopra's testimony relied upon by Bennis is merely relaying speculation conveyed to Chopra by unnamed—and self-interested—sources at TRA.[174]

All in all, then, Bennis' frozen market opinion rests on speculation, unmoored from the scientific method, and conveyed through two layers of hearsay. For this reason, it is excluded.

The only other evidence TRA offers in support of the frozen market theory is Lieberman's testimony.[175]  To the extent Lieberman's testimony rests on

---

[172]     *See supra* Part II.D.

[173]     *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) (quotation marks and citations omitted).

[174]     *See* Chopra Dep. at 83:19-84:5.

[175]     *See* Lieberman Dep. at 168:23-169:22; 295:8-13.

the WPP Companies initiating suit, it is foreclosed by the *Noerr-Pennington*

doctrine.  The balance of Lieberman's testimony rests on speculation.  Nielsen—a

competitor of TRA and Kantar Media—occupied seventy-five percent of TRA's

broader market (*i.e.*, advertising analytics),[176] the Accused Products had fewer than

half a million dollars in revenues,[177] and TRA *increased* its prices after the

introduction of the Accused Products.[178]  Given these facts, Lieberman's testimony

that TRA suffered a competitive injury from the release of the Accused Products is

an insufficient basis for a reasonable jury to find that TRA suffered damages

measured by Lieberman's dream of building a platform for one hundred million

dollars in revenue.  The frozen market theory of damages is excluded.

### 2.   Dismissing TRA's Frozen Market Theory Does Not Dispose of TRA's Non-Patent Claims

Contrary to the WPP Companies' argument, excluding the frozen

market theory of damages does not dispose of TRA's non-patent claims.  TRA

notes in its opposition brief that it may be entitled to nominal damages for its

breach of contract claim; attorneys' fees for its breach of fiduciary duty claim; and

---

[176]   *Compare* WPP 56.1 ¶ 26 *with* TRA 56.1 ¶ 26 (citations omitted).

[177]   *See* WPP 56.1 ¶ 20 (citing Bennis Rpt. at 66).

[178]   *See id*. ¶ 21 (citations omitted).

equitable relief for both claims.[179]  The WPP Companies do not dispute this point in their reply brief.

### C.   Patent Infringement

For the following reasons, the WPP Companies' motion for a summary judgment of non-infringement is granted, as no reasonable jury could find that: (1) the CPG Products practice the purchase data limitation; and (2) the Auto Products practice double-blind matching, or make use of a thesaurus.  This holding moots the remainder of the WPP Companies' non-infringement arguments, as well as its arguments as to patent invalidity.

#### 1.   The CPG Products Do Not Collect Purchase Data, and Therefore Do Not Infringe the Asserted Patent Claims Either Literally or Under the Doctrine of Equivalents

The parties' dispute about whether the CPG Products practice the purchase data limitation of the patents in suit is ripe for summary adjudication, as it turns on issues of claim construction, rather than disputed questions of fact.  The WPP Companies contend that the CPG Products do not collect or use purchase data—or, indeed, any information about *when* a purchase was made—although

---

[179]    *See* Opp. Mem. at 40 (citing *T&N PLC v. Fred S. James & Co.*, 29 F.3d 57, 60 (2d Cir. 1994) ("[N]ominal damages are always available for breach of contract."); *William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011) (attorneys' fees); *Gotham Ptrs., L.P. v. Hallwood Realty Ptrs., L.P.*, 817 A.2d 160, 176 (Del. Sup. Ct. 2002) (equitable relief for breach of fiduciary duty claim)).

they do categorize users into "user types."  All of the patents in suit distinguish between "purchase data" and "user types."  For example, the specification of the '301 Patent provides that "[t]he ROI report may use the following data as inputs, for example: . . . purchase data; user type (heavy, medium, or light category purchase rate). . . ."[180]

Based on Mela's declaration, TRA contends that this is a distinction without a difference, because any classification of users into user-types must be based on survey evidence showing those users' purchases of a product over a "given time."  In Mela's opinion, the various inputs listed in the patents-in-suit—*e.g.*, dayparts, time selection (current and base period); report date range; purchase data; user type (heavy, medium, or light category purchase rate); user loyalty; and/or, report groupings—may overlap: "'[T]ime selection,' 'date range,' and 'daypart' (*i.e.*, what part of the day) are all examples of inputs, and interrelated types of temporal data, yet are listed separately."[181]  In short, TRA argues that

---

[180]     '301 Patent at col. 29:48-51.  *See* '940 Patent at col. 26:61-64 ("The [True Target Index] report may use the following data as inputs, for example: campaign data; time selection (current and base period); report date range; consumer purchase data; user type (e.g., heavy, medium, light category purchase)"); '993 Patent at col. 28:1-4 ("The ROI report may use the following data as inputs, for example: . . . purchase data; user type (heavy, medium, or light category purchase rate)").

[181]     Mela Decl. ¶ 16.

although "user type" and "purchase data" are distinguished in the patents-in-suit, this distinction is illusory, as "user types" is an input that may be subsumed within "purchase data," just as "time selection" is an input that may be subsumed within "daypart."

The fatal flaw in this theory is that the input "user type" is categorically distinct from the temporal inputs relied upon by Mela. A "user type" designates the relative positions of users within a set, but conveys nothing about time. By way of analogy, designating three runners as "slow, fast, and fastest" does not convey anything about their top one hundred meter dash time. In contrast, collecting purchase data—*i.e.*, "data describing the purchase of a particular product at a given time"—plainly requires collecting data that conveys *when* a purchase was made.

The evidence establishes that the CPG Products do not make use of temporal data at all; instead, they collect only user types. Accordingly, Mela's opinion provides insufficient grounds for a reasonable jury to find that the CPG Products practice the Purchase Data Limitation.

For the same reason, Mela's opinion that the CPG Products infringe under the doctrine of equivalents is foreclosed. Mela's doctrine of equivalents opinion—that collecting survey data over a period of time to generate user types is

the equivalent of collecting purchase data—is merely a repackaged form of TRA's literal infringement theory.[182]  This repackaging adds nothing to the analysis above. Accordingly, TRA's doctrine of equivalents theory must be dismissed.

In sum, TRA's patent infringement claims pertaining to the CPG Products are dismissed.

### 2.   The Auto Products Do Not Utilize Double Blind Matching

In opposition to the WPP Companies' argument that the Auto Products do not practice double-blind matching, TRA submits the Experian Contract, and objects to Shabbab's declaration "describ[ing] what J.D. Power (a third party) sends to Experian (a third party)."[183]  TRA's objection is overruled. Shabbab's declaration describes the operation of the Accused Products, a subject that, as the president of Kantar Media—the ultimate recipient of the data in question—he has personal knowledge.[184]

TRA's other basis for resisting summary judgment—the Experian Contract—is a legally insufficient for a reasonable juror to conclude that the Auto Products practice double-blind matching.  I note initially that the Experian

---

[182]   *See id*. ¶¶ 17-18.

[183]   Opp. Mem. at 28 (citing Fed. R. Civ. P. 56(c)(4), Shabbab Decl. ¶ 21).

[184]   *See* Shabbab Decl. ¶ 21 (describing the operation of the Accused Products).

Contract is of limited probative value, as it is unsigned.[185]

However, the real problem with TRA's use of the Experian Contract is that it does not contradict Shabbab's declaration relating to the functioning of the Auto Products.  Shabbab testifies in pertinent part that:

> Experian. . . appends J.D.Power purchase attribute data to the DirecTV [identifier], removes all PII, and sends the data to [Kantar Media]. [Kantar Media] uses the same DirecTV [identifier] to correlate STB data with J.D.Power purchase attribute data.[186]

The Experian Contract provides that Experian is to receive "J.D. Power's data file, which include [sp] the following data fields: Unique Key [identifier], last name, address, city, state, zip code[,]" and that Experian is to use this data to "perform anonymous, blind matching of it to certain Client data . . . provided to Experian . . . ."[187]  Nothing in this language suggests that Shabbab's testimony relating to the operation of the Auto Products is erroneous.

As such, TRA's opposition to a summary judgment of non-infringement for the Auto Products boils down to a  "broad, conclusory attack[] on

---

[185]    *Cf. Tampone v. Richmond*, No. 10 Civ. 11776, 2013 WL 118431, at *1 (E.D. Mich. Jan. 9, 2013) (granting motion *in limine* to exclude unsigned operating agreement).

[186]    Shabbab Decl. ¶ 21.

[187]    Experian Contract.

the credibility of [Shabbab] [that] [] [can]not, by [itself], present [a] question[] of

material fact."[188]  Without evidence contradicting Shabbab's testimony, a trial on

whether the Auto Products perform double-blind matching—or utilize a

'thesaurus'—would consist entirely of TRA's attorneys' speculation that Shabbab

is lying about how his company's products work.  Accordingly, the WPP

Companies' motion for a summary judgment of non-infringement by the Auto

Products is granted.[189]

### D.    The WPP Companies' Patent Invalidity Contentions Are Moot

The WPP Companies raised their patent invalidity contentions as

affirmative defenses to TRA's patent infringement claims, and the only affirmative

relief they seek is a declaratory judgment of non-infringement.[190]  In consequence,

---

[188]    *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (citation omitted) (holding that party who bears the burden of proof at trial cannot dispute the evidence offered by opposing party on summary judgment with a general attack on witnesses' honesty).

[189]    *Cf. Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003) (noting that "frivolous, gauzy, spurious, . . . [and] speculative" submissions are inadequate to establish the showing necessary to survive summary judgment) (citations omitted).

[190]    *See* Kantar Media's Answer to TRA's Amended Counterclaims at 38 (raising invalidity defenses to TRA's patent infringement counterclaims).  *Cf.* WPP Mem. at 3 n.7 ("Should the Court grant the non-infringement portions of this motion, it need not reach invalidity.").

the WPP Companies' motion for a summary judgment of invalidity is moot.[191]

## V.    CONCLUSION

In light of the foregoing: (1) the WPP Companies' motion for summary judgment as to non-infringement is granted; (2) the WPP Companies' motion for summary judgment as to invalidity is mooted by my holding of non-infringement; and (3) TRA's 'frozen market' theory of damages for its non-patent claims is excluded.  The Clerk of the Court is directed to close this motion (Doc. No. 122).  A Conference is scheduled for October 16 at 2:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
              October 3, 2013

---

[191]    *See Hon Hai Precision Indus. Co., Ltd. v. Wi-LAN, Inc.*, No. 12 Civ. 7900, 2013 WL 2322675, at \*2 n.11 (S.D.N.Y. May 28, 2013) (citing *Solomon Techs., Inc. v. International Trade Comm.*, 524 F.3d 1310, 1319 (Fed. Cir. 2008)).

**- Appearances -**

**For Defendant and Counterclaim-Plaintiff TRA:**

Nathan Lowenstein, Esq.
Perry Mark Goldberg, Esq.
Trevor Stockinger, Esq.
Goldberg, Lowenstein & Weatherwax LLP
11400 West Olympic Blvd., Suite 400
Los Angeles, California 90064
(310) 203-9222

**For Plaintiffs and Counterclaim-Defendants the WPP Companies:**

Marc Rachman, Esq.
Andrew Keisner, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
(212) 468-4800

Michael A. Albert, Esq.
John Strand, Esq.
Charles Steenburg, Esq.
Eric Rutt, Esq.
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Ave.
Boston, Massachusetts 02210
(617) 646-8000