UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————X

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES) and
CAVENDISH SQUARE HOLDING, B.V.,

               Plaintiffs,

      - against -

TIVO RESEARCH AND ANALYTICS,
INC.,

               Defendant.

—————————————————————X

TIVO RESEARCH AND ANALYTICS,
INC.,

               Counterclaim-Plaintiff,

      - against -

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES);
CAVENDISH SQUARE HOLDING, B.V.;
WPP PLC; WPP GROUP USA, INC.;
KANTAR GROUP LTD.; and KANTAR
RETAIL AMERICA, INC.,

               Counterclaim-Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/4/14

**OPINION AND ORDER**

11 Civ. 4039 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

      On June 14, 2011, TNS Media Research, LLC (d/b/a Kantar Media

Audiences) and Cavendish Square Holding, B.V. (collectively "Kantar") initiated

this litigation against TiVo Research and Analytics, Inc. ("TRA").[1]  Kantar sought

a declaratory judgment of non-infringement of United States Patent No. 7,729,940

(the "'940 Patent"), of which TRA is the sole assignee.[2]  TRA, in response,

asserted the following counterclaims: (1) patent infringement of the '940 Patent;

(2) misappropriation of trade secrets; (3) aiding and abetting breach of fiduciary

duty; and (4) breach of contract.[3]  TRA later amended its counterclaims to include

allegations of infringement of United States Patent No. 8,000,993 (the "'993

Patent") and United States Patent No. 8,112,301 (the "'301 Patent") — of which

TRA is the sole assignee for both.

     At the close of discovery, Kantar moved for summary judgment on

TRA's patent infringement and trade secret misappropriation claims, as well as for

no damages on TRA's fiduciary duty, trade secrets, and breach of contract

---

[1]    On October 25, 2013, TRA changed its name from TRA Global, Inc. to TiVo Research and Analytics, Inc.  *See* Stipulation and Order at 2 [Dkt. No. 188].

[2]    *See* Complaint ¶¶ 8, 16-18.  Kantar also alleged breach of contract, but subsequently dropped this claim. *See id.* ¶¶ 19-22 (detailing Kantar's breach of contract claim); *see also* 5/1/13 Endorsed Letter at 1 [Dkt. No. 119] ("Kantar is . . . dropping its breach of contract claim against TRA.").

[3]    *See* Answer ¶¶ 105-129; *see also* Amended Answer ¶¶ 104-151.

counterclaims.[4]  I granted summary judgment as to "non-infringement, trade secrets, and non-patent damages."[5]

On July 2, 2014, the parties stipulated to nominal damages of $1 for TRA's breach of contract and fiduciary duty claims.[6]  The parties then stipulated to the entry of final judgment,[7] at which point, TRA appealed the final judgment to the United States Court of Appeals for the Federal Circuit.[8]

Kantar now moves for attorneys' fees and non-taxable expenses pursuant to Federal Rule of Civil Procedure 54(b), Section 285 of Title 35 of the United States Code, and the Court's inherent power.[9]  For the following reasons, Kantar's motion is GRANTED.

## II.    BACKGROUND

---

[4]    *See generally* Counterclaim-Defendants' Notice of Motion and Motion for Summary Judgment [Dkt. No. 122].

[5]    *TNS Media Research, LLC v. TRA Global, Inc.*, 984 F. Supp. 2d 205, 208 (S.D.N.Y. 2013) ("*TNS IV*").

[6]    *See generally* Stipulation and Order.

[7]    *See generally* Judgment [Dkt. No. 189].

[8]    *See generally* Notice of Appeal [Dkt. No. 194].

[9]    *See generally* Counterclaim-Defendants' Notice of Motion for Attorneys' Fees [Dkt. No. 191].  Kantar presently estimates its sum at approximately five million dollars.  *See* Counterclaim-Defendants' Memorandum in Support of Their Motion for Attorneys' Fees ("Kantar AF Mem.") at 2 n.2.

## A.      Complaint, Counterclaims, and Preliminary Injunction

The underlying dispute in this case involves intellectual property that relates to the goal of "cross-referencing huge amounts of data from a variety of sources in order to determine which television programs are the best match for an advertiser seeking to market specific products, while protecting the privacy interests of television viewers."[10]  After Kantar commenced this action by seeking a declaration of non-infringement of the '940 Patent, TRA counterclaimed that Kantar infringed upon Claim 71 of the '940 Patent, which, in sum, teaches a method for:

> (1) using a computer to collect data about (i) commands that viewers input into, *e.g.*, a television; (ii) the advertisements that they view; (iii) the programs they watch; and (iv) the products they go on to purchase; (2) grouping these data with a unique identifier that does not personally identify the viewer/purchaser, and transmitting it to a central database; (3) storing this grouped, 'blinded' data in the centrally located database; (4) cleansing and editing the data (*e.g.*, deleting information that is irrelevant to the advertiser using the invention, or repeated); and (5) using the data to generate granular statistical inferences about the cost-effectiveness of advertisements.[11]

On July 5, 2011, TRA moved for a preliminary injunction to enjoin

---

[10]      Amended Answer ¶ 22.

[11]      *TNS IV*, 984 F. Supp. 2d at 210-11.

Kantar from "making, selling, and offering for sale its infringing product[.]"[12]
Kantar opposed the preliminary injunction motion by arguing that the '940 Patent
was invalid.[13]   Kantar also argued that its products did not infringe Claim 71 of the
'940 Patent.[14]   In its brief, Kantar moved sequentially through each disputed claim
term and discussed how its products did not practice those limitations.[15]   In so
doing, Kantar noted, among other things, that its products do not apply a
"cleansing and editing algorithm to the matched and stored data" as required in
Claim 71 of the '940 Patent.[16]   Kantar argued that its products only apply such an
algorithm before, not after, the data is matched and stored.[17]   TRA argued briefly in
reply that the claim term at issue here — "[applying a] cleansing and editing
algorithm to the matched and stored data" — "does not impose a sequential

---

[12]     Notice of Motion and Motion for Preliminary Injunction Against
Plaintiff/Counterclaim-Defendant TNS Media Research, LLC d/b/a Kantar Media
Audiences at 1 [Dkt. No. 11].

[13]     *See* Plaintiffs' Opposition to Defendant's Motion for a Preliminary
Injunction at 12-21.

[14]     *See id.* at 9-12.

[15]     *See id.*

[16]     *See id.* at 11-12.

[17]     *See id.*

limitation."[18]

I denied TRA's motion finding that Kantar had raised a substantial question about the validity of Claim 71 of the '940 Patent.[19]  In denying TRA's motion, I also found, among other things, that (1) the disputed language in Claim 71 of the '940 Patent — "[applying a] cleansing and editing algorithm to the matched and stored data" — required the algorithm to be applied *after* the data is matched and stored;[20] (2) TRA's argument that the algorithm could be applied *before* the data is matched and stored "does violence to the ordinary grammatical understanding of the past tense[;]"[21] (3) prior art substantially taught all of the limitations in Claim 71;[22] and (4) an article written by Gerald J. Eskin constituted prior art that "taught to compare information about what programs and advertisements households actually saw with purchasing data[.]"[23]  I did not,

---

[18]     Reply Memorandum in Support of Preliminary Injunction Against Plaintiff/Counterclaim-Defendant TNS Media Research, LLC d/b/a Kantar Media Audiences at 8.

[19]     *See generally TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2011 WL 4425415, at *6 (S.D.N.Y. Sept. 22, 2011) ("*TNS I*").

[20]     *See id.* at *5.

[21]     *Id.*

[22]     *See id.* at *6.

[23]     *Id.* at *5 & n.61.

however, reach the issue of infringement in denying TRA's motion for preliminary injunctive relief.[24]

## B.     TRA Amends Its Counterclaims

On March 21, 2012, TRA sought and obtained permission to file supplemental amended counterclaims.[25]  TRA then added allegations of Kantar's infringement of two patents — the '993 Patent and the '301 Patent — that had been issued after the filing of TRA's initial counterclaims.[26]

## E.     Claim Construction

On July 6, 2012, I held a *Markman* hearing.[27]  Prior to the hearing, the parties stipulated to the meaning of fifteen disputed claim terms, leaving only three remaining for adjudication: (1) "household level data associated with multiple consumer households[;]" (2) "household level data[;]" and (3) "cleansing and

---

24      *See id.* at *3 (noting that only "[i]f the court finds that a patent is valid, the court should proceed to analyze infringement claims").

25      *See generally* Notice of Motion for Leave to File TRA Global, Inc.'s Supplemental and Amended Counterclaims [Dkt. No. 56]; *TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2012 WL 2052679 (S.D.N.Y. June 4, 2012).

26      *See* Amended Answer ¶¶ 116-127.

27      *See generally Markman* Hearing Transcript [Dkt. No. 87].

editing algorithm[.]"[28]  On August 29, 2012, I issued an Opinion and Order

construing the three claim terms in dispute in the '940 Patent.[29]  I adopted TRA's

proposed construction with respect to disputed claim term (1),[30] but adopted

Kantar's proposed contstruction with respect to disputed claim term (3).[31]  I

declined to construe disputed claim term (2) because my construction of (1)

"resolved all relevant questions as to the meaning of the claim words [in (2)]."[32]

       In adopting Kantar's proposed construction of the phrase "cleansing

and editing algorithm," I held that "TRA's proposed construction would . . . render

meaningless the amendments TRA added after the PTO rejected the original

versions of the claim language" and that "TRA should not now be permitted to

---

[28]    *See TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2012 WL 3756325, at *3 (S.D.N.Y. Aug. 29, 2012) ("*TNS III*"); *see also* Parties Joint Claim Construction Statement at 3-4 [Dkt. No. 51].

[29]    *See generally TNS III*, 2012 WL 3756325.  The parties stipulated to the constructions of the other claim terms in the '940 Patent.  *See id.* at *3 (citing Parties Joint Claim Construction Statement at 3-4).  The parties also stipulated to all of the claim terms in the '993 Patent and the '301 Patent.  *See generally* 9/19/12 Joint Claim Construction Statement - Stipulations and Order Concerning Claim Construction [Dkt. No. 93].

[30]    *See TNS III*, 2012 WL 3756325, at *7, *11.

[31]    *See id.* at *13.

[32]    *Id.* at *11.

8

adopt a construction that undoes this prosecution history."[33]

I also found that "[a]ccording to both proposed constructions, [several] algorithms which are described in the specification can properly be considered 'cleansing and editing' algorithms[.]"[34]  One such "algorithm . . . corrects for the 'false positive' problem of data collected from a set-top box that remains on even though the associated television has been turned off."[35]

### F.    April 2013 Status Conference

On April 23, 2013, the Court held a status conference to discuss the possibility of eliminating some claims from the litigation — which then consisted of twenty-seven patent claims and twenty-four trade secret claims.[36]  At the conference I intimated that "Kantar has the better of it in saying this thing needs to be slimmed down.  This is quite ridiculous."[37]  I added that "the case is sprawling and out of control, and it would be poor judicial management to let it continue in a

---

[33]    *Id.* at *13.

[34]    *Id.* at *12.

[35]    *Id.*

[36]    *See* 4/23/13 Status Conference Transcript ("4/23/13 Tr.") at 3:4-5, 15-21.

[37]    *Id.* at 2:23-24.

sprawling and uncontrolled manner."[38]  I then ordered the parties to meet and

confer by May 2, 2013 and agree on how to narrow the claims in this case.[39]  In an

Endorsed Letter dated May 1, 2013, TRA agreed to reduce its number of patent

claims to fifteen and its number of trade secret claims to five.[40]  The fifteen

remaining patent claims related to two groups of products that TRA alleged

infringed on its patents — the CPG Products and the Auto Products (collectively

the "Accused Products").

       I also noted at the April 23 status conference that although "I can't

know whether what they tell me is accurate[,] [Kantar alleges] that one of the

experts for TRA ignores my claim construction."[41]  I continued, "[TRA] may need

to think about whether to continue pressing . . . parts of [its] expert Mela['s report],

because after I have warned you not to do it, if you do it, and Kantar is right, I am

telling you now, I have got too much on my plate to waste time with frivolous

motions.  I will turn right to Rule 11.  I don't say that lightly because I hate

sanctions."[42]

---

[38]     *Id.* at 3:10-13.

[39]     *See id.* at 12:23-24.

[40]     *See* 5/1/13 Endorsed Letter at 1 [Dkt. No. 119].

[41]     4/23/12 Tr. at 4:3-4, 6-7.

[42]     *Id.* at 4:24-5:4.

G.    **Summary Judgment**

1.    **Kantar's Arguments in Favor of Summary Judgment**

On June 5, 2013, Kantar moved against TRA for summary judgment.[43]  Kantar sought to "dispose of the case as a whole," arguing that "TRA faces a 'lack of evidence' as to an 'essential element' of each of [its] claims, even after extensive discovery."[44]  Kantar argued, with respect to TRA's patent infringement theories, that

> (1) the CPG Products do not collect "purchase data," as all fifteen claims require;
> (2) the Auto Products do not perform double-blind matching of data, as all fifteen claims require;
> (3) none of the Accused Products apply a "cleansing and editing algorithm to the matched and stored data," as [] claim 71 [of the '940 Patent] requires;
> (4) none of the Accused Products use matched data to drive an addressable commercial, as [claim 42] of the '301 [Patent] . . . requires; and
> (5) TRA has waived any argument under the doctrine of equivalents.[45]

2.    **TRA's Opposition to Summary Judgment**

a.    **TRA's Argument that Kantar's Products Apply a**

---

[43]    *See generally* Counterclaim-Defendants' Notice of Motion and Motion for Summary Judgment [Dkt. No. 122].

[44]    Counterclaim-Defendants' Memorandum in Support of Their Motion for Summary Judgment at 1.

[45]    *TNS IV*, 984 F. Supp. 2d. at 218.

### Cleansing and Editing Algorithm *After* the Data Is Matched and Stored

In opposition to the motion, TRA asserted that Kantar's products did in fact apply a "cleansing and editing algorithm" *after* the data had been matched and stored.[46]  TRA proposed two ways in which Kantar's products apply such an algorithm in accordance with the Court's previous claim constructions.[47]  One way was by a "false positive" algorithm.[48]  However, in supporting this contention, TRA relied on the deposition testimony of Alex North, a Kantar employee.[49]  In that deposition, the following exchange occurred between TRA's attorney and North:



. . .

---

[46]    *See* Counterclaim-Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("TRA SJ Opp.") at 28-29.

[47]    *See id.*

[48]    *See id.*

[49]    *See id.* at 29.

12

A: [50]

This definition of "false positive" differs from that which the Court adopted in its claim construction opinion.[51] Furthermore, TRA's expert, Carl Mela, adopted this deposition testimony, and therefore this different definition of "false positive," in his declaration, which TRA attached as an exhibit to its opposition.[52] Mela stated:

> I understand that the Court in its Claim Construction Order itself, quoting from the patent, mentioned examples of cleansing and editing algorithms such as false positive algorithms and intab determination algorithms. . . . [I]n my opinion Kantar performs these types of cleansing and editing algorithms in a way that satisfies claim 71 [of the '940 Patent]. Alex North has indicated that ██████████████████████████████████████████████████████████[53]

TRA, however, did not mention this argument again — not in its surreply nor at

---

[50] Deposition Transcript of Alex North, Ex. 3 to Declaration of Trevor V. Stockinger (counsel for TRA) in Support of TRA's Opposition to Counterclaim–Defendants' Motion for Summary Judgment ("Stockinger Decl."), at 105:23-106:25.

[51] *See TNS III*, 2012 WL 3756325, at *12 ("[T]he 'false positive' problem of data collected from a set-top box that remains on even though the associated television has been turned off.").

[52] *See* Declaration of Carl F. Mela, Ph.D., in Support of Counterclaim–Plaintiff's Memorandum in Support of Its Opposition to the Motion for Summary Judgment ("Mela Decl.") ¶ 13.

[53] *Id.*

oral argument.  Nor was this argument addressed by the Court in its summary judgment opinion.

### b.    TRA's Doctrine of Equivalents Theory

TRA also opposed summary judgment by arguing that in addition to the CPG Products literally infringing its patents, they also infringed under the doctrine of equivalents.[54]  TRA had initially raised this argument in Mela's February 2, 2013 expert report, but in less than a page and without discussing "purchase data" — the critical claim term.[55]  With its opposition, however, TRA submitted a declaration from Mela that contained two full paragraphs explaining TRA's doctrine of equivalents theory, including a discussion of "purchase data."[56]  In its reply brief, Kantar objected to this new, more-substantiated doctrine of equivalents theory as untimely and barred by Federal Rule of Civil Procedure 37(c).[57]

---

[54]    *See* TRA SJ Opp. at 25-26.

[55]    *See* Excerpts from Amended Export Report and Disclosure of C. Mela Feb. 11, 2013, Ex. C to Declaration of Eric Rutt in Support of Counterclaim-Defendants' Motion for Summary Judgment at 213.

[56]    *See* Mela Decl. ¶¶ 17-19.

[57]    *See* Counterclaim-Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment ("Kantar SJ Reply") at 13.  Rule 37(c) provides, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

### c.      TRA's Judicial Estoppel Argument

TRA also argued that "Kantar should be judicially estopped from contending that its products do not collect and utilize the 'purchase data' in question."[58]  TRA contended that the Court, in denying TRA's motion for a preliminary injunction, had relied on Kantar's position "that its products utilized 'purchase data' [in order to find] that [Kantar's] prior art was invalidating."[59]  But TRA asserted that now to avoid infringement "Kantar takes the exact opposite position on purchase data, claiming its products do not utilize 'purchase data.'"[60]

### d.      TRA's Argument that the Auto Products Practice Double-Blind Matching

TRA argued as well that the Auto Products practice double-blind matching.[61]  In an effort to rebut the testimony of Kantar's president, George Shababb, that the Auto Products do not practice double-blind matching, TRA produced a contract between Experian and J.D. Power & Associates (the "Experian

---

substantially justified or is harmless."  Fed. R. Civ. P. 37(c).

[58]      TRA SJ Opp. at 21.

[59]      *Id.* at 22.

[60]      *Id.*

[61]      *See id.* at 27.

Contract") that TRA claimed contradicted Shababb's testimony.[62]  TRA also claimed that Shababb lacked personal knowledge from which to testify about whether or not the Auto Products practice double-blind matching.[63]

### 3.     The Court Grants Summary Judgment

On November 25, 2013, I issued an Opinion and Order on Kantar's motion for summary judgment.[64]  I granted the motion, but only as to non-infringement, misappropriation of trade secrets, and non-patent damages.[65]  I held that TRA still "may be entitled to nominal damages for its breach of contract claim; attorneys' fees for its breach of fiduciary duty claim; and equitable relief for both claims."[66]

### a.     Dismissal of TRA's Trade Secret Claims

I dismissed all five of TRA's trade secret claims: (1) TRAnalytics Secret; (2) Clients Secret; (3) Strategy Secret; (4) Positioning Secret; and (5) Financial Secret.[67]  I first noted that

---

[62]     *See id.*

[63]     *See id.* at 28.

[64]     *See TNS IV*, 984 F. Supp. 2d 205.

[65]     *See id.* at 208.

[66]     *Id.* at 242.

[67]     *Id.* at 239-40.

> [a]s a result [of the April 23, 2013 status conference], TRA
> dismissed [nineteen] of its twenty-[four] trade secrets. Prior to that
> point, TRA asserted hundreds of pages of documents in support
> of *twenty*-[*four*] alleged trade secrets, with little to no indication
> as to *how* these documents combined to form trade secrets.  It was
> apparently TRA's intention to wait until it was before a jury to
> define the precise contours of its trade secrets claim; but, faced
> with [a] motion for summary judgment, it instead narrowed the
> range of documents in its opposition papers.[68]

But I then explained that "reviewing these documents . . . consumed considerable

judicial resources. . . . [and] was conducted for little purpose."[69]  I sustained

Kantar's Rule 37 objection to this belated narrowing of documents and dismissed

TRA's five trade secret claims for violating Federal Rule of Civil Procedure

26(e).[70]  I noted that "TRA's 'Dance of the Seven Veils approach to [its] trade

secret claim' is manifestly prejudicial to [Kantar], and taxing on the Court."[71]

Furthermore, I stated that "TRA had ample opportunity to identify its alleged trade

secrets with specificity prior to the close of discovery . . . [but] it failed to do

---

[68]    *Id.* at 238.

[69]    *Id.*

[70]    *See id.* at 238-39.  Rule 26(e) provides, in pertinent part, "[a] party
who has . . . responded to an interrogatory . . . must supplement or correct its
disclosure or response:  in a timely manner if the party learns that in some material
respect the disclosure or response is incomplete or incorrect, and if the additional
or corrective information has not otherwise been made known to the other parties
during the discovery process or in writing. . . ."  Fed. R. Civ. P. 26(e).

[71]    *TNS IV*, 984 F. Supp. 2d at 239.

so[.]"[72]

As an alternative reason for dismissing TRA's trade secret claims, I held that the documents now identified by TRA "[f]ailed to [a]llege [p]rotectable [t]rade [s]ecrets, and/or [e]vidence of use" by Kantar.[73]  In each of the five trade secret claims, I found that either TRA had (1) alleged a non-protectable trade secret as a matter of law; (2) publicly disclosed the trade secret; (3) not evidenced use of the trade secret by Kantar; or (4) done some combination of the above.[74]  The following summarizes my holdings with respect to each of the five trade secret claims:

> **TRAnalytics Secret**: "TRA *disclosed* most of the properties of TRAnalytics that it now apparently claims as a trade secret . . . and there is *no evidence* in the record that [Kantar's products] *made use* of any of the technical information alleged by TRA."[75]
> **Clients Secret**: "[Kantar has] produced abundant evidence that TRA *disclosed* its clients at every turn. . . . [I]t *stretches credulity* to suggest that TRA's client list is a trade secret.  There is *no evidence* that TRA undertook the type of effort to develop it that would render such a list proprietary. . . . [Nor is there] evidence

---

[72]     *Id.*

[73]     *Id.*  "And even though TRA narrowed its list of trade secrets, it reserved the 'right to rely upon additional documents or testimony related to each trade secret.'" *Id.* (citing 5/10/13 Letter from Nathan N. Lowenstein (counsel for TRA) to John L. Strand (counsel for Kantar), Ex. 2 to Stockinger Decl., at 1).

[74]     *See TNS IV*, 984 F. Supp. 2d at 239-40.

[75]     *Id.* at 239 (emphasis added).

indicating that [Kantar] *used* its client list."[76]

**Strategy Secret**: "The Strategy Secret *fails as a matter of law*. Based on the documents submitted by TRA, the Strategy Secret *consists of little more than the aspirations* of a company struggling to achieve revenue traction."[77]

**Positioning Secret**: "The Positioning Secret . . . *fails as a matter of law*. 'Price lists, product samples, and 'marketing plans' are all items that are not, as a matter of law, protected as trade secrets.' The documents that TRA alleges constitute the Positioning Secret *fit comfortably* within this rule."[78]

**Financial Secret**: "[T]he information that allegedly constitutes the Financial Secret was *publicly disclosed* by TRA. In any event, TRA fails to prove that [Kantar] *used* the Financial Secrets *in any way*."[79]

As to non-infringement, I held that "[t]he parties' dispute about whether the CPG Products practice the purchase data limitation of the patents in suit is ripe for summary adjudication, as it turns on issues of claim construction, rather than disputed questions of fact."[80]  I found that these three products "[d]o [n]ot [c]ollect [p]urchase [d]ata, and [t]herefore [d]o [n]ot [i]nfringe the [a]sserted [p]atent [c]laims [e]ither [l]iterally or [u]nder the [d]octrine of [e]quivalents[.]"[81]

---

[76]   *Id.* (emphasis added).

[77]   *Id.* at 240 (emphasis added).

[78]   *Id.* (emphasis added).

[79]   *Id.* (emphasis added).

[80]   *Id.* at 242-43.

[81]   *Id.* at 242.

In so holding, I barred TRA's doctrine of equivalents theory for three reasons: (1) TRA's timely assertion of its theory in "Mela's report contains less than a page of conclusory statements about the doctrine of equivalents and says nothing about purchase data[;]"[82] (2) Mela's subsequent "declaration — submitted at the summary judgment stage — [which] include[d] two pages of testimony on the purchase data element[,]" was "untimely expert disclosure [and] barred by Rule 37(c)[;]"[83] and (3) TRA's doctrine of equivalents opinion "is merely a repackaged form of TRA's literal infringement theory."[84]  I also rejected TRA's theory of judicial estoppel because "the Court [had] relied on a 1985 article by Gerald J. Eskin — not on [Kantar's] argument — to find that prior art taught the matching of purchase data and viewer data[.]"[85]

As to the Auto Products, I held that they "[d]o [n]ot [u]tilize [d]ouble [b]lind [m]atching[.]"[86]  I found that (1) Shabbab had personal knowledge;[87] and (2) "[n]othing in [the Experian Contract] suggests that Shabbab's testimony

---

[82]    *Id.* at 244.

[83]    *Id.*

[84]    *Id.*

[85]    *Id.*

[86]    *Id.*

[87]    *See id.*

relating to the operation of the Auto Products is erroneous."[88]  Thus, "TRA's

opposition to a summary judgment of noninfringement for the Auto Products boils

down to a "broad, conclusory attack[] on the credibility of [Shababb] [that] []

[can]not, by [itself], present [a] question[] of material fact."[89]  And therefore,

"[w]ithout evidence contradicting Shabbab's testimony, a trial on whether the [two

products] perform double-blind matching . . . would consist entirely of TRA's

attorney's speculation that Shabbab is lying about how his company's products

work."[90]

### H.    Final Judgment and Appeal

In a subsequent Opinion and Order, I held, among other things, that

(1) TRA could not obtain injunctive relief for its breach of fiduciary claim or its

breach of contract claim;[91] (2) "TRA may request attorneys' fees [for its breach of

fiduciary duty claim] only by motion after judgment has entered[;]"[92] and (3)

"TRA may be able to recover nominal damages on its [contract and fiduciary duty

---

[88]     *Id.* at 245.

[89]     *Id.* (citing *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (citation omitted)).

[90]     *Id.*

[91]     *See TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2014 WL 1370279, at *1 (S.D.N.Y. Apr. 7, 2014).

[92]     *Id.* at *2.

claims].'"[93]

As a result of these holdings, only one issue remained for trial: nominal damages for breach of contract and aiding and abetting breach of fiduciary duty.[94]  However, on July 2, 2014, the parties stipulated to nominal damages of $1.[95]

With no issues remaining for trial, both parties stipulated to the entry of final judgment.[96]  On July 22, 2014, TRA appealed the final judgment to the United States Court of Appeals for the Federal Circuit.[97]  Kantar now moves against TRA for an award of attorneys' fees and non-taxable expenses.

## IV.   APPLICABLE LAW

### A.   Sanctions Under 35 U.S.C. § 285

Section 285 provides, in its entirety, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the Supreme Court eschewed the former interpretation of section 285, and articulated a new, more flexible standard

---

[93]     *Id.*

[94]     *See generally* Stipulation and Order.

[95]     *See id.* at 1.

[96]     *See generally* Judgment.

[97]     *See generally* Notice of Appeal.

22

by which to assess sanctions under section 285.[98]  The Court held that

> an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.[99]

Under this standard, "a district court may award fees in the rare case in which a party's unreasonable conduct — while not necessarily independently sanctionable — is nonetheless so 'exceptional' as to justify an award of fees."[100]  Section 285 "demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one."[101]  However, "[t]he purpose of section 285, unlike that of Rule 11, is not to control the local bar's litigation practices . . . but is remedial and for the purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust, based on the baselessness of the suit or because of litigation or Patent Office

---

[98]    134 S. Ct. 1749, 1756 (2014) ("Th[e] [former interpretation] superimpose[d] an inflexible framework onto statutory text that is inherently flexible.").

[99]    *Id.*

[100]    *Id.* at 1757.

[101]    *Id.* at 1758.

misconduct, to require it to bear its own costs."[102]  Section 285, in essence, may

require "in exceptional cases . . . the losing party to reimburse the prevailing party

its attorney fees."[103]

### B.    Sanctions Under the Court's Inherent Power

A court "may exercise its inherent power to sanction a party or an

attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive

reasons.'"[104]  To impose sanctions, "a court must find clear evidence that (1) the

offending party's claims were entirely without color, and (2) the claims were

brought in bad faith — that is, 'motivated by improper purposes such as

harassment or delay.'"[105]  A claim entirely without color "lacks any legal or factual

basis."[106]  A colorable claim, however, "has some legal and factual support,

---

[102]    *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1310 n.1 (Fed. Cir. 2012), *vacated and remanded*, 134 S. Ct. 1744 (2014).  *Accord Gametek LLC v. Zynga, Inc.*, No. CV 13–2546 RS, 2014 WL 4351414, at *3 (N.D. Cal. Sept. 2, 2014) (citing *Highmark*, 687 F.3d at 1310 n.1).

[103]    *Phonometrics, Inc. v. ITT Sheraton Corp.*, 64 Fed. App'x 219, 222 (Fed. Cir. 2003).

[104]    *Ransmeier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).

[105]    *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999)).

[106]    *Sierra Club v. United States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985) (citing *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980)).

considered in light of the reasonable beliefs of the individual making the claim."[107]
As a matter of proof, "bad faith may be inferred 'only if actions are so completely
without merit as to require the conclusion that they must have been undertaken for
some improper purpose such as delay.'"[108]  Moreover, "[t]he court's factual
findings of bad faith must be characterized by 'a high degree of specificity.'"[109]

## VI.   DISCUSSION

### A.   Kantar's Request for Attorneys' Fees and Expenses Is Granted

Kantar seeks attorneys' fees and non-taxable expenses under section
285 for TRA's assertion of its patent-related claims.  In its papers, Kantar describes
a litany of instances that allegedly demonstrate the "exceptional" nature of this
case.  While some of these instances support an "exceptional" case finding more
than others, the "totality of the circumstances" dictates that TRA acted in an
"exceptional" manner throughout this litigation.  In one instance, TRA even
ignored an express warning from the Court not to take certain action — otherwise
sanctions would follow — and TRA nevertheless proceeded.  Thus, with respect to

---

[107]     *Nemeroff*, 620 F.2d at 348.

[108]     *Schlaifer Nance*, 194 F.3d at 336 (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir.1996) (quotations omitted)).

[109]     *Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34 (2d Cir. 1995) (quoting *Oliveri v. Thompson*, 803 F.2d 1266, 1272 (2d Cir. 1986) (quotations omitted)).

25

TRA's patent-related claims, Kantar is entitled to its attorneys' fees and costs for the following reasons.

### 1.     TRA's "Matched and Stored" Argument Lacked Merit

At the preliminary injunction stage, TRA pressed a proposed construction of "[applying a] cleansing and editing algorithm to matched and stored data" that lacked merit. TRA proposed a construction that would allow for the algorithm to be applied *before* the data is matched and stored. The Court, however, held that TRA's proposed construction "does violence to the ordinary grammatical understanding of the past tense."[110] No correct application of the rules of grammar could have supported TRA's proposed construction. Thus, TRA's proposed construction lacked merit and was frivolous.

TRA argues now, however, that it cannot be sanctioned because the Court did not rule on the basis of the "matched and stored" construction, but rather ruled on the basis of patent validity.[111] This argument lacks merit as well. Adjudicating the preliminary injunction motion required the Court to construe

---

[110]     *See TNS I*, 2011 WL 4425415, at *5.

[111]     *See* Counterclaim-Plaintiff's Memorandum in Opposition to Motion for Attorneys' Fees ("TRA AF Opp.") at 5.

26

disputed claim terms — including "matched and stored."[112]  Moreover, TRA should not now be excused for its frivolous argument simply because the question of patent validity did not directly hinge on the Court's construction of "matched and stored."

Additionally, TRA argues that it later adhered to the Court's construction and proposed two separate ways that Kantar's products apply a cleansing and editing algorithm to data already matched and stored.[113]  But as explained below, this contention is not entirely accurate.  Further, belated reasonable arguments do not compensate for earlier frivolous ones.

TRA also argues that "when TRA moved for an injunction it was not clear that [the construction of 'matched and stored'] would even be an issue:  the patent contains no express sequence of steps . . . and Federal Circuit authority provides that '[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.'"[114]  However, I addressed this precise argument in denying TRA's preliminary injunction motion.[115]  Basic grammar —

---

[112]    *See TNS I*, 2011 WL 4425415, at *3 ("The court must construe claim terms before determining whether a patent is obvious in light of prior art.").

[113]    *See* TRA AF Opp. at 5-6.

[114]    *Id.* at 4-5 (quoting *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001)).

[115]    *See TNS I*, 2011 WL 4425415, at *5.

specifically, the past tense — imparts an express sequential limitation.[116]

TRA also argues that the Court cannot award sanctions on the basis of a position "argued only once, in just two short paragraphs[, and] only in rebuttal[.]"[117]  But length and placement of an argument should not dictate its level of frivolity.  Nor should it matter that Kantar initially raised the issue.  It behooved TRA to abandon the issue and recognize its lack of merit.

In the same vein, TRA argues that if its argument truly lacked any merit, Kantar should have led with this argument in its opposition to the preliminary injunction motion.[118]  Kantar, however, organized its brief to mirror the steps of the patent.[119]  Moreover, TRA cites no case law to show that the order in which an opponent raises counterarguments somehow reflects the degree to which one's own arguments lack merit.

TRA lastly contends that the Court's use of "do[ing] violence" equates to a "simpl[e] compari[son] [of] competing interpretations and

---

[116]    *See id.*

[117]    TRA Opp. at 5.

[118]    *See id.*

[119]    *See* Counterclaim-Defendants' Reply in Support of Their Motion for Attorneys' Fees at 2; *see also generally* Plaintiffs' Opposition to Defendant's Motion for a Preliminary Injunction.

identif[ication] [of] a basis for preferring one[.]"[120]  But TRA fails to understand that courts rarely portray litigants' positions as "do[ing] violence."

For these reasons, I find that TRA's proposed construction of "matched and stored" was frivolous.  This conclusion supports the finding of an "exceptional" case.

### 2.    Kantar's "Cleansing and Editing Algorithm" Argument

TRA also deserves to be sanctioned for proposing a construction of "cleansing and editing algorithm" that the Court later held "render[ed] meaningless the amendments TRA added after the [Patent and Trademark Office] rejected the original versions of the claim language."[121]  The Court previously determined that TRA's proposed construction "undoes th[e] prosecution history."[122]  TRA argues in response that sanctioning it here would be "nitpick[ing]" and that TRA, if anything, acted reasonably and cooperatively throughout claim construction.[123]  TRA notes that it stipulated to the meaning of fifteen disputed terms and, of the three terms the Court construed, TRA only lost one — "cleansing and editing

---

[120]    TRA AF Opp. at 5.

[121]    *See* Kantar AF Mem. at 5; *see also TNS III*, 2012 WL 3756325, at *13.

[122]    *See* Kantar AF Mem. at 5; *see also TNS III*, 2012 WL 3756325, at *13.

[123]    *See* TRA AF Opp. at 6.

29

algorithm."[124]  TRA now characterizes the Court's rejection of its proposed

construction as "inferring from the prosecution history that the term should have

the more restrictive meaning."[125]  But that characterization grossly understates the

Court's view.  The Court did not just "infer" from the prosecution history; rather

the Court concluded that TRA had attempted to undo that which the PTO had

required TRA to amend in order to obtain its patent.  This attempt to undo the

prosecution history vitiates any reasonableness or cooperation otherwise

demonstrated by TRA during claim construction.

TRA also argues that the Court's construction of "cleansing and

editing algorithm" was not dispositive in the case because the Court ultimately

ruled on other grounds at summary judgment.[126]  As such, TRA argues that its

proposed construction cannot form the basis for an award of attorneys' fees.

However, a finding of frivolity does not depend on whether the issue ultimately

disposed of the case or motion.  Rather, frivolity can exist in isolation.  Parties

cannot litigate a case by presenting multiple alternative arguments, some of which

lack merit, then later take shelter under the meritorious ones when facing a motion

---

[124]   *Id.*

[125]   *Id.*

[126]   *Id.*

for attorneys' fees.  Moreover, Kantar pursued summary judgment on the ground

that "none of [its products] apply a 'cleansing and editing algorithm to the matched

and stored data,' as [] claim 71 [of the '940 Patent] requires[.]"[127]  That the Court

chose not to adjudicate summary judgment on this basis does not show that TRA's

arguments had merit.

TRA notes, however, that at summary judgment it adopted the Court's

construction and showed that Kantar's products still infringed.[128]  But as stated

above, belated reasonable arguments do not compensate for earlier frivolous ones.

Further, TRA's contention that it adhered to the Court's constructions is not

entirely accurate.  In attempting to argue that Kantar's products infringed under the

Court's construction of "cleansing and editing algorithm," TRA contorted the

definition of "false positive."  Prior to claim construction, both parties had

stipulated to the meaning of "false positive" and the Court adopted it.[129]  However,

despite the Court's warning not to ignore previously construed terms,[130] TRA

---

[127]     *TNS IV*, 984 F. Supp. 2d at 218.

[128]     *See* TRA AF Opp. at 6.

[129]     *See TNS III*, 2012 WL 3756325, at *12.

[130]     "[TRA] may need to think about whether to continue pressing . . . parts of [its] expert Mela['s report], because after I have warned you not to do it, if you do it, and Kantar is right, I am telling you now, I have got too much on my plate to waste time with frivolous motions.  I will turn right to Rule 11.  I don't say that lightly because I hate sanctions."  4/23/12 Tr. at 4:24-5:4.

relied upon an incorrect definition of "false positive" when arguing that Kantar's products did in fact apply a cleansing and editing algorithm.[131]  Such failure to heed a Court warning strongly favors the finding of an "exceptional" case.

In response, TRA does not dispute that it contorted the meaning of "false positive."  Rather, TRA argues that this issue was "inconsequential" and that it consisted of only "one paragraph of a much longer declaration, and the cited deposition testimony was just one piece of evidence in support of that opinion."[132] Moreover, TRA asserts that its reliance on the meaning of "false positive" was "merely the first of two alternate bases for arguing that Kantar's products practice a 'cleansing and editing' limitation."[133]  TRA also notes that "[n]ot a single line of TRA's surreply, nor a single moment of oral arguement, were devoted to this issue, and the Court did not decide it."[134]  However, each of these arguments lack force. *First*, ignoring a court warning is never inconsequential.  It does not matter that the Court paid little attention to this issue in deciding summary judgment, or that TRA's expert only mentioned it in one paragraph of his declaration.  *Second*, TRA

---

[131]     *See* Counterclaim-Plaintiff's Memorandum in Opposition to Motion for Summary Judgment at 29.

[132]     TRA AF Opp. at 8.

[133]     *Id.*

[134]     *Id.*

cannot immunize itself from liability simply by pointing out that its "false positive" interpretation formed only one of two alternate bases for its infringement argument.  Ignoring a Court's directive is separate and apart from whether TRA's argument as a whole lacked merit.

Lastly, TRA argues that its decision to appeal the final judgment of this case should divest this Court of jurisdiction to determine if TRA's distortion of "false positive" contributes to a finding of an "exceptional" case.[135]  TRA believes the Court would have ruled in its favor on the issue of whether Kantar's products do in fact apply a cleansing and editing algorithm after the data is matched and stored.[136]  But, TRA argues, the Federal Circuit now has exclusive jurisdiction to determine whether TRA's argument has merit.[137]  However, in determining whether this case is "exceptional," I am not deciding the merits of TRA's "false positive" argument.  Rather, I am holding that TRA's decision to flout the Court's claim construction is further evidence that this case is "exceptional," thereby warranting an award of attorneys' fees.

**3.    Judicial Estoppel**

---

[135]    *See id.*

[136]    *See* TRA AF Opp. at 8.

[137]    *See id.*

TRA's judicial estoppel argument in its surreply also favors a finding of an "exceptional" case.  As I held at summary judgment, "the Court relied on a 1985 article by Gerald J. Eskin — not on Kantar['s] argument — to find that prior art taught the matching of purchase data and viewer data, and thus, denied TRA's preliminary injunction motion."[138]  Had TRA read the preliminary injunction decision, it would have been apparent that the Court did not rely on an inconsistent Kantar position.  Nevertheless, TRA pressed its baseless judicial estoppel argument.

### 4.    Doctrine of Equivalents

TRA's assertion of the doctrine of equivalents as a basis for finding infringement also contributes to the "exceptional" nature of this case.  In the first instance, Kantar's only timely assertion of its doctrine of equivalents theory consisted of "less than a page of conclusory statements . . . and sa[id] nothing about purchase data."[139]  Then, when TRA added substance to its doctrine of equivalents theory at summary judgment, I held that it was both untimely and of no added value.[140]  However, TRA argues now that it reasonably asserted its further-

---

[138]    *TNS IV*, 984 F. Supp. 2d at 244.

[139]    *Id.*

[140]    *See id.*

34

substantiated doctrine of equivalents theory because parties waive timeliness objections "all the time and for all sorts of reasons."[141]  But here, Kantar provided no indication that it would waive a timeliness objection and TRA should not have relied on that as a basis for arguing it in the first place.  In fact, Kantar, in its summary judgment reply brief, raised a timeliness objection in its first opportunity to do so.[142]  TRA thus exercised poor judgment in attempting to assert its doctrine of equivalents theory and should therefore be liable for the unnecessary attorneys' fees imposed on Kantar as a result.

### 5.    Shabbab Speculation

TRA's "broad, conclusory attack"[143] on Shabbab's credibility reinforces an "exceptional" case finding.  In attempting to avoid summary judgment, TRA offered two arguments in opposition to Kantar's assertion that its products did not perform double-blind matching.[144]  However, the first argument — that the Experian Contract contradicted Shabbab's testimony — failed because the Court held that "[n]othing in [the Experian Contract's] language suggests that Shababb's testimony relating to the operation of the Auto Products is

---

[141]    TRA AF Opp. at 16.

[142]    *See* Kantar SJ Reply at 13.

[143]    *TNS IV*, 984 F. Supp. 2d at 245.

[144]    *See id.* at 244-45.

erroneous."[145]  Thus, TRA's second argument — that Shabbab lacked personal knowledge[146] — remained its only chance of avoiding summary judgment on this issue.  However, a "broad, conclusory attack" on Shabbab's credibility cannot present a question of material fact.[147]  Moreover, Shabbab, "as the president of Kantar [] — the ultimate recipient of the data in question — [] has personal knowledge."[148]  Therefore, TRA's entire effort here boiled down to (1) a contract that did not contradict Shabbab, and (2) a "broad, conclusory attack" on Shabbab's credibility.  As the Court stated, "[w]ithout evidence contradicting Shababb's testimony, a trial on whether the Auto Products perform double-blind matching . . . would consist entirely of TRA's attorneys' speculation that Shababb is lying about how his company's products work."[149]  TRA's arguments here were frivolous and merit an award of attorneys' fees.

### B.   Kantar's Request for Attorneys' Fees Under the Court's Inherent Power Is Granted with Respect to the Five Trade Secrets Adjudicated at Summary Judgment

TRA initially claimed that Kantar had misappropriated twenty-four

---

[145]   *Id.* at 245.

[146]   *See id.* at 244.

[147]   *See id.* at 245 (citing *Island Software*, 413 F.3d at  261).

[148]   *Id.* at 244.

[149]   *Id.* at 245.

trade secrets.[150]  However, following the April 23, 2013 status conference, TRA

reduced its number of trade secret claims to five.[151]  While the nineteen dismissed

trade secret claims may have no merit, the record contains insufficient detail for the

Court to determine their frivolity.  However, the remaining five trade secret claims

do provide the Court with a foundation upon which to determine their relative

merit.  Upon such a review, I find that these five trade secret claims lacked any

colorable basis and were brought in bad faith, thus satisfying the standard for an

award of attorneys' fees under the Court's inherent power.

> ### 1.  The Court Has Jurisdiction to Determine Whether TRA's Trade Secret Claims Warrant an Award of Attorneys' Fees Under the Court's Inherent Power

TRA argues that its pending appeal in the Federal Circuit divests this

Court of jurisdiction to determine whether Kantar may collect attorneys' fees in

this litigation.[152]  That is incorrect.  District courts retain jurisdiction to decide

motions for attorneys' fees even if the underlying merits decision has been

appealed.[153]  Thus, the Court has jurisdiction to determine whether, under the

---

[150]    *See* 5/1/13 Endorsed Letter at 1 [Dkt. No. 119].

[151]    *See id.*

[152]    *See* TRA AF Opp. at 21.

[153]    *See Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004) ("[N]otwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters, including claims for attorneys' fees.").

Court's inherent power, TRA can collect its attorneys' fees with respect to the five trade secret claims adjudicated at summary judgment.

### 2.    The Five Trade Secret Claims Adjudicated at Summary Judgment Had No Colorable Basis and Were Brought in Bad Faith

The Court's summary judgment decision makes clear that "reviewing the[] documents [TRA produced to support its trade secret claims] [] consumed considerable judicial resources [and] was conducted for little purpose."[154] Ultimately, the Court held that "TRA [h]as [f]ailed to [a]llege [p]rotectable [t]rade [s]ecrets and/or [e]vidence of [u]se[.]"[155]

In its summary judgment opinion, the Court discussed the merits of each of the five trade secret claims.[156]  The Court's discussion and subsequent dismissal of each claim demonstrates that each was baseless.  Under New York law, non-disclosure of the trade secret, as well as use of the trade secret by the alleged misappropriating party, form critical components of the standard for trade secret misappropriation.[157]  In dismissing each of the five claims the Court relied

---

[154]    *TNS IV*, 984 F. Supp. 2d at 238.

[155]    *Id.* at 239.

[156]    *See id.* at 239-40.

[157]    *See id.* at 237 (citing *Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd.*, 783 N.Y.S.2d 758, 770-71 (Sup. Ct. N.Y. Co. 2004)).

on the complete absence of one or both of these components.[158]  And in some

instances the Court held that TRA's trade secret claims failed as a matter of law.[159]

TRA's analysis lacked critical elements of a claim for trade secret

misappropriation.  For that reason, TRA's claims were frivolous.  In fact, I find

here that bad faith may be inferred because TRA's claims were "so completely

without merit as to require the conclusion that they must have been undertaken for

some improper purpose[.]" Indeed, that TRA waited until summary judgment to

narrow the number of documents pertaining to its trade secret claims shows that

"[i]t was apparently TRA's intention to wait until it was before a jury to define the

---

[158]     *See, e.g.*, *TNS IV*, 984 F. Supp. 2d at 239 ("[T]he record shows that TRA disclosed most of the properties of TRAnalytics[.]"); *id.* ("[T]here is no evidence in the record that [Kantar's products] made use of any of the technical information alleged by TRA."); *id.* at 240 ("[Kantar has] produced abundant evidence that TRA disclosed its clients at every turn. . . . TRA has submitted no evidence indicating that [Kantar] used its client list."); *id.* ("[T]he Financial Secret was publicly disclosed by TRA. . . . TRA fails to prove that [Kantar] used the Financial Secrets in any way.").

[159]     *See, e.g.*, *id.* at 239 ("[I]t stretches credulity to suggest that TRA's client list is a trade secret. There is no evidence that TRA undertook the type of effort to develop it that would render such a list proprietary[.]"); *id.* at 240 ("The Strategy Secret fails as a matter of law. . . . [T]he Strategy Secret consists of little more than the aspirations of a company struggling to achieve revenue traction."); *id.* ("The Positioning Secret . . . fails as a matter of law. 'Price lists, product samples, and 'marketing plans' are all items that are not, as a matter of law, protected as trade secrets.' The documents that TRA alleges constitute the Positioning Secret fit comfortably within this rule.").

precise contours of its trade secrets claim."[160]  And as the Court held at summary

judgment, "TRA's 'Dance of the Seven Veils approach to [its] trade secret claim'

is manifestly prejudicial to [Kantar], and taxing on the Court."[161]  This delay by

TRA, when it "had ample opportunity to identify its alleged trade secrets with

specificity prior to the close of discovery,"[162] reinforces a finding of bad faith.

Because I find that TRA's trade secret claims had no colorable basis and were

brought in bad faith, Kantar is entitled, under the Court's inherent power, to collect

attorneys' fees for its efforts in defending against these allegations.

### C.     Scope of Award of Attorneys' Fees Under Section 285 and the Court's Inherent Power

The attorneys' fees and non-taxable expenses that Kantar may collect

from TRA are limited to those fees and expenses that are causally-related to the

misconduct or frivolous arguments detailed in this Opinion and Order.  The

purpose of section 285 "is remedial and for the purpose of compensating the

prevailing party for the costs it incurred in the . . . defense of a case where it would

---

[160]     *Id.* at 238.  Moreover, even when TRA did agree to narrow the quantity of its trade secret claims, it still reserved the "right to rely upon additional documents or testimony related to each trade secret."  5/10/13 Lowenstein Letter to Strand, Ex. 2 to Stockinger Decl., at 1.  Thus, TRA's narrowing of the documentary evidence was somewhat disingenuous.

[161]     *TNS IV*, 984 F. Supp. 2d at 239.

[162]     *Id.*

be grossly unjust, based on the baselessness of the suit or because of litigation . . .

misconduct, to require it to bear its own costs."[163]   Therefore, Kantar, in order to

collect any attorneys' fees or costs for its defense of the patent-related claims, must

demonstrate it incurred those fees and expenses as a direct result of TRA's

litigation misconduct or frivolous arguments (as described in this Opinion and

Order).

          Similarly, with respect to the non-patent-related attorneys' fees

awarded under the Court's inherent power, Kantar must demonstrate that the fees it

seeks to collect are only those fees that directly resulted from its defense against

the five trade secret claims that were adjudicated at summary judgment.  No fees or

costs will be awarded as a result of the trade secret claims dropped subsequent to

the April 23, 2013 status conference.

---

[163]     *Highmark, Inc.*, 687 F.3d at 1310 n.1.

41

## IV.    CONCLUSION

For the foregoing reasons, Kantar's motion for attorneys' fees and non-taxable expenses is GRANTED.  Kantar is directed to submit a detailed request for the fees and expenses incurred as a direct result of TRA's conduct identified in this Order.  Such submission must be made by November 24, 2014.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           November 4, 2014

42

**- Appearances -**

**For Defendant and Counterclaim-Plaintiff TRA:**

Perry Mark Goldberg, Esq.
Kevin S. Rosenberg, Esq.
Mark Paluch, Esq.
Goldberg, Lowenstein & Weatherwax LLP
11400 West Olympic Blvd., Suite 400
Los Angeles, California 90064
(310) 307-4500

**For Plaintiffs and Counterclaim-Defendants Kantar:**

Marc Rachman, Esq.
Andrew Keisner, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, New York 10019
(212) 468-4800

Michael A. Albert, Esq.
John Strand, Esq.
Charles Steenburg, Esq.
Eric Rutt, Esq.
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Ave.
Boston, Massachusetts 02210
(617) 646-8000