USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/16/2015

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

———————————

**TNS MEDIA RESEARCH, LLC, dba Kantar Media Audiences, CAVENDISH SQUARE HOLDING B.V.,**
*Plaintiffs-Appellees*

v.

**TIVO RESEARCH AND ANALYTICS, INC.,**
**dba TRA, INC.,**
*Defendant-Appellant*

———————————

2014-1668

———————————

Appeal from the United States District Court for the Southern District of New York in No. 1:11-cv-04039-SAS, Judge Shira Ann Scheindlin.

———————————

Decided: September 16, 2015

———————————

MICHAEL A. ALBERT, Wolf, Greenfield & Sacks, P.C., Boston, MA, argued for plaintiffs-appellees. Also represented by JOHN STRAND, ERIC J. RUTT, CHARLES T. STEENBURG.

PERRY M. GOLDBERG, Progress LLP, Los Angeles, CA, argued for defendant-appellant.

———————————

Before NEWMAN, CLEVENGER, and O'MALLEY, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Tivo Research and Analytics, Inc. dba TRA, Inc. ("TRA") appeals a judgment of the district court granting summary judgment in favor of TNS Media Research, LLC dba Kantar Media Audiences and Cavendish Square Holding B.V. (collectively, "Kantar"). Kantar initially filed suit in the district court, seeking a declaratory judgment that it did not infringe U.S. Patent No. 7,729,940 (the "'940 Patent"). Tivo Research and Analytics, Inc. dba TRA, Inc. ("TRA") counterclaimed, asserting infringement of the '940 Patent, and also U.S. Patent Nos. 8,000,993 (the "'993 Patent"); and 8,112,301 (the "'301 Patent"), misappropriation of trade secrets, and breach of contract and fiduciary duty claims against Kantar. The district court determined at summary judgment that Kantar's two categories of accused products—the Auto Products and the Consumer Packaged Goods ("CPG") Products—did not infringe the patents-in-suit, that Kantar did not misappropriate TRA's trade secrets, that TRA could not rely upon its damages expert's testimony or report to support its claim for damages with respect to its non-patent claims, and that TRA could not seek punitive damages against Kantar. Ultimately, the district court determined that TRA only could pursue a request for nominal damages for its remaining breach of contract and fiduciary duty claims, but, was not entitled to do so before a jury. The parties agreed to settle that remaining claim, however, and the court entered final judgment.

We affirm-in-part, reverse-in-part, vacate-in part, and remand. Specifically, because the district court correctly determined that TRA's Auto Products do not meet the "double blind matching" limitation, we affirm this part of the judgment. But because the district court's non-infringement ruling as to Kantar's CPG Products was

based on a disputed stipulation, we vacate this decision and remand for further proceedings. We also reverse the district court's decision to dismiss TRA's claims for misappropriation of trade secrets as a discovery sanction, and vacate and remand its alternative ruling that TRA's client secrets and its TRAnalytics product are not protectable. We reverse the district court's ruling that TRA's financial projections and strategic plans are not protectable as a matter of law. We affirm, however, its determination that TRA's product positioning secrets are not protectable as a matter of law. We also affirm the district court's exclusion of the "frozen market" opinion expressed by TRA's damages expert. But, we reverse its determination that, without this report, TRA submitted insufficient evidence to support a claim for compensatory damages. We also reverse the district court's conclusion that TRA was only entitled to nominal damages on its non-patent claims after its summary judgment ruling, thereby mooting the district court's determination that TRA was not entitled to a jury trial as to those claims. And, we reverse the district court's conclusion that TRA is not entitled to injunctive relief on its fiduciary duty claims as a matter of law. Ultimately, although we agree with some of the district court's rulings, we conclude that TRA has a right to a jury trial on at least a subset of its claims. Finally, we reject TRA's request that the case be reassigned to another judge on remand.

## Background

Companies spend billions of dollars on advertising each year hoping to reach potential customers. But it can be difficult to determine how effective these advertisements are. TRA sought to address this problem in the television context by developing techniques for processing television viewing data and consumer purchasing data to create reports that can be used to determine what households watch and what they buy. TRA claims its solution, implemented in its Media TRAnalytics product, allows

companies to target their advertisements more strategically and to assess the effectiveness of these ads. This solution is protected by the patents-in-suit, which all relate to systems and uses of consumer data in advertising.

## A. Patents-in-Suit

Specifically, the '940 Patent is directed to a method for collecting, matching, and analyzing television viewing and consumer purchasing data to create reports determining the return on advertising investments and other metrics. Although there were other prior art methods for performing such a task, the '940 Patent differed in that it claimed a method that did not require the installation of supplemental equipment in homes or retail locations or a consumer's "opt-in" permission, all while maintaining the privacy of the consumer.

Claim 71 is illustrative of the invention, and it recites:

[a] computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

collecting in an advertising measurement system:

(i) clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

(ii) advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and

also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii) program data associated with the program delivered on the program delivery source, wherein collecting the program data is not dependent on a supplemental data collection device, and also wherein the collected program data includes household level data associated with multiple consumer households; and,

(iv) purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with a centrally located electronic computer processor configured for centrally processing data received from the program delivery source, the advertising data source, the program data source, and the purchase data source, wherein the matching further includes:

(i) grouping the collected data in association with an account identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

> (ii) matching each account identifier associated with each consumer household with other account identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

storing the matched advertising data, clickstream data, purchase data, and program data in at least one centrally located electronic data storage medium operatively associated with the computer processor;

applying at least one cleansing and editing algorithm to the matched and stored data; and,

calculating at least one true target index metric based on the matched and stored data.

The '993 Patent, titled "Using Consumer Purchase Behavior for Television Target," is similar to the '940 Patent, and is directed to a system for facilitating the analysis of consumer data associated with advertising exposure. Likewise, the '301 Patent is directed to a related invention, a computer-implemented method and system directed towards facilitating the analysis of consumer behavior associated with advertising exposure.

To help aid the growth of the company, TRA sought outside investment. It successfully went through three rounds of financing, the first resulting in a post-money valuation of roughly $10 million in August 2007, the second resulting in a valuation of roughly $27 million in May 2009, and the third resulting in a valuation of roughly $54 million in May 2010. Kantar, a market research company, participated in these rounds via its investment arm, Cavendish Square Holding B.V., investing a substantial sum in each round. These investments granted

Kantar access to TRA's board which, in turn, gave it access to TRA's trade secrets.

During this time, the companies also engaged in merger discussions, but these plans fell through shortly after Kantar spent almost two billion dollars acquiring TNS Media Research, a competing market analytics company. Soon after Kantar's acquisition of TNS Media Research, Kantar released its own analytics product, which directly competed with TRA's Media TRAnalytics product. It was during this time that TRA attempted to undergo a fourth round of financing, but was unable to raise the necessary funds. This led to a substantial drop in value and, subsequently, TiVO purchased TRA for approximately $20 million in July 2012.

## B. District Court Proceedings

Believing that Kantar's competing product was in fact infringing its patent rights, TRA contacted Kantar in March 2011 about the product. In response, Kantar filed a declaratory judgment action, seeking a judgment that it did not infringe the '940 Patent. TRA answered and counterclaimed, alleging: (1) patent infringement of the '940, '993, and '301 Patents; (2) misappropriation of trade secrets; (3) breach of contract; and (4) breach of fiduciary duty. The district court ultimately resolved every one of the many issues raised by these pleadings as a matter of law. A detailed description of the court's multiple and interrelated rulings is, thus, necessary to understand the issues we address on appeal.

## 1. Patent Claims

At the time of the district court's November 2013 summary judgment order, TRA asserted that Kantar's two types of products—the Auto Products (comprising Kantar's Rapidview Auto and Charter with Auto products) and the CPG Products (comprising its Rapidview Retail, Rapidview for Retail, and Charter with CPG

products)—directly infringed claim 71 of the '940 Patent, claims 1, 2, 3, 7, 8, and 9 of the '993 Patent, and claims 1, 23, 42, 47, 49, 63, 108, and 109 of the '301 Patent. *TNS Media Research, LLC v. TRA Global, Inc.*, 984 F. Supp. 2d 205, 209–14 (S.D.N.Y 2013) ("*Summary Judgment Op.*"). Kantar's Auto Products match information regarding motor vehicle registrations maintained by J.D. Power & Associates ("J.D. Power") with television viewing data, while its CPG Products match data collected from supermarket loyalty cards with television viewing data. Kantar countered that none of its accused products directly infringe the asserted claims, alleging that: (1) its Auto Products did not perform double blind matching of data as required by all asserted claims; (2) its CPG Products did not collect "purchase data" as all fifteen asserted claims require; (3) TRA waived any argument that its CPG Products infringed under the doctrine of equivalents; (4) Kantar's accused products did not meet the "cleansing and editing algorithm to the matched and stored data" limitation of claim 71 of the '940 Patent; and (5) that none of the accused products meet the claim limitation embodied in claim 42 of the '301 Patent. The district court found that summary judgment was warranted based on the first three arguments, and declined to address the other two.

With respect to the "purchase data" limitation, the parties stipulated that "purchase data" meant "data describing the purchase of a particular product *at a given time*, obtained from a purchase data source, such as a shopping loyalty card, point of sale collection means, or other record of a sale of a product or service." *Id*. at 218 (emphasis added). Although Kantar conceded that its CPG Products did utilize information from "purchase data source[s]," it argued that its products did not meet the "purchase data" limitation, because they did not collect data about the time at which a purchase was made, but

only categorized the users into types, such as heavy, medium, or light user. *Id.*

Because the dispute between the parties concerned how to interpret the term "purchase data," the district court found the issue was purely one of claim construction, and, thus, was amenable to summary judgment. *Id.* at 243. It determined that the asserted patents distinguish between "purchase data" and "user types." For example, the '301 Patent explains that "[t]he ROI [return on investment] report may use the following data as inputs, for example: . . . purchase data; user type (heavy, medium, or light category purchase rate). . . ." 301 Patent col. 29:48–51). Although TRA argued that this distinction was meaningless because a classification of users into types necessarily must consider the users' purchase of products over a given time, the district court disagreed, ruling that "user type" only conveys relative purchasing information, whereas "purchase data" requires data about when an actual purchase was made. *Summary Judgment Op.*, 984 F. Supp. 2d at 243. Additionally, the district court rejected TRA's allegation that Kantar should be estopped from arguing that it does not meet the "purchase data" limitation, because Kantar argued at the preliminary injunction stage that its current method of matching viewer data to purchase data was nearly identical to what it had been doing before TRA received a patent. Under applicable Second Circuit law, judicial estoppel only applies when the court relies on a party's prior inconsistent arguments. Here, because the district court did not rely upon Kantar's assertion in denying TRA's motion for a preliminary injunction, it declined to find that TRA was estopped from raising its present argument. *Id.* at 244.[1] Accordingly, the district court concluded that

---

[1] This estoppel issue is not before us on appeal.

Kantar's CPG Products did not literally infringe the asserted claims.

The district court also concluded that the CPG Products did not infringe the asserted claims under the doctrine of equivalents. It found that TRA's expert report only made conclusory statements about the doctrine of equivalents and did not mention the "purchase data" limitation in this discussion. *Id.* at 244. Because it felt that TRA failed to explain this theory adequately in its report, the district court found that TRA could no longer assert it. Although TRA attempted to amend its expert report by submitting an expert declaration during summary judgment briefing, the district court found that these untimely disclosures were barred under Fed. R. Civ. P. 37(c). Thus, the district court also dismissed TRA's doctrine of equivalents infringement theory for the CPG Products.

Regarding the accused Auto Products, both sides agreed that all the asserted patent claims require double blind matching. Double blind matching is a process where no data supplier provides both behavioral data—in this case automobile registration data and television viewing data—and personally identifying information—such as names—to the same party at the same time. *See* '940 Patent, col. 9:26–34 ("[N]o single party has access to both household identity and household purchase or viewing behavior. A party that knows a household identity, for example, will not know the behavior of the household; likewise, a party that knows the behavior of a household will not know the identity of that household."). Instead, one data supplier will provide a trusted third party with personal information and an abstract identification code for each household, while a second data supplier will provide the same third party with personal information and an abstract identification code. At the same time, the two data suppliers will each send the behavioral data linked to an abstract identification code to the party that

ultimately will match the two sets of behavioral data, in this case the market researcher. By separating the identifying information from the behavioral data, a party, aside from the original data collectors, cannot know both the name of a person and behavioral information about that person. The third party will then correlate the two identification codes via matching personal information. It will then provide this correlation to the market researcher, who will use information to associate the two different behavioral data points, collected by the two data suppliers in order, to generate a market research report.

It was undisputed that in order to generate reports regarding the effectiveness of automobile advertisements, Kantar matches household automobile registration data and television viewing data. And, it was also uncontested that Kantar relies upon Experian to provide it with automobile registration data. But the parties disputed whether Experian receives personally identifiable information along with the automobile registration data. To support its claims that Kantar's Auto Products utilize double blind matching, TRA cited an unsigned draft contract between J.D. Power and Experian, which stated that J.D. Power would not send personal identifying information to Experian, and that Experian would use anonymous, blind matching to pair data from set-top providers, like DirecTV, with auto registration data provided by J.D. Power, using a unique identifier, as opposed to relying upon the names of consumers. *Summary Judgment Op.*, 984 F. Supp. 2d at 221. Kantar disputed TRA's interpretation of the contract, arguing that the contract did not address whether J.D. Power provides additional information to Experian and did not explain what "Unique Key ID" meant.

The district court agreed with Kantar. It first noted that TRA's Experian contract was unsigned, and, thus, was of limited value. *Id.* at 245. But, more importantly, the district court concluded that the unsigned contract did

not contradict the declaration from Kantar Media's president, Shabbab, who stated that "Experian . . . appends J.D. Power[s] purchase attribute data to the DirecTV [identifier], removes all [personally identifying information], and sends that data to [Kantar Media].  [Kantar Media] uses the same DirecTV [identifier] to correlate [set-top box] data with J.D. Power[s] purchase attribute data."  *Id.*  In the absence of any evidence contradicting Shabbabb's testimony, the district court granted Kantar's motion for summary judgment of non-infringement with respect to Kantar's Auto Products.

### 2. Trade Secret Claims

TRA also alleged that Kantar misused its confidential information—which Kantar received during the merger discussions and via its appointed board member—in order to assess whether to launch its competing product and to accelerate its own product development.  But for this improper use, TRA contended that Kantar would have been unable to release a competing product as quickly as it did.  Originally, TRA asserted that Kantar misappropriated twenty four categories of trade secrets but, in order to streamline this case for trial, the district court ordered TRA to reduce the number of asserted trade secrets in April 2013.  Following this order, TRA agreed to reduce the number of trade secrets to the following five: "(1) Media TRAnalytics'—TRA's product—speed, reliability, scalability and performance;  (2) TRA's client lists and client interactions[;] (3) TRA's strategic plans[;] (4) TRA's product positioning[;] and, (5) TRA's capital structure, financials, financing proposals target investor list, and offers to acquire or merge the company."  *Summary Judgment Op.*, 984 F. Supp. 2d at 222.

After this reduction, Kantar filed a motion for summary judgment arguing, in part, that TRA could not show any misappropriation of a trade secret because it had failed to sufficiently identify any trade secret during

discovery.  The district court agreed, ruling that TRA's attempt to identify a small number of documents to support its five categories of trade secrets for the first time on the eve of summary judgment briefing was in violation of Fed. R. Civ. P. 26(e), which requires a party to supplement or correct its disclosure or response in a timely manner.  Because allowing TRA to remedy its deficiency after the close of discovery would be prejudicial to Kantar and taxing on the district court, the district court dismissed TRA's trade secret claim as a sanction under Fed. R. Civ. P. 37.  *Id*. at 239.

The district court, moreover, concluded that, even if it did consider the merits of TRA's misappropriation claims, TRA had failed to submit sufficient evidence that would demonstrate that Kantar used TRA's alleged trade secrets or that TRA's secrets were protectable.  *Summary Judgment Op.*, 984 F. Supp. 2d at 239.  Specifically, with respect to the Media TRAnalytics trade secret, the district court determined that TRA had disclosed most of the properties of the system to the public, such as its use of application program interfaces ("APIs") to handle legacy clients, and that TRA failed to provide evidence that Kantar's products used any of TRA's technical information.  *Id*.  Similarly, the district court found that TRA's client lists were also disclosed to various companies, that there was no evidence to support the claim that TRA took the necessary steps to protect this information, and that there was no proof that Kantar used these client lists.  *Id*. at 240.  Regarding TRA's strategic plans, the district court concluded that these plans were merely goals of the company, which are not protectable trade secrets under New York law, and, thus, failed as a matter of law.  *Id*.  Likewise, the district court determined that TRA's product placement strategies did not qualify as a trade secret, because they were mere marketing plans, which are unprotectable as a matter of law.  *Id*.  Lastly, the district court concluded that TRA's financial information was not

secret because it was publicly disclosed by TRA and that, even if the information was undisclosed, there was no evidence that Kantar used this information.  Therefore, assuming arguendo that TRA was allowed to supplement its responses to add details regarding its trade secrets, the district court concluded that summary judgment would have been appropriate nevertheless.  *Id.*

### 3. Non-Patent Damages

In addition to arguing that TRA could not satisfy its burden of proving that Kantar misappropriated TRA's trade secrets and Kantar infringed TRA's patents, Kantar also argued that TRA could not establish that it was entitled to damages for Kantar's alleged breach of fiduciary duty, breach of contract, and misappropriation of trade secrets.  *Summary Judgment Op.*, 984 F. Supp. 2d at 233–34.  TRA's main damages theory turned on Kantar's decisions to release a competing product and to file a declaratory judgment against TRA which, according to TRA, froze the market.  Specifically, TRA alleged that Kantar's actions spooked investors, because investors are hesitant to fund companies embroiled in litigation and are reluctant to invest in less-established companies—like TRA—when they are competing against a powerful and well-known company such as Kantar.  *Id.* at 235.  TRA estimated Kantar's actions cost it $21–23 million.  TRA calculated this figure by considering the value of TRA before Kantar's allegedly improper acts—$54 million—in May 2010 and after—$20 million—in July 2012 and reducing this figure by thirty percent because only seventy percent of this loss was attributable to Kantar.  *Id.* at 234.  To support its damages theory, TRA submitted: (1) an expert report by its damages expert, Melissa Bennis; (2) a portion of a declaration of its CEO, Mark Lieberman; (3) a portion of a declaration of Naveen Chopra, TiVo's CEO; and, (4) a portion of a declaration of Stephen B. Morris, another TRA expert that had been proffered, in support of its motion for an injunction.  *Id.* at 234.

As for TRA's claim that Kantar's release of a competing product caused TRA harm, the district court determined that the opinion of TRA's damages expert, Ms. Melissa Bennis, did not satisfy the requirements of Federal Rule of Evidence 702 ("FRE") for several reasons. Bennis asserted that TRA's inability to acquire more financing in a fourth round of investments was caused, in large part, by Kantar's decision to release a competing product. The district court found that this opinion, based solely on a temporal relationship, was insufficient to satisfy the rigors of FRE 702(c). *Summary Judgment Op.*, 984 F. Supp. 2d at 241. The district court also found that Bennis's opinion was flawed because it failed to consider the alternative explanations given for TRA's failure—that investors were concerned about TRA's lack of revenue given the amount of capital already raised. *Id.* Lastly, the district court determined that Bennis's report relied upon mere speculation by Chopra that Kantar's product caused the market to freeze, making it difficult for TRA to compete. *Id.* For these reasons, the district court excluded Bennis's report.

Without Bennis's report, the only other evidence proffered by TRA to support its "frozen market" theory was Liberman's testimony. But the district court found that his testimony was based on conjecture and could not alone be relied upon to justify TRA's damages. *Id.* at 242. Thus, the district court excluded the entire theory from the case. *Id.* Without this theory, the court found no other basis for a request for compensatory damages and, thus, barred TRA from seeking any.

As for TRA's possible claim for nominal damages for TRA's remaining non-patent claims—breach of fiduciary and contract claims—its request for attorneys' fees for its breach of fiduciary duty claim and its request for equitable relief for both claims in the form of an injunction, the district court concluded that Kantar's motion for summary judgment did not dispose of these claims, and the

court delayed consideration of these claims until a later date. *Summary Judgment Op.*, 984 F. Supp. 2d at 242, 246. The district court subsequently ordered the parties to meet and confer to decide what, if any, remedies were still available to TRA and, if the parties disagreed, to file an appropriate motion. *TNS Media Research, LLC v. TRA Global, Inc.*, No 1:11-cv-4039, slip op. at 2 (S.D.N.Y. April 7, 2014), ECF No. 185 ("*Damages Order*"). Unable to reach an agreement, Kantar filed a motion to limit TRA's remedies and strike its jury demand. Upon consideration, the district court granted in part the motion, concluding that TRA was not entitled to any remedy, aside from nominal damages. *Id.* at 13.

With respect to TRA's request for injunctive relief for its breach of fiduciary duty claim, the district court concluded that such relief was now moot. TRA argued that Kantar breached its fiduciary duty to TRA by manipulating its representative on TRA's board to gain improper access to TRA's confidential information. In light of this access, TRA sought to enjoin Kantar from continuing to breach its fiduciary duties to TRA. Since 2012, Kantar no longer had a representative on the board, however. *Id.* at 3. With no fiduciary to enjoin, the district court concluded that TRA had no basis for injunctive relief.

As for TRA's breach of contract claim, the district court determined that two out of the four asserted contracts—a 2008 non-disclosure agreement ("NDA") and a 2009 NDA—had expired, mooting a request for injunctive relief as to those contracts. *Id.* at 4. And, although the other two contracts—a 2007 NDA and an End-User License Agreement ("EULA")—had yet to expire, the district court concluded that its prior summary judgment ruling foreclosed any relief. Under the 2007 NDA, TRA granted Kantar access to its confidential information. TRA alleged Kantar used this information to copy TRA's patented method of creating target indices, but the district court had already determined that Kantar's accused

method of creating market research reports was different than TNA's and granted summary judgment of non-infringement on this basis. *Damages Order*, at 5. Therefore, the court concluded that TRA could not now claim damages for Kantar's alleged misuse of this information. Similarly, the EULA between TRA and Kantar granted Kantar access to TRA's Media TRAnalytics product. TRA asserted that Kantar breached the contract by incorporating this information into its own products, but the district court had already determined that Kantar did not use any of TRA's technical information related to the TRAnalytics product. Without evidence that TRA improperly used this confidential information, the district court determined that TRA could not pursue damages for Kantar's alleged breach of this agreement.

TRA also sought a jury trial on attorneys' fees, based on the disputed contracts.[2]  The district court denied this request. It explained that attorneys' fees are only awarded after entry of judgment unless the law requires those fees be proven at trial as an element of damages. *Id.* at 6. Because none of the contracts asserted by TRA included a provision for attorneys' fees, the district court concluded that TRA could not rely on those contracts to support its claim to a jury trial. Accordingly, the district court found that TRA was not entitled to a trial on attorneys' fees, but the court recognized that TRA could request those fees after a judgment had been entered.

Next, the district court considered whether TRA could recover nominal damages for its breach of contract and fiduciary duty claims. *Id.* at 7. TNS alleged that TRA waived any claim to such damages by failing to specifically plead them in its complaint. But, the district court found that this failure did not prevent TRA from pursuing

---

[2]  The district court rejected this claim, but TRA does not dispute it on appeal.

such relief, because a general request for damages can include nominal damages. *Id.*  Thus, the district court found that TRA could seek nominal damages in this case. *Id.*  It, however, concluded that TRA could not try this issue to a jury, noting that TRA's request was below twenty dollars—the threshold amount for a right to a jury trial under the Seventh Amendment to the U.S. Constitution. *Damages Order*, at 7 n.23.

In addition to its other damages theories, TRA also argued that the district court's prior decision eliminating its frozen market theory did not foreclose its ability to pursue its compensatory damages theories, including "loss of exclusive use" and unjust enrichment.  The district court disagreed.  It first noted that it understood TRA's only compensatory damages theory to be its "frozen market" theory, because TRA stated in its summary judgment briefing that it was not seeking "lost profits," "lost sales," or "price erosion." *Id.* at 8.  Because the district court had already addressed this theory in its resolution of Kantar's motion for summary judgment, the district court found that TRA could no longer pursue any other theory for compensatory damages.

The district court concluded, moreover, that even considering the merits of these alternative theories, it would conclude that TRA's alternative theories failed as a matter of law. *Id.*  TRA alleged that part of its loss in value was attributable to its loss in the exclusive use of its trade secrets.  The district court, however, found it already had ruled that TRA failed to put forth sufficient evidence that Kantar caused any of TRA's loss in value, thereby barring a "loss of exclusive use" claim. *Id.* at 9.  As for TRA's unjust enrichment claim, the district court found that TRA's damages expert's brief discussion of this theory was legally insufficient.  Thus, the district court found that TRA had failed to meet its burden that it was entitled to damages under this theory. *Id.* at 10.

Lastly, the district court considered TRA's assertion that it was entitled to punitive damages on its breach of contract and fiduciary duty claims because of Kantar's egregious behavior.   The district court stated that, in order to be awarded punitive damages, one must "satisfy the [] 'very high threshold of moral culpability.'" *Damages Order*, at 10–11 (quoting *In re Methyl Tertiary Butyl Ether*, 725 F.3d 65, 128 (2d Cir. 2013)).   Under New York law, a party must demonstrate that a defendant acted with actual malice or such reckless disregard that borders on criminality to be awarded punitive damages.   Although there was evidence that Kantar hoped to starve TRA for cash, there was no evidence that Kantar actually acted on those intentions.   It determined that there was also evidence that TRA authorized the disclosure of confidential information to Kantar, which suggested that Kantar had a good faith belief that it was authorized to share this information.   Without any proof of egregious conduct, the district court concluded that TRA was not entitled to punitive damages. *Id.* at 13.

Following this decision, only TRA's claim for nominal damages arising from Kantar's alleged breach of contract and fiduciary duty remained.   *TNS Media Research, LLC v. TRA Global, Inc.*, No. 1:11-cv-4039, slip op. at 1 (S.D.N.Y. July 2, 2014), ECF No. 188.   Ultimately, the parties agreed that it would be wasteful to conduct a bench trial on these claims when so little was at stake. Accordingly, Kantar agreed to pay TRA $1 in nominal damages, thereby mooting the final issue left in the case. The parties acknowledged that this agreement did not foreclose the parties from pursuing claims reinstated after an appeal.   *Id.*   In light of the parties' agreement, the district court entered a final judgment.

TRA timely appealed to this court.   We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2012).

DISCUSSION

A. Trade Secret Claims

Trade secret misappropriation is a matter of state law. *See Atl. Res. Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1356 (Fed. Cir. 2011). The parties agree that New York law applies to TRA's trade secret claims against Kantar. We review the grant of summary judgment under the law of the regional circuit. *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1378 (Fed. Cir. 2013). The Second Circuit reviews the grant or denial of summary judgment de novo. *Petrosino v. Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004). Summary judgment is appropriate when, drawing all justifiable inferences in the non-movant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Additionally, this court reviews a district court's decision to exclude evidence and impose discovery sanctions under the law of the relevant regional circuit. *See Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1358 (Fed. Cir. 2012). In the Second Circuit, such rulings are reviewed for abuse of discretion. *See Phoenix Assocs. III v. Stone*, 60 F.3d 95, 100 (2d Cir. 1995); *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990).

1. Discovery Sanctions

TRA argues that the district court erroneously dismissed its trade secret claims, contending that the district court abused its discretion in dismissing the claims as a sanction for TRA's discovery violations. First, TRA disputes the district court's conclusion that it improperly waited until summary judgment to narrow its claims. *See Summary Judgment Op.*, 984 F. Supp. 2d at 239. According to TRA, it voluntarily agreed to reduce the number of asserted trade secrets and did so, in part, at the district court's express invitation. To be punished for such a

reduction was improper especially considering that it had not violated any court order previously, which is a prerequisite to dismissal of all or part of a cause of action as a sanction under the Federal Rules of Civil Procedure. Additionally, TRA claims that the district court's conclusion that Kantar was severely prejudiced by TRA's discovery failures is unsupported as there was no evidence suggesting that Kantar misunderstood TRA's claims or that it required additional depositions or subpoenas for additional documents. Because this was TRA's only discovery shortcoming, it argues that there was no reason for the district court to issue such as a harsh sanction.

Kantar disputes TRA's allegations, explaining that TRA failed throughout the course of the litigation to sufficiently identify its trade secrets. For example, when Kantar requested more information about TRA's trade secrets in June 2012, TRA conceded that its responses were inadequate. Although TRA amended these responses in October 2012, Kantar alleges that these amendments were still insufficient because they merely listed several hundred documents, without explaining how these documents demonstrated the existence of trade secrets. And, even though the district court suggested that TRA reduce the number of its trade secrets in April 2013, Kantar contends that this was not an invitation for TRA to supplement its deficient disclosures because the discovery deadline had passed. Because TRA failed to identify its trade secrets adequately, Kantar contends that the district court correctly concluded that TRA had violated Federal Rule of Civil Procedure 26(e) ("FRCP"). And, because FRCP37(c) permits a district court to exclude information that should have been disclosed under FRCP 26, Kantar contends that dismissing TRA's claims was well within the district court's discretion.

Federal Rule of Civil Procedure 26(e)(1)(A) provides that a party who has responded to an interrogatory "must supplement or correct its disclosure or response . . . in a

timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless.*"   Fed. R. Civ. P. 37(c) (emphasis added).

Additionally or instead of this sanction, a district court:

> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

> (B) may inform the jury of the party's failure; and

> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

*Id.*   Therefore, a failure to follow Rule 26(e) will warrant preclusion of omitted information, "unless the failure was substantially justified or is harmless." *Id.*   "Failure to timely amend a contention interrogatory can bar use of a theory of liability, especially when such failure results in prejudice to the adverse party." *N.J. Dep't of Envtl. Prot. v. Atl. Richfield Co.*, No. 1:00-cv-1898, 2014 U.S. Dist. LEXIS 15966, at *9 (S.D.N.Y. Feb. 6, 2014) (citing *Unigene Labs. v. Apotex, Inc.*, No. 06-cv-5571, 2010 U.S. Dist. LEXIS 67444, at *6 (S.D.N.Y. July 7, 2010), *aff'd*, 655 F.3d 1352 (Fed. Cir. 2011) ("[W]here there is substantial prejudice to the Plaintiffs—namely, not being advised of the contours of [a] claim until long after the termination of discovery and the filing of dispositive motions—the Defendants' failure to amend their contentions results in [a] claim being deemed waived.")).

Here, the district court concluded that TRA violated Rule 26 when it narrowed its trade secret claims on May 10, 2013. We note that on April 23, 2013, the court ordered TRA to reduce its trade secret claims. In response to that order the parties stipulated, with the court's approval, that TRA would reduce its trade secret claims by May 10. While this does not necessarily establish that TRA complied with Rule 26, it is also not clear that TRA's actions—to reduce its trade secret claims on the court-approved timeline—rise to the level of violating the rules of procedure. For the reasons below, we conclude the district court abused its discretion when it dismissed all of TRA's trade secret claims as a discovery sanction. On remand, the district court should both address whether TRA violated Rule 26 and, if there was a violation, craft a more appropriate sanction.

We find that the district court abused its discretion when it dismissed all of TRA's trade secrets claims as a discovery sanction. Generally, "[a] district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions.'" *Zervos v. Verizon N.Y., Inc.*, 277 F.3d 635, 650 (2d Cir. 2002) (quoting *Zervos v. Verizon N.Y, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)). In order to determine the appropriate sanction for a discovery violation, the Second Circuit considers several factors including "(1) the willfulness of acts underlying noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of noncompliance; and (4) whether the noncompliant party was on notice that it faced possible sanctions,'" but no one factor is dispositive. *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302–03 (2d Cir. 2009); *see also SEC v. Razmilovic*, 738 F.3d 14, 25 (2d Cir. 2013) (noting that "these

factors are not exclusive, and they need not each be resolved against the [sanctioned] party").

Considering these factors, it is clear that a dismissal was an inappropriate sanction in these circumstances. First, there is no indication that TRA purposefully shirked its discovery obligations. *Cf. Robertson v. Dowbenko*, 443 F. App'x 659, 661 (2d Cir. 2011) (noting that willful non-compliance exists when a party has "repeatedly failed to respond to interrogatories and produce documents . . . in violation of the district court's orders"). Instead, the record suggests that TRA actually tried to meet its obligations, as evidenced by its decision to amend its initial disclosures in response to Kantar's complaint that such disclosures were deficient and the fact that it was not until Kantar lobbied the court in April 2013 to order TRA to identify and limit its trade secrets in anticipation of trial that TRA became aware that Kantar still believed its disclosures were inadequate. When the court ordered the parties to confer in the hopes of streamlining the case, moreover, TRA responded by reducing the number of trade secret claims asserted. It did so within days of the court's suggestion and well before Kantar filed its motion for summary judgment. We see no discovery violation which would warrant such a harsh sanction, especially one imposed without warning.

There is also nothing in the record that evinces the district court considered the efficacy of lesser sanctions. *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (finding that a dismissal of a party's damages claim was inappropriate, in part, because "there [was] no indication in the record that the district court considered any lesser sanctions"). Most importantly, there was no indication prior to the district court's summary judgment order that TRA's discovery shortcomings could result in a dismissal of its trade secret claims. *Id.* at 160 ("Parties must be given notice and an opportunity to respond before a cause of

action, or potential remedy, is dismissed as a sanction for failure to comply with court orders."); *cf. Sit-Up v. IAC/InterActive Corp.*, No. 05-CIV.-9292, 2008 U.S. Dist. LEXIS 12017, at *16–19 (S.D.N.Y. Feb. 20, 2008) (before dismissing trade secret claims, the court afforded plaintiff two opportunities to amend its disclosures and warned them that failure to provide more detailed responses would result in their dismissal).   Although Kantar disputes this conclusion, arguing that the district court did warn TRA at the April 2013 conference that its trade secret claims may be dismissed, a review of the record belies that contention. The district court did no more than state that Kantar's motion for summary judgment of no trade secret misappropriation would be granted if the secrets identified did not meet the legal definition of a trade secret—it did not say that TRA's claims might be dismissed as a discovery sanction.   And, although the district court justified its decision because it said TRA's actions were prejudicial to Kantar, the district court failed to explain *why* this was the case.  *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) ("With no findings or explanation from the district court, we cannot conclude that the sanction of dismissal of the complaint and granting of the counterclaims was appropriate.").   Thus, while the facts perhaps suggest that some sanction was appropriate, the record before us does not support dismissal.   Accordingly, we reverse the district court's decision to dismiss TRA's trade secret claims.

## 2. Summary Judgment of Trade Secrets

In the alternative, the district court concluded that TRA's trade secrets claims would be dismissed on the merits even if they had not been dismissed as a sanction. TRA argues that this decision was incorrect because there were material factual disputes that prohibited it, both regarding whether TRA's information was secret and whether Kantar wrongfully used it.

Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (quotation omitted). When a party alleges misappropriation of a trade secret, they must show: "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999). "The existence, vel non, of a trade secret usually is treated as a question of fact." *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 29 (2d Cir. 1987).

In determining whether information constitutes a trade secret, New York courts have considered the following factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*N. Atl. Instruments, Inc.*, 188 F.3d at 44 (quoting Restatement of Torts § 757, comment b).

### a. Media TRAnalytics

With respect to TRA's proprietary information related to how Media TRAnalytics operates, i.e. its speed, reliability, scalability, and performance, the district court con-

cluded that the evidence on the record demonstrated that TRA disclosed most of the product's properties it was now claiming as a trade secret, and that Kantar's accused products did not make use of any of the allegedly protected technical information. *Summary Judgment Op.*, 984 F. Supp. 2d at 239. Because TRA failed to submit evidence from which a reasonable jury could find that its Media TRAnalytics secrets were in fact secret and that Kantar used this information, the district court granted summary judgment as to this information.

The evidence, however, does not support the district court's decision. A review of the record reveals that the publicly available documents that allegedly disclosed TRA's highly confidential information merely provided an overview of Media TRAnalytics. There remains an unresolved question of fact as to whether the propriety information about Media TRAnalytics was known outside TRA. *See Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d. Cir. 1986) ("Secrecy is a question of fact."). And, this fact is material because it bears on whether this information constitutes a trade secret. *See N. Atl. Instruments, Inc.*, 188 F.3d at 44. Thus, it was inappropriate for the district court to grant summary judgment of no trade secret misappropriation as to the Media TRAnalytics secret.

The district court also erred in its determination regarding Kantar's use of the Media TRAnalytics secret. TRA accused Kantar of using this proprietary information in order to gain a competitive advantage over TRA. It did not allege that Kantar incorporated TRA's technical information into its own product. The district court only considered the later possibility and disregarded evidence that Kantar improperly used this secret to create a product that *could* compete with Media TRAnalytics product, something it allegedly could not have done but for its improper use of the trade secret. Accordingly, there is still a question as to whether Kantar used the proprietary

information, and, thus, summary judgment was improper under these circumstances.

### b. TRA's Customer Information

The district court also concluded that TRA's information regarding customer contract terms and pricing, customer negotiations, customer proposals, and potential customers were not protectable as trade secrets. *Summary Judgment Op.*, 984 F. Supp. 2d at 239–40.  Specifically, the district court found that TRA publicly disclosed its clients and that there was no evidence that TRA attempted to develop its client list in a way that would render the list proprietary.  *Id.* at 239.  It also determined that TRA failed to provide evidence that Kantar used TRA's client list.  *Id.*  at 240.  Accordingly, the district court also granted summary judgment of no trade secret misappropriation as to TRA's customer information.

With respect to customer lists and information associated with customer preferences, even where some of that information may be publicly available, courts have held that "where a company's customers are not readily ascertainable, but must be cultivated with great effort and secured through the expenditure of considerable time and money, the names of those customers are [protectable] trade secrets." *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 606 (S.D.N.Y. 2001) (quotations and citations omitted); *see also Oppenheimer & Co., Inc. v. Northstar Agri Indus., LLC*, No. 651839/2103, 2013 N.Y. Misc. LEXIS 5142, at *20 (Sup. Ct. 2013) ("The identity of a client is not a trade secret 'where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or product.'") (*quoting Leo Silfen v. Cream*, 29 N.Y.2d 387, 392 (1972)).  Here, there was no evidence that TRA undertook the type of effort required to develop a proprietary client list.  Additionally, there was unrefuted evidence that TRA's customers were not secret.  *See Defiance*

*Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985) (explaining that once a client list is disclosed, even if inadvertently, the "information ceases to be a trade secret and will no longer be protected"). Thus, the district court did not err in its analysis with respect to this information.

But in addition to TRA's client list, TRA also alleged other client information was protectable, such as customer contract terms, customer proposals, and customer pricing. The district court did not, however, consider whether this customer data was protectable. The Second Circuit has recognized that such "non-business information—for example, related to customers, merchandising, cost and pricing, and systems and methods—are also protected." *Lehman v. Dow Jones Co.*, 783 F.2d 285, 297 (2d Cir. 1986). Because the district court failed to evaluate whether *all* of TRA's customer information was protectable, summary judgment that Kantar did not misappropriate TRA's client information was inappropriate.

### c. TRA's Financial Information

Similarly, the district court concluded that details about TRA's capital structure, income statements, financial projections, and strategic plans were not entitled to protection because the information was publicly disclosed and there was no evidence that Kantar used the information. *Summary Judgment Op.*, 984 F. Supp. 2d at 240. We disagree. Confidential business documents alone are not trade secrets because these documents are "simply information as to single or ephemeral events in the conduct of the business [and not] a process or device for continuous use in the operation of the business." *Softel, Inc. v. Dragon Med. & Sci. Comm'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997); *see Bear, Stearns Funding, Inc. v. Interface Grp.*, 361 F. Supp. 2d 283, 305–06 (S.D.N.Y. 2005) (finding that financial information, including terms

of a loan agreement, and personal financial information, is not a trade secret). It is also true that market research and business goals are not protectable trade secrets. *LinkCo. v. Fujistu Ltd.*, 230 F. Supp. 2d 492, 500 (S.D.N.Y 2002) ("Marketing concepts and new product ideas are not considered trade secrets. Similarly, information consisting simply of business possibilities or goals is not a trade secret."); *see also Hudson Hotels Corp. v. Choice Hotels Int'l*, 994 F.2d 1173, 1177 (2d Cir. 1993) (finding that a marketing concept is not a trade secret). Proprietary financial projections and strategic plans may be protectable trade secrets, however, where it is not publicly known, not readily identifiable without inside information, or otherwise complex. Here, Kantar's appointed Board member allegedly learned critical proprietary plans for future development. TRA alleges that Kantar then decided to go into competition using this proprietary information, to which TRA claims Kantar did not otherwise have access. Drawing all reasonable inferences in favor of TRA, we find that TRA's allegations are sufficient to survive summary judgment. The district court's summary judgment concerning financial information and strategic plans is modified accordingly; further factual development as to these claims remains.

### d. TRA's Product Positioning

As for TRA's information related to its relative position in the market compared to similar companies, the district court found that such information was not protectable as trade secrets. *Summary Judgment Op.*, 984 F. Supp. 2d at 240. Additionally, the district court concluded that, even if the documents could be protected, the documents alleged to constitute product positioning secrets were publically disclosed. *Id.*

As previously explained, "[a] trade secret is a process or device for continuous use in the operation of a business"—it does not encompass marketing materials. Here,

TRA only cites to documents that generically compare Media TRAnalytics to other systems on the market and list the potential return on investment for Media TRAnalytics' users. Because this information is not recognized as a trade secret, the district court properly dismissed this allegation.

### B. Damages for Non-Patent Claims

#### 1. TRA's Frozen Market Theory

TRA also disputes the propriety of the district court's decision to exclude Bennis's opinion that Kantar's actions froze the market to TRA's detriment. TRA additionally contends that the district court's decision to find that, absent this report, TRA had failed to produce sufficient evidence to establish it was entitled to compensatory damages was improper.

Federal Rule of Evidence 702 requires an expert's testimony to be based on sufficient facts or data and be the product of reliable principles and methods. A district court "should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Horneck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). But, when a party objects to an expert simply on grounds that the report is based on questionable data, this objection goes to the weight of the evidence and not the admissibility and, thus, does not provide a basis for excluding an expert's report. *Id.*

We review the district court's decision to exclude expert testimony for abuse of discretion. *Tokai Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1364 (Fed. Cir. 2011); *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 264 (2d Cir. 2002). And we conclude that the

court did not abuse its discretion when it excluded the "frozen market" opinion in Bennis's report. In her report, Bennis explained TRA's state in 2008 and its optimistic outlook for future growth. She then detailed the problems associated with TRA's fourth round of financing, noting that many investors declined to invest because of a lack of strategic fit whereas others mentioned concerns about management structure and sales cycle length. But, Bennis also noted that the timing of TRA's fourth round of financing occurred after Kantar decided to release a product that competed directly with TRA's Media TRAna-lytics product. Because the investors' comments were similar to those made in prior rounds of financing, Bennis determined that these types of miscellaneous individual concerns did not hinder TRA's ability to raise capital during its fourth round of investing. Instead, Bennis concluded that it was Kantar's decision to enter the market that severely impacted TRA's financial future.

But Bennis did not analyze the actual impact of Kan-tar's release of a competing product into the marketplace; she merely assumed that this factor impacted TRA's market value without any explanation. Although TRA argues that these criticisms go to the weight—not the admissibility—of the report, her report merely speculates why TRA's value dropped from $54 million to $20 million. She provides no reason why the loss in TRA's value is actually linked to Kantar's behavior aside from the fact that Kantar's conduct occurred between the third and fourth round of investing. *See R.F.M.A.S. Inc. v. So.*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010) ("As one court has observed, it is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Fed. R. Evid. 702."). This error is compounded by the fact that Bennis ignored the undis-puted statements from investors, who said they did not invest in TRA's fourth round of financing because they

were concerned about TRA's lack of revenue traction given the amount of capital already raised. And, on the fact that her opinion was based, in part, on Kantar's decision to file its declaratory judgment action—which is not a "bad act" that could cause compensable damages for TRA. For these reasons, we conclude that the district court did not abuse its discretion when it excluded Bennis's expert report.[3]

Without this report, the district court determined that TRA lacked sufficient evidence to support a request for compensatory damages. A party need not rely upon an expert to demonstrate it is entitled to damages, however. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1330 (Fed. Cir. 2014) (finding that the absence of expert testimony did not negate the right to recover damages). While it may be inappropriate to allow an expert to premise an opinion upon no more than a temporal relationship between TRA's dramatically divergent valuations, the jury is entitled to consider that fact, among others, when assessing TRA's request for compensatory damages. *See Brooktree Corp v. AMD*, 977 F.2d 1555, 1578 (Fed. Cir. 1992) ("As in damages determinations in general, the measurement of actual damages is a question of fact.").

Here, TRA had lay witness testimony from its own CEO, Mark Lieberman, and TiVo's CEO, Naveen Chopra, to support its claim for damages. "The Federal Rules of Evidence allow a lay witness to testify in the form of an opinion, provided such testimony 'is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue.'" *Lightfoot v. Union Carbide*

---

[3] Of course, the district court has the discretion to allow supplemental expert reports on remand if it deems such reports appropriate.

*Corp.*, 110 F.3d 898, 911 (2d Cir. 1977) (quoting Fed. R. Evid. 701). A CEO with personal knowledge of his business is certainly capable of providing evidence regarding the impact of a new competing product and estimating the losses attributable to this new product. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) (stating that a company president can testify about "lost profits where the projection is based on evidence of decreased sales"). Because TRA was able to cite to other evidence in the record indicating that Kantar's actions led to confusion in the marketplace and affected TRA's market position and ability to raise capital, it was inappropriate for the district court to prohibit TRA from pursuing a claim for damages premised on its contention that Kantar's actions had a deleterious effect on its market value.[4]

### 2. TRA's unjust enrichment theory

TRA also challenges the district court's decision that TRA was not entitled to seek damages based on an unjust enrichment theory. First, TRA argues that the district court erred when it concluded that TRA had only asserted one compensatory theory, i.e. its "frozen market" theory, and that, even if TRA had asserted more theories, the district court erred when it concluded TRA could not assert them as a matter of law.

During the summary judgment stage, Kantar alleged that TRA failed to offer any admissible evidence that Kantar caused TRA any non-patent damages. In re-

---

[4]  TRA also argues that the district court erred when it concluded that TRA had no right to a jury trial solely on its claim for nominal damages regarding its breach of contract and fiduciary duty claims. Because we conclude that TRA can still pursue a theory for compensatory damages, we need not consider whether TRA was entitled to a trial on nominal damages alone.

sponse, TRA noted that it did not seek lost profits, lost sales or price erosion, asserting that its damages theory was based on the diminution of TRA's value caused by Kantar's bad acts.  Although TRA may have alluded to other theories to support its damages claim earlier in the litigation, TRA expressly limited itself during the summary judgment phase to just one theory.  Accordingly, the district court did not err in concluding that TRA dropped its other compensatory damages theories before the summary judgment phase of the case.[5]

### 3. Punitive Damages

TRA also argues that the district court erred when it concluded that TRA was not entitled to punitive damages for its breach of fiduciary duty and contract claims.[6]  TRA contends that it was at an unfair disadvantage when the district court entertained Kantar's motion to strike TRA's jury demand, because the district court treated this motion effectively as a summary judgment motion, without affording TRA the benefit of additional pages to detail its opposition.  It alleges that the district court failed to address these procedural concerns, and also failed to draw

---

[5]    At the district court, TRA also asserted a "loss of use" damages theory, but in its opening brief here, TRA does not discuss this theory.  Because TRA failed to address this issue in its opening brief, TRA has waived any argument regarding its "loss of use" damages theory. *See SmithKline Beecham Corp. v. Apotex Corp.,* 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.") (citation omitted).

[6]    This ruling assumed that TRA's trade secret claims were no longer in the case.  To the extent those claims result in any compensatory damages judgment, they may also support a request for punitive damages.  We leave that question to be resolved on remand.

all reasonable inferences in TRA's favor when it decided that TRA could not pursue its claim for punitive damages. This was especially prejudicial, according to TRA, because the district court previously had limited the parties to a single round of summary judgment briefing.

TRA overstates what occurred at the district court. Although TRA did raise its procedural concerns with the district court, TRA did not request additional pages or file a motion to strike Kantar's purported summary judgment motion as untimely. Further, to the extent that TRA was disadvantaged by the district court's failure to allow TRA to present additional evidence, TRA has not cited to any rule or procedure that prevented TRA from submitting additional documentation with its opposition to Kantar's motion. Thus, it is difficult to say that TRA truly was at a disadvantage here. Additionally, while TRA asserts that the district court stated there would only be one round of summary judgment briefing, this statement was made before the district court, in its ruling on Kantar's motion for summary judgment, asked that the parties attend a scheduling conference to address how to best proceed with the remaining claims. At this scheduling conference, the district court discussed the possibility of allowing Kantar to file a motion to strike, and the district court agreed to allow Kantar to file such a motion. *See TNS Media Research, LLC v. TRA Global, Inc.*, No. 1:11-cv-4039 (Jan. 9, 2014), ECF No. 164 (Transcript of Dec. 20, 2013 hearing). Thus, there is no reason to find that the district court's procedures in disposing of TRA's claims for punitive damages were improper in this case.

We agree with TRA, however, that in resolving this question as a matter of law, the district court did not consider the evidence in the light most favorable to TRA. Here, the district found that "TRA present[ed] no evidence that Kantar acted on its alleged intentions" to starve TRA for cash. *Damages Op.* at 12. But there was evidence on the record that Kantar "intended to starve TRA for cash,"

attempted to "slow and frustrate TRA's ability to obtain financing," and "disclosed confidential information in violation of the NDAs." *Damages Op.* at 11–13.  In order to receive punitive damages, one must demonstrate that a party has acted with actual malice or such wanton, willful or reckless disregard for a plaintiff's rights.  *See In re Methyl Tertiary Butyl Ether*, 725 F.3d at 128.  Intent is quintessentially a question of fact.  *See Waltree Ltd. v. ING Furman Selz LLC*, 97 F. Supp. 2d 464, 470 (S.D.N.Y. 2000) ("Under New York law, punitive damages are available in a tort action . . . Whether to award punitive damages . . . is a question of fact for the jury.")  And, where there is a genuine issue of material fact, summary judgment is inappropriate.  Fed. R. Civ. P. 56.  In this case, TRA presented sufficient evidence to create a colorable question about Kantar's intent to injure TRA.  Thus, it was inappropriate for the district court to find, as a matter of law, that TRA could not demonstrate that it was entitled to punitive damages.

### 4. Injunctive Relief

Additionally, TRA challenges the district court's ruling that TRA could not seek injunctive relief for its remaining non-patent claims.  In particular, TRA alleges that the district court erred when it concluded that the 2009 NDA had expired, thereby mooting its claim for injunctive relief on its breach of contract theory, and that relief for its fiduciary duty claim was also moot, because Kantar no longer had a fiduciary on TRA's board.  We agree with TRA's position.

With respect to the 2009 NDA, TRA does not dispute that the 2009 NDA contained a confidentiality provision lasting for 18 months.  TRA argues that, because other provisions of the contract were still enforceable—especially, the term affording TRA the right to seek equitable relief, including an injunction, in the event of a breach—TRA could still pursue its claim for injunctive

relief based on the NDA.  After a contract has expired, injunctive relief based upon that contract is moot.  *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 214 n.2 (1979) ("The contracts have expired, and the question of injunctive relief is out of the case."); *Planned Parenthood v. Steinhaus*, 60 F.3d 122, 125 (2d Cir. 1995) (noting that a request for injunctive relief is moot after a contract has expired).  TRA accused Kantar of breaching the confidentiality provision of the 2009 NDA, but once that provision expired, TRA's ability to seek injunctive relief was moot.  The fact that other aspects of the contract remained enforceable cannot revive the NDA.  Accordingly, the district court did not err in dismissing TRA's claim for an injunction under the 2009 NDA.

The district court did err, however, in dismissing as moot TRA's theory that Kantar breached its fiduciary duty to TRA .  In its ruling, the court emphasized that Kantar no longer has a member on TRA's board and there is no indication that Kantar would rejoin its board.  But the district court ignored TRS's allegation that Kantar's representative learned critical information during his time of active board membership.  TRA alleged that Kantar violated its fiduciary obligation to TRA when it manipulated its own TRA board member to obtain improper access to TRA's confidential information and trade secrets.  Under New York law, "a fiduciary relationship is necessarily fact-specific, and is not dependent on a contractual relationship."  *Koether v Sherry*, 977 N.Y.S.2d 667, 667 (N.Y. Sup. Ct. 2013) (citing *First Keystone Consultants, Inc. v DDR Construction Services*, 904 N.Y.S.2d 113 (2d. Dept 2010)).  And, a Board member's fiduciary obligations do not cease when his or her term of office ceases.  *See Roslyn Union Free School Dist. v Barkan*, 16 N.Y.3d 643, 647 (2011) (reinstating cause of action for breach of fiduciary duty against a former board member).  TRA's request for injunctive relief is not moot simply because Kantar no longer has a representative on its

Board.  The district court could issue an injunction prohibiting use of information learned while Kantar did have a representative on TRA's Board.  We find that the district court should consider a renewed request by TRA for injunctive relief if, after trial, TRA establishes that Kantar has breached and threatens to continue to breach its fiduciary duties to TRA.

## C. Patent claims

To prove infringement, the patentee must show that the accused device contains each and every limitation, literally or under the doctrine of equivalents.  *See Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1215 (Fed. Cir. 2015).  In this case, TRA argues that the district court erred when it concluded that all of TRA's accused products do not infringe the patents-in-suit.

### 1. CPG Products

When determining whether a patent is infringed, the court must first construe the disputed claims and then compare the claims to the allegedly infringing devices.  *See Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998)).

During claim construction, the parties agreed to construe "purchase data" as "data describing the purchase of a particular product at a given time, obtained from a purchase data source, such as a shopping loyalty card, point of sale collection means, or other record of a sale of a product or service."  *See Summary Judgment Op.*, 984 F. Supp. 2d at 218.  But at the summary judgment stage, the parties contested whether they actually agreed how "purchase data" should be construed.  In particular, the parties disputed if the phrase "at a given time" should be defined.  TRA asserted that it should, because it impacted the scope of the claim.  Kantar disagreed, arguing that the issue could be avoided because the accused CPG

Products indicated nothing at all about time, meaning there was no need to construe what "at a given time" might mean. In order to resolve Kantar's summary judgment motion, the district court decided to further construe the parties' stipulated construction. It then applied this second construction to the disputed CPG Products, without further input from the parties. We find this procedure improper.

"[P]arties in patent cases frequently stipulate to a construction or the court construes a term, only to have their dispute evolve to a point where they realize that a further construction is necessary." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1310 (Fed. Cir. 2014). Generally, when a determinative claim construction dispute arises, a district court must resolve it. *See 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed. When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.") (quotation omitted); *see also Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.*, 674 F.3d 1365, 1373 (Fed. Cir. 2012) (finding that a court may construe a term found only in the construction, and not in the claims, if the correct construction of a claim term necessitates it). And, although a district court has great latitude in how it conducts the claim construction process, the parties must be involved. *See Ballard Med. Prod. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("*Markman* does not require a district court to follow any particular procedure in conducting claim construction."); *Eon-Net LP v. Flagstar Bancorp*, 249 F. App'x 189, 198 (Fed. Cir. 2007) (vacating and remanding a summary judgment ruling because the district court had failed to afford the non-moving party notice and opportunity to present its claim construction arguments during the

relevant briefing).  Here, neither party was afforded the opportunity to present its own claim construction arguments before the district court sua sponte decided the claim construction issue, i.e. how to define "at a given time" itself.  It appears, moreover, that additional input may have altered the court's view of this determinative question.  Because the district court improperly construed the parties' stipulation and granted summary judgment based on that construction, without affording TRA or Kantar notice or opportunity to present argument about the appropriate construction, we vacate the district court's grant of summary judgment of non-infringement as to Kantar's CPG Products and remand for further proceedings.

TRA also objects to the district court's ruling that it could not pursue its doctrine of equivalents argument simply because its infringement expert did not opine adequately on the matter.  TRA explains that it supported this theory with both expert and non-expert testimony, and that the district court erred when it found that TRA needed expert testimony to prove infringement under the doctrine of equivalents.

TRA is correct that a party is not required to submit expert testimony as evidence of equivalents.  *See AquaTex Indus. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (stating that "evidence of equivalents must be from the perspective of someone skilled in the art, for example 'testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art'") (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609 (1950)).  But, despite its contention to the contrary, the *only* evidence TRA submitted to establish that Kantar's CPG Products infringed under the doctrine of equivalents was its expert report.  *See Summary Judgment Op.*, 984 F. Supp. 2d at 222 (noting that "TRA's sole evidence that the CPG Products infringe under the

doctrine of equivalents is Mela's [TRA's expert] declaration"). Where the nonmoving party submits evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249. Without any other evidence for the district court to consider, we find that the court did not err when it dismissed TRA's doctrine of equivalents theory with respect to Kantar's CPG products.

### 2. Auto Products

The district court also found that Kantar's Auto Products did not infringe the asserted claims because the products did not perform double-blind matching. *Id.* at 244–45. Accordingly, the district court granted summary judgment of non-infringement as to these products as well. On appeal, TRA argues that the district court improperly found that there was no evidence to support TRA's claim that Kantar's Auto Products perform this required step. If the district court had properly made all reasonable inferences in its favor, as is required during summary judgment, TRA argues that the district court would have concluded that the unsigned draft contract between J.D. Power and Experian was evidence that refuted Kantar's claim that Kantar's Auto Products do not perform double blind matching. We find TRA's arguments unpersuasive.

Essentially, the dispute between the parties is how the unsigned draft contract between J.D. Power and Experian should be interpreted—does Experian receive the behavioral data, in this case automotive registration data, in addition to the personal identifying information, such as names, or does it simply receive an account number linked to personal identifying information from J.D. Power. If Experian only receives an account number, without information about automotive purchases, TRA argues that Kantar's Auto Products meet the double blind matching limitation.

The contested contract states that "J.D. Power will deliver to Experian . . . J.D Power's data file, which include the following data fields:   Unique Key ID, last name, address, city, state, zip code ("J.D. Power Data")."  *Id.* at 221. Experian then will use this information:

> solely for the purpose of performing anonymous, blind matching of it to certain Client data ("[Kantar] data") provided to Experian by Client [Kantar].  Experian will run a process to associate the names and addresses from Client with the names and address from Advertiser and create a unique identification number that anonymously links common names and addresses.

*Id.* After Experian matches the data, it "will send the matched IDs to KantarMedia for use by KantarMedia in order to improve advertising relevance and measurement." Joint Appendix at 1669.

"Summary judgment of non-infringement . . . is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard of infringement, because such failure will render all other facts immaterial." *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (citing *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537 (Fed. Cir. 1991) ("There can be no genuine issue as to any material fact where the nonmoving party's proof is deficient in meeting an essential part of the applicable legal standard.")); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that proof is sufficient if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). On summary judgment, all inferences must be drawn in favor of the nonmoving party. *Anderson,* 477 U.S. at 256. In response to a well-supported summary judgment motion, however, to create a triable issue of fact the nonmoving party must proffer evidence sufficient for a jury to find for that party. *Id.* at

249-50.  In this case, we find that TRA failed to submit
sufficient evidence to create a genuine issue as to whether
Kantar's Auto Products satisfy the double blind matching
limitation.

In its opposition to Kantar's summary judgment mo-
tion, TRA alleged that the "Unique key ID" is the masked
automobile registration data, such that Experian does not
receive both individuals' personal information and their
automobile registration data, but it failed to provide any
support for this allegation.  And, a review of the record
fails to provide any further insight.  Without any evidence
regarding the meaning of "Unique key ID," one cannot say
that it is necessarily an abstract identification code that
does not reveal anything about and individual's automo-
bile registration.  *See TechSearch*, 286 F.3d at 1372
("[I]nfringement must be shown literally or equivalently
for each limitation; general assertions of facts, general
denials, and conclusory statements are insufficient to
shoulder the non-movant's burden.").  But, even assuming
that "Unique key ID" is an abstract identification code
related to automobile registration, the unsigned contract
states *Kantar* will provide Experian with the other data to
match to J.D. Power's data.  It is unknown if Experian
utilizes the same process when it receives masked data
from the set-top box provider, who provides Experian with
the television viewing data in Kantar's Auto Products
process.  There is also no indication if this other client
data includes behavioral information.  TRA was required
to submit sufficient evidence to raise a genuine issue of
material fact.  There is simply no evidence that Experian
utilizes double blind matching for Kantar's Auto Products.
Accordingly, the district court did not err in granting

summary judgment of non-infringement with respect to Kantar's Auto Products.[7]

### D. Reassignment of the Case on Remand

Lastly, TRA argues that, if this case were to be remanded, it should be assigned to a new judge. Specifically, TRA alleges that, in light of the nature, extent, and frequency of the district court's errors, it would be necessary to reassign the case, in order to avoid the district court's bias against TRA to permeate the case. In response, Kantar contends that such a request is moot if this Court affirms the district court but, even if this Court does remand this case, Kantar argues that TRA has failed to demonstrate such a serious measure is required in this case. Kantar cites to several instances where the district court made allowances for TRA, such as allowing TRA a surreply during summary judgment briefing, affording it the opportunity to present its summary judgment arguments at a hearing, and granting TRA permission to amend its pleadings. Further, Kantar alleges that a

---

[7]   TRA also argues that the district court's ruling regarding the "cleansing and editing algorithm" limitation of the '940 Patent was erroneous. TRA acknowledges that this construction was not the basis for the grant of summary judgment of non-infringement, but it nevertheless contends that this Court should address the construction. Although we may review a non-dispositive claim construction, we decline to do so on the record before us. See Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1375 n.2 (Fed. Cir. 2005) (deciding to consider the construction of a term that "was not dispositive to the district court's decision [because it] may be relevant on remand"); Arlington Indus. v. Bridgeport Fittings, Inc., 632 F.3d 1246, 1256–57 (Fed. Cir. 2011) (declining to address a non-dispositive claim construction, in part, because more briefing was required to address the issue).

reassignment would waste judicial resources, as the district court judge has spent over three years working on the case and, therefore, is the most familiar with it. Accordingly, Kantar argues that reassignment is not warranted in this case.

We find TRA's extraordinary request inappropriate in this case.  In the Second Circuit, such a request "is a serious request rarely made and rarely given."  *United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006). TRA is correct that the Second Circuit does allow such reassignment, but the instances where the Second Circuit reassigned a case are much more egregious than the case we have before us today.  *See United States v. Steppello*, 664 F.3d 359, 367 (2d Cir. 2011) (assigning the case to a new judge after the "district judge denied [a] motion [to reconsider] without comment" when the Second Circuit had clearly addressed the same issue after the district court's original decision but came to the opposite conclusion); *Armstrong v. Guccione*, 470 F.3d 89, 113 (2d Cir. 2006) ("Further, while we emphasize that we have never found any fault in Judge Owen's skillful handling of this case, we believe that on the seventh anniversary of Armstrong's confinement, his case deserves a fresh look by a different pair of eyes. We therefore direct the district court to reassign the case randomly to a different district court judge on remand."); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128 (2d Cir. 2003) (reassigning the case because the original judge "was required to disqualify himself" since he had a financial interest in a party).  While we have disagreed with some of the district court's rulings, we have affirmed many others.  Because there does not appear to be any glaring errors that warrant a fresh set of eyes, reassignment is not warranted in this case.

CONCLUSION

For the foregoing reasons, we affirm the district court's conclusion that there is insufficient evidence from which a reasonable juror could conclude that Kantar's Auto Products do not infringe the asserted patent claims, that TRA's product positioning secrets are not protectable as a matter of law, and that TRA's damages expert failed to comply with Fed. R. of Evid. 702. We reverse the district court's ruling that TRA's financial projections and strategic plans are not protectable as a matter of law. We reverse the district court's decision to dismiss TRA's misappropriation of trade secret claims as a discovery sanction and its decision to dismiss TRA's remaining trade secrets claims as a matter of law. We also reverse the district court's determination that TRA was entitled to only nominal damages on its non-patent claims, which moots the propriety of the district court's conclusion that TRA was not entitled to a jury trial as to those claims. And, we reverse the district court's conclusion that TRA is not entitled to injunctive relief on its fiduciary duty claims as a matter of law. Lastly, we vacate the district court's decision that Kantar's CPG Products do not infringe the asserted patent claims. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**