UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES) and
CAVENDISH SQUARE HOLDING, B.V.,

                    **Plaintiffs,**

     - against -

TIVO RESEARCH AND ANALYTICS,
INC. (d/b/a TRA, Inc.),

                    **Defendant.**
-------------------------------------------------------X

TIVO RESEARCH AND ANALYTICS,
INC. (d/b/a TRA, Inc.),

                    **Counterclaim-Plaintiff,**

     - against -

TNS MEDIA RESEARCH, LLC (d/b/a
KANTAR MEDIA AUDIENCES);
CAVENDISH SQUARE HOLDING, B.V.;
WPP PLC; WPP GROUP USA, INC.;
KANTAR GROUP LTD.; and KANTAR
RETAIL AMERICA, INC.,

                    **Counterclaim-Defendants.**
-------------------------------------------------------

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/22/16

**OPINION AND ORDER**

11 Civ. 4039 (SAS)

## I.    INTRODUCTION

On November 25, 2013, this Court issued an Opinion and Order (the "November 25 Opinion" granting summary judgment, *inter alia*, as to counterclaim-defendants' patent non-infringement claims.  Because I granted summary judgment on the patent non-infringement claims, I held that counterclaim-defendants' patent ineligibility claims were moot.  On appeal, the Federal Circuit affirmed in part and remanded in part this Court's grant of summary judgment.[1]  In light of the Federal Circuit's decision, I now address the patent ineligibility issue.  For the following reasons, counterclaim-defendants' motion for summary judgment is GRANTED.

## II.    BACKGROUND[2]

This is a dispute over intellectual property pertaining to marketing and advertising analytics.  Plaintiffs TNS Media Research, LLC (d/b/a Kantar Media Audiences) ("Kantar Media") — a market research company — and Cavendish Square Holding B.V. ("Cavendish") — Kantar Media's affiliate — commenced

---

[1]    *See TNS Media Research, LLC v. Tivo Research & Analytics, Inc.*, No. 2014-1668, 2015 WL 5439002 (Fed. Cir. Sept. 16, 2015).

[2]    The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the affidavits submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.

this action on June 14, 2011 against defendant TRA Global, Inc. ("TRA").  Kantar

Media sought a declaration that it had not infringed United States Patent No.

7,729,940 (the "'940 patent"), of which TRA is the sole assignee.  Cavendish

alleged in the complaint that TRA breached a contract entitling Cavendish to place

a member on TRA's board, but subsequently dropped this claim.

Kantar Media and Cavendish are indirect subsidiaries of WPP PLC.

WPP PLC (hereafter, "WPP Parent") is the parent company to WPP Group USA,

Inc. ("WPP USA"), Kantar Group Ltd. ("Kantar Group"), and Kantar Retail

America, Inc. ("Kantar Retail") (collectively with WPP PLC, Kantar Media and

Cavendish, the "WPP Companies").

TRA asserted the following six counterclaims against counterclaim-

defendants the WPP Companies (singly or in combination): (1) patent infringement

of the '940 patent (against Kantar Media); (2) patent infringement of United States

Patent No. 8,000,993 (the "'993 patent") (against Kantar Media and Kantar Retail);

(3) patent infringement of United States Patent No. 8,112,301 (the "'301 patent")

(against Kantar Media and Kantar Retail); (4) aiding and abetting breach of

fiduciary duty (against Kantar Media, Cavendish, WPP Parent, WPP USA, and

Kantar Group); (5) misappropriation of trade secrets (against the WPP

Companies); and (6) breach of contract (against Kantar Retail, Kantar Media, and

WPP USA).

## A.    Overview

TRA — a nested acronym[3] meaning "True ROI for Media"[4] — was founded in 2007 with the goal of using modern data-mining techniques to determine the cost-effectiveness of advertisements.[5]  After its first financing round in August 2007, its post-money valuation was roughly ten million dollars; after its second round in May 2009, roughly twenty-seven million dollars; and after its third round in May 2010, roughly fifty-four million dollars.  The WPP Companies, through their investment arm, invested a substantial sum in each of TRA's first three financing rounds.[6]

---

[3]      A nested acronym is an acronym that contains another acronym; in this case, TRA contains the acronym "ROI," which means "return on investment."

[4]      2/23/09 Press Release Announcing TRA's Partnership with Kognitio (a hardware neutral data warehousing firm), Ex. E to Declaration of Eric Rutt (counsel for the WPP Companies) in Support of Counterclaim-Defendants' Motion for Summary Judgment ("Rutt Decl."), at SPENCE_006020.

[5]      *See* Answer, Defenses, and Supplemental and Amended Counterclaims for Patent Infringement, Aiding and Abetting Breach of Fiduciary Duty, Misappropriation of Trade Secrets, and Breach of Contract ¶ 22.

[6]      *See id.*

**B.     The Patent Claims Asserted by TRA**

**1.     The '940 Patent**

**a.     Claim Asserted**

The '940 patent — titled "Analyzing Return on Investment of Advertising Campaigns by Matching Multiple Data Sources" — issued on June 1, 2010 with TRA designated as the sole assignee.[7]  As the title suggests, the claimed invention relates to a method for correlating the advertisements that consumers view with their purchasing behavior.  Claim 71 is illustrative of the invention, and is the only claim of the '940 patent asserted by TRA.  It is set forth in full below.

A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

collecting in an advertising measurement system:

(i)     clickstream data [a recording of the user's input into a media device, such as a computer or television set-top box] from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

---

[7]     *See* '940 Patent, Ex. S to Rutt Decl.

(ii)    advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)    program data associated with the program delivered on the program delivery source, wherein collecting the program data is not dependent on a supplemental data collection device, and also wherein the collected program data includes household level data associated with multiple consumer households;

(iv)    purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with a centrally located electronic computer processor configured for centrally processing data received from the program delivery source, the advertising data source, the program data source, and the purchase data source, wherein the matching further includes:

(i)     grouping the collected data in association with an account identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

(ii)    matching each account identifier associated with each consumer household with other account identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

storing the matched advertising data, clickstream data, purchase data, and program data in at least one centrally located electronic data storage medium operatively associated with the computer processor;

applying at least one cleansing and editing algorithm to the matched and stored data; and,

calculating at least one true target index metric based on the matched and stored data.[8]

In sum, the '940 patent teaches a method for: (1) using a computer to collect data about (i) commands that viewers input into, *e.g.*, a television; (ii) the advertisements that they view; (iii) the programs they watch; and (iv) the products they then purchase; (2) grouping these data with a unique identifier that does not personally identify the viewer/purchaser, and transmitting it to a central database; (3) storing this grouped, 'blinded' data in the centrally located database; (4)

---

[8]    *Id.* at cols. 46:33-48:8.

cleansing and editing the data (*e.g.*, deleting information that is irrelevant to the advertiser using the invention, or repeated); and (5) using the data to generate granular statistical inferences about the cost-effectiveness of advertisements.  For example, TiVo might collect data about the programs and advertisements its users watch, while Walgreens collected their purchasing information from customer loyalty cards; the companies might then group this data together and transmit it—without any personally identifying information — to TRA, which could use it to advise Proctor & Gamble whether to run ads for Tide Detergent during America's Got Talent.

### b.    Claim Construction Proceedings

A *Markman* hearing was held on July 6, 2012, and I subsequently issued an Order construing the two phrases in dispute as follows.[9]

| Disputed Phrase | Construction |
| --- | --- |
| "household level data associated with multiple consumer households" | "data about a household that can be later aggregated into a data set including multiple consumer households" |

---

[9]    *See TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039, 2012 WL 3756325, at *14 (S.D.N.Y. Aug. 29, 2012).

| | |
|---|---|
| "cleansing and editing algorithm" | "an algorithm to remove inconsistencies in, correct, or otherwise improve the reliability of data collected from a program delivery source" |

The parties stipulated to the following claim term constructions, which were entered as an Order.[10]

| Term | Stipulated Construction |
|---|---|
| "clickstream data from a program delivery source of a consumer" | "data describing a consumer's exposure to content delivered from a program delivery source" |
| "advertising data associated with deliver of the program by the program delivery source" | "data describing advertisements delivered from a program delivery source" |
| "program data associated with the program delivered on the program delivery source" | "data describing media content delivered from a program delivery source" |
| "purchase data from a purchase data source" | "data describing the purchase of a particular product at a given time, obtained from a purchase data source, such as a shopping loyalty card, point of sale collection means, or other record of a sale of a product or service" |
| "supplemental data collection device" | "a piece of hardware that is separate from the program delivery source or purchase data source and is used for the exclusive purpose of recording data that facilitates analysis of consumer behavior" |

---

[10]     *See* 4/9/12 Stipulation and Order, Doc. No. 65.

| Term | Stipulated Construction |
|------|------------------------|
| "return on investment metric" | "a measurement of the benefit that a particular past investment (*e.g.*, an advertisement) has produced in terms of changed purchasing behavior" |
| "true target index report" | "a report that allows users to compare different media environments (*e.g.*, particular programs, networks, or dayparts) based on the likelihood that consumers who meet a particular profile will be exposed to such media" |
| "demographics weighting algorithm" | "a process to account for differences between the composition of the sample from which data is drawn and the composition of the larger population that one wants to study" |

### 2.    The '993 Patent

The '993 Patent — titled "Using Consumer Purchase Behavior for Television Targeting" — issued on August 16, 2011, and lists TRA as the sole assignee.[11]   TRA asserts that Kantar Media and Kantar Retail have infringed claims 1, 2, 3, 7, 8, and 9.  These claims are quoted in full below.

[**Claim 1**]:

A computer-implemented system for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the system comprising:

----

[11]     *See* '993 Patent, Ex. T to Rutt Decl.

an advertising measurement system including at least one electronic computer processor configured for:

[(i)]   collecting clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

(ii)   collecting advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)   collecting programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households;

(iv)   collecting purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households; and

(v)   matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected programming data at a household data level;

wherein the collected data include a first identifier associated with the household assigned to the program delivery source;

-11-

a module configured to use a thesaurus for:

(i)    producing data from the collected data without personally identifiable information, and

(ii)   indexing the produced data with a second identifier, wherein the thesaurus relates each first identifier of each household to the second identifier;

at least one electronic data storage medium operatively associated with the computer processor, the data storage medium configured for storing the matched advertising data, clickstream data, purchase data, and programming data;

a module programmed for applying at least one cleansing and editing algorithm to the matched data or the stored data; and

a module programmed for calculating at least one return on investment metric or true target index metric based on the matched or stored data.[12]

**[Claim 2]**

The system of claim 1, further comprising:

a list matcher configured to:

receive data communicated in parallel from the one or more data sources, the communicated data comprising at least personally identifiable information associated with the household and the first identifier associated with the household assigned by the data source;

generate the thesaurus relating each first identifier associated with the household to the second identifier; and

---

[12]    *Id*. at cols. 42:16–43:3.

send the thesaurus to the module configured to use the thesaurus.[13]

## [Claim 3]

The system of claim 1, wherein the thesaurus is configured for relating an account number identifier to at least one other account number identifier associated with the same household across multiple data sources.[14]

## [Claim 7]

A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

collecting in an advertising measurement system:

(i) clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household level data associated with multiple consumer households;

(ii) advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

---

[13]     *Id*. at col. 43:4-15.

[14]     *Id*. at col. 43:16-19.

(iii)    programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households; and,

(iv)    purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household level data associated with multiple consumer households;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected programming data in the advertising measurement system at a household data level with at least one electronic computer processor configured for processing data received from the program delivery source, the advertising data source, the programming data source, and the purchase data source, wherein the matching further includes:

[(i)]    receiving data including a first identifier associated with the household assigned by the data source, and

(ii)     electronically using a thesaurus for: producing data without personally identifiable information, and indexing the produced data by a second identifier, wherein the thesaurus relates each first identifier of the household to the second identifier; storing the matched advertising data, clickstream data, purchase data, and programming data in at least one electronic data storage medium operatively associated with the computer processor; applying at least one cleansing and editing algorithm to the matched data or the stored data; and, calculating at least one return on investment metric or true target index metric based on the matched or stored data.[15]

**[Claim 8]**

The method of claim 7, further comprising:

receiving data communicated in parallel from the one or more data sources, the communicated data comprising at least personally identifiable information associated with the household and the first identifier associated with the household assigned by the data source; and,

generating the thesaurus for relating each first identifier associated with the household to the second identifier.[16]

---

[15]     *Id*. at cols. 43:28-44:14.

[16]     *Id*. at col. 44:15-22.

**[Claim 9]**

The method of claim 7, further comprising using the thesaurus for relating an account number identifier to at least one other account number identifier associated with the same household across multiple data sources.[17]

### 3.    The '301 Patent

The '301 Patent — titled "Using Consumer Purchase Behavior for Television Targeting" — issued on February 7, 2012, and lists TRA as the sole assignee.[18]  TRA asserts that Kantar Media and Kantar Research have infringed claims 1, 23, 42, 47, 49, 63, 108, and 109, which are set forth in full below.

**[Claim 1]**

A computer-implemented method for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the method comprising:

collecting in an advertising measurement system:

> (i)    clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household data;

---

[17]    *Id.* at col. 44:23-26.

[18]    *See* '301 Patent, Ex. U to Rutt Decl.

(ii)     advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

(iii)    programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households; and,

(iv)    purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household data;

matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with at least one electronic computer processor configured for processing data received from the program delivery source, the advertising data source, the programming data source, and the purchase data source, wherein the matching further includes:

(i)     grouping the collected data in association with an identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

    (ii)    matching each identifier associated with each consumer household with other identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

storing the matched advertising data, clickstream data, purchase data, and programming data in at least one electronic data storage medium operatively associated with the computer processor;

applying at least one cleansing algorithm or editing algorithm to the collected data, the matched data or the stored data; and,

calculating at least one return on investment metric or true target index metric based on the collected data, the matched data or the stored data.[19]

**[Claim 23]**

The method of claim 1, further comprising receiving clickstream data derived from a program delivery source comprising a television set-top box operatively associated with a television distribution system.[20]

**[Claim 42]**

The method of claim 1, further comprising using at least a portion of the matched data to drive at least one addressable commercial to the household.[21]

---

[19]    *Id*. at cols. 51:23-52:11.

[20]    *Id*. at col. 53:9-12.

[21]    *Id*. at col. 54:28-30.

**[Claim 47]**

The method of claim 1, wherein the purchase data are associated with product purchase records of a discount card associated with the consumer.[22]

**[Claim 49]**

The method of claim 1, further comprising generating a true target index report in the advertising measurement system.[23]

**[Claim 63]**

A system for facilitating analysis of consumer behavior in association with advertising exposure or program delivery, the system comprising:

an advertising measurement system including an electronic computer programmed for:

    (i)    collecting clickstream data from a program delivery source of a consumer, wherein collecting the clickstream data is not dependent on a supplemental data collection device, and also wherein the collected clickstream data includes household data;

    (ii)    collecting advertising data associated with delivery of the program by the program delivery source, wherein collecting the advertising data is not dependent on a supplemental data collection device, and also wherein the collected advertising data includes household level data associated with multiple consumer households;

---

[22]    *Id*. at col. 54:47-49.

[23]    *Id*. at col. 54:53-55.

(iii)   collecting programming data associated with the program delivered on the program delivery source, wherein collecting the programming data is not dependent on a supplemental data collection device, and also wherein the collected programming data includes household level data associated with multiple consumer households; and,

(iv)   collecting purchase data from a purchase data source, wherein collecting the purchase data is not dependent on a supplemental data collection device, and also wherein the collected purchase data includes household data;

(v)   matching at least portions of the collected advertising data, the collected clickstream data, the collected purchase data, and the collected program data in the advertising measurement system at a household data level with at least one electronic computer processor configured for processing data received from the program delivery source, the advertising data source, the programming data source, and the purchase data source, wherein the matching further includes:

(i)   grouping the collected data in association with an identifier of each consumer household without processing any personally identifiable information associated with the consumer household, and

(ii)   matching each identifier associated with each consumer household with other identifiers associated with the same consumer household without processing any personally identifiable information associated with the consumer household;

-20-

at least one data storage medium operatively associated with the computer processor, the data storage medium configured for storing the matched advertising data, clickstream data, purchase data, and programming data;

a module programmed for applying at least one cleansing algorithm or editing algorithm to the collected data, the matched data or the stored data; and,

a module programmed for calculating at least one return on investment metric or true target index metric based on the collected data, the matched data or the stored data.[24]

## III.   LEGAL STANDARD[25]

Summary judgment is appropriate where, "viewing the record in the light most favorable to the non-moving party . . . 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[26] "In making this determination . . . we resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

---

[24]     *Id*. at cols. 55:28-56:18.

[25]     In a case arising under the patent laws, the rules of the regional circuit govern the standard of review applicable to a motion for summary judgment. *See, e.g.*, *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 18 (Fed. Cir. 2012). Accordingly, the summary judgment standard of the Second Circuit is recited below.

[26]     *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)) (quotation marks and citation omitted).

sought."[27]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[28]

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact."[29]  To defeat a motion for summary judgment, the non-moving party must "'do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.'"[30]  "If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim."[31]

"'The function of the district court in considering the motion for

---

[27]     *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quotation marks and citation omitted).

[28]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S.Ct. 2675 (2013) (quotation marks, citation, and alterations omitted).

[29]     *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[30]     *Robinson*, 781 F.3d at 44 (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).

[31]     *Chen v. New Trend Apparel*, 8 F. Supp. 3d 406, 430 (S.D.N.Y. 2014) (citing *Celotex v. Catrett*, 477 U.S. 317, 325 (1986) (further citations omitted)).

summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists.'"[32] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[33]

## IV.   APPLICABLE LAW

### A.   Patent Invalidity Under 35 U.S.C. § 101

Section 101 of Title 35 of the United States Code provides that "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ."  The courts recognize three general exceptions to this rule: "laws of nature, physical phenomena, and abstract ideas" are inherently unpatentable.[34]  The Supreme Court has "described the concern that drives this exclusionary principle as one of preemption."[35]  That is, "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological

---

[32]   *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

[33]   *Crawford*, 758 F.3d at 486 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[34]   *Bilski v. Kappos*, 561 U.S. 593, 601 (2010).

[35]   *Alice Corp. v. CLS Bank*, 134 S.Ct. 2347, 2354 (2014).

work," and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws . . . ."[36]

In 2012, the Supreme Court articulated a two-prong test for policing this prohibition as to laws of nature and physical phenomena.[37]  The Supreme Court then applied this test to abstract ideas two years later, in *Alice Corporation v. CLS Bank.*[38]

Step one of the *Alice* test requires assessing whether the claims at issue are directed to a patent-ineligible concept (a law of nature, physical phenomenon, or abstract idea).[39]  An abstract idea can encompass "longstanding practices" tied to human activity, and need not be limited to "preexisting, fundamental truths" stated in a vacuum.[40]  Categories of abstract ideas recognized by the Federal Circuit post-*Alice* include "method[s] of organizing human activity," "data collection, recognition, and storage," "using categories to organize,

---

[36]     *Id.* (internal citations and quotations omitted).

[37]     *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289 (2012).

[38]     134 S.Ct. at 2347.

[39]     *See id.* at 2355.

[40]     *Id.* at 2356.

store, and transmit information," and "process[es] of organizing information."[41]

        If the patent at issue is directed towards a patent-ineligible concept, a court then "examine[s] the elements of the claim to determine whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application."[42]  This step requires examining the elements of each claim both individually and as an ordered combination.[43]  Claims are invalid for lack of an inventive concept if they merely combine the patent-ineligible concept with "well-understood, routine, conventional activities."[44]  For example, "routine data-gathering steps" do not transform an abstract idea into a patent-eligible invention.[45]  Nor does "conventional computer activity."[46]  As the Supreme Court explained in *Alice*, "transformation into a patent-eligible application requires more than simply

---

[41]    *Id.* at 2356-57; *Content Extraction & Transmission LLC v. Wells Fargo*, 776 F.3d 1343, 1347 (Fed. Cir. 2014); *Digitech Image Techs. v. EFI, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014).

[42]    *Alice,* 134 S.Ct. at 2357.

[43]    *See id.* at 2355.

[44]    *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015).

[45]    *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360-61 (Fed. Cir. 2015).

[46]    *Id.*

stating the abstract idea while adding the words 'apply it.'"[47]

     *Alice* has had a marked, even transformative impact on courts' assessment of patents directed towards arguably abstract ideas.  In twelve of the Federal Circuit's first thirteen decisions applying *Alice* (including one issued mere days after the filing of counterclaim-defendants' reply brief), the Federal Circuit invalidated the patents at issue as insufficiently inventive abstract ideas.[48]  Each

---

[47]     *Alice*, 134 S.Ct. at 2357 (quoting *Mayo*, 132 S.Ct. at 1294).

[48]     *See Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, No. 2015-1415, 2016 WL 362415, at *1 (Fed. Cir. Jan. 20, 2016) (patent directed to calculating borrower's credit "grade" and providing loan pricing information); *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA*, LLC, No. 2015-1411, 2015 WL 9461707, at *2 (Fed. Cir. Dec. 28, 2015) (patent directed to testing operators of moving equipment for physical or mental impairment); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1333 (Fed. Cir. 2015) (patent directed to product group price determinations); *OIP Techs., Inc.*, 788 F.3d at 1359 (patent directed to e-commerce price optimization); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (patent directed to sending notifications regarding financial transactions); *Internet Patents Corp.*, 790 F.3d at 1344 (patent directed to retaining online application data regardless of use of web browser's "back" and "forward" buttons); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377 (Fed. Cir. 2015) (patent directed to detecting and amplification of DNA sequences in blood plasma or serum); *Digitech*, 758 F.3d at 1344 (patent directed to generation and use of "improved device profile" to improve printing of digital photographs); *Ultramercial, Inc. v. Wildtangent, Inc.*, 772 F.3d 709 (Fed. Cir. 2014) (patent directed to free delivery of copyrighted material over the Internet in conjunction with sponsor advertising); *Content Extraction & Transmission LLC*, 776 F.3d at 1343 (patents directed to collection and recognition of scanned document data by ATMs); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. App'x 1005, 1007 (Fed. Cir. 2014) (patent directed to managing computerized bingo games); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (patents directed to computer-based third-party guarantee of sales

and every one of these invalidated patents was directed towards a digital application of a non-digital concept.[49]

## B.   The WPP Companies' Burden

The parties dispute counterclaim-defendants' burden in connection with their motion for summary judgment.  TRA argues that its patents are presumed valid and the WPP Companies bear the burden of proving invalidity by clear and convincing evidence, relying on section 282(a) of Title 35 of the United States Code ("A patent shall be presumed valid . . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.").  The WPP Companies argue that the clear and convincing evidence standard does not apply to patent eligibility claims brought under section 101, as patent eligibility is a question of law, not fact.

The Federal Circuit appears to have resolved this question.  After *Alice*, courts have frequently decided questions of patent eligibility on the

---

transactions).

[49]     In the single case where the Federal Circuit upheld a patent under *Alice*, the patent at issue was directed towards an entirely new technological problem — the retention of website visitors during online purchases.  *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1249-50 (Fed. Cir. 2014).

pleadings.[50]   Courts decline to decide patent eligibility at the pleading stage *not*
because factual development is required, but because certain claims require
construction before the patent eligibility question can be adjudicated.[51]   Because no
evidence outside the pleadings is considered in deciding a motion to dismiss or a
motion for judgment on the pleadings, "it makes little sense to apply a clear and
convincing evidence standard — a burden of *proof* — to such motions."[52]   The
same is true in the summary judgment context: like summary judgment on a claim
of breach of an unambiguous contract, this Court's determination of patent-
eligibility requires no extraneous information, no factual record — only the patents
themselves.   The presumption of validity — and its concomitant clear and
convincing evidence standard — does not apply to section 101 claims.

This determination is in line with the Federal Circuit's guidance on
the issue: "Although the Supreme Court has taken up several section 101 cases in
recent years, it has never mentioned — much less applied — any presumption of

---

[50]     *See, e.g.*, *Content Extraction & Transmission LLC*, 776 F.3d at 1349;
*Ultramercial*, 772 F.3d at 711; *buySAFE, Inc.*, 765 F.3d at 1351 (affirming district
court's decision to grant judgment on the pleadings based on 35 U.S.C. § 101).

[51]     *See, e.g.*, *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, No. 8:13-
CV-2240-T-33MAP, 2015 WL 518852 (M.D. Fla. Feb. 9, 2015).

[52]     *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-
DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17, 2015).

eligibility.  The reasonable inference, therefore, is that while a presumption of *validity* attaches in many contexts, no equivalent presumption of *eligibility* applies in the section 101 calculus."[53]

Although the clear and convincing evidence standard is not applicable to the WPP Companies' claims, as the parties moving for relief they still bear the burden of establishing that the claims are patent-ineligible under section 101. Additionally, the Court construes the challenged patent claims in a manner most favorable to TRA.[54]

## V.   DISCUSSION

### A.   Ripeness for Review

TRA contends that the WPP Companies' section 101 claims are not ripe until this Court construes the '940 patent term "at a given time," which the Federal Circuit indicated required construction in the context of the WPP Companies' patent infringement claims.[55]  I disagree.  While "it will ordinarily be desirable — and often necessary — to resolve claim construction disputes prior to

---

[53]   *Ultramercial*, 772 F.3d at 720-21 (Mayer, J., concurring) (emphasis added).

[54]   *See Content Extraction & Transmission LLC*, 776 F.3d at 1349.

[55]   *See TNS Media Research*, 2015 WL 5439002, at *21.

a § 101 analysis,"[56] courts have routinely invalidated claims without the benefit of

claim construction or discovery — especially post-*Alice*.[57]  To the extent the

Federal Circuit indicated that this Court was required to engage in further claim

construction, that claim construction was required to properly adjudicate the WPP

Companies' patent infringement claims, not its section 101 claims.  Indeed, the

term "at a given time" is entirely irrelevant to the patent eligibility question — as

evinced by TRA's failure to "identify any relevant factual dispute"[58] about the term

that would affect the WPP Companies' patent eligibility claim.  Further claim

construction is not required; the section 101 claims are ripe for resolution.

### B.      Representativeness

One question remains before this Court can adjudicate the WPP

Companies' section 101 claims — whether claim 71 of the '940 patent is

representative of the '993 and '301 patent claims.  TRA argues that it is not

representative, correctly noting that the Federal Circuit did not explicitly *hold* that

---

[56]      *Modern Telecom Sys.*, 2015 WL 1239992, at *6.

[57]      *See, e.g.*, *Internet Patents Corp.*, 790 F.3d at 1344 (affirming district
court's dismissal for § 101 invalidity prior to claim construction and discovery).
*See also Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266,
1273 (Fed. Cir. 2012) ("claim construction is not an inviolable prerequisite to a
validity determination under § 101.").

[58]      *Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, No. 4:14-cv-2972,
2014 WL 7342525, at *4 (S.D. Tex. Dec. 23, 2014).

claim 71 of the '940 patent is representative of TRA's purported invention. However, while the Federal Circuit did not have reason to hold claim 71 of the '940 patent representative, its language strongly suggested such an outcome — it chose to emphasize claim 71 of the '940 patent as "illustrative of [TRA's] invention," and set out that claim in full while presenting the '993 and '301 patents as "similar to" the '940 patent, with very little further detail.[59]  The Federal Circuit looked to the '940 patent in reviewing this Court's November 25 Opinion.  There was, however, no holding of representativeness.

This Court is certainly not *required* to "individually address every one of [TRA's] claims" under section 101 merely because the Federal Circuit made no explicit ruling on representativeness.[60]  "[I]t is not necessary to address each claim when one claim (or more) is representative [of the others]."[61]  So long as "the other claims of the patent[s] are drawn to a similar process,"[62] and so long as the remaining claims are "substantially similar in that they recite little more than the same abstract idea,"[63] this Court may apply the *Alice* test to a single representative

---

[59]     *TNS Media Research*, 2015 WL 5439002, at *2.

[60]     *Content Extraction & Transmission LLC*, 776 F.3d at 1348.

[61]     *Modern Telecom Sys.*, 2015 WL 1239992, at *10 n.4.

[62]     *Ultramercial*, 772 F.3d at 712.

[63]     *Content Extraction & Transmission LLC*, 776 F.3d at 1348.

claim.

I find claim 71 of the '940 patent to be representative of the '301 and '993 patent claims. While there are minor differences across each of the three patents-in-suit, each of the patents describes the same basic invention in five basic steps: (1) collecting household-level data from a variety of digital sources, (2) matching this data to individual households through the use of digital double-blind matching, (3) digitally storing this matched data, (4) applying a "cleansing and editing algorithm" to the data to remove extraneous and/or private information, and (5) calculating an advertising metric based on the data. The differences that *do* exist between the patents are ancillary to this core invention; indeed, TRA itself has described the '993 and '301 patents as "relat[ing] to the same technology" and "contain[ing] similar claims as those in the original ['940] patent" in arguing for leave to file supplemental counterclaims based on these two patents.[64] It is noteworthy that, across all of the briefing on this matter (including sur-reply), TRA has failed to articulate *why* the differences between the '940, '301, and '933 patent claims matter for the purpose of patent eligibility. It has instead hung its hat on the argument that without an explicit holding by this Court, or an agreement among the parties, there was no basis for the use of a representative claim at all. TRA now

---

[64]   Memorandum of Law in Support of TRA's Motion for Leave to File Supplemental and Amended Counterclaims at 14.

has its holding; I proceed to analyze claim 71 of the '940 patent under *Alice*.

## C. *Alice*

### 1. *Alice* Step One: "Abstract Idea"

The first step of the *Alice* test requires a court to "distill the gist of the claim," then determine whether that claim is directed towards a patent-ineligible concept — such as an abstract idea.[65]  TRA's claim is for the digital, double-blind matching of collected purchase data and program delivery data to individual households.  TRA argues that this view of its invention "completely ignor[es] the fact that to practice TRA's invention, one must use concrete and tangible items such as television set top boxes and cash registers."[66]  This is a mischaracterization of its own patent, which refers generically to "purchase data sources" and "program delivery sources" — sources that could just as easily be found entirely on the Internet.[67]  No tangible machine is needed to collect the data required for the

---

[65]     *Open Text S.A. v. Box, Inc.*, 78 F. Supp. 3d 1043, 1046 (N.D. Cal. 2015).  *Accord buySAFE*, 765 F.3d at 1354-55 (holding that "[t]he claims are squarely about creating a contractual relationship" despite the existence of other, more specific claim limitations).

[66]     Counterclaim-Plaintiff's Response to Supplemental Memorandum Regarding Summary Judgment ("TRA Mem.") at 5.

[67]     For example, purchase data could come from an online retailer instead of a brick-and-mortar store, and program delivery data could come from an online video streaming service instead of a cable company.

double-blind match.

Nor would such a tangible machine defeat the abstract nature of TRA's patent claims.  An otherwise-abstract idea cannot be rendered patent-eligible by requiring it to be implemented alongside routine data collection.  Such "insignificant data-gathering steps . . . add nothing of practical significance to the underlying abstract idea."[68]  Here, TRA's invention requires the gathering of data from many possible sources (including cash registers and television set top boxes).  That conventionally gathered data is then matched to individual households using digital double-blind matching, is digitally stored, and is digitally prepared for and presented to end users in the form of advertising metrics.  The abstract concept of matching consumer data to households using a double-blind matching strategy runs through this entire claim, and is not changed by the fact that certain possible sources of data to be matched are gathered using separate computer systems.

The abstract nature of TRA's patent is confirmed by the fact that TRA's claim, as a whole, can be performed by humans rather than computers.  "[A] helpful way of assessing whether the claims of [a] patent are directed to an abstract idea is to consider if all of the steps of the claim could be performed by

---

[68]        *Ultramercial*, 772 F.3d at 716.

human beings in a non-computerized 'brick and mortar' context."[69]  Here, a human

could take the place of the generic computer described in claim 71 of the '940

patent.  For example, a research analyst could gather purchase data from an online

retailer and viewing data from an online video streaming service, with each list

identifying only accounts rather than personally identifiable information (the data

collection).  The researcher could then correlate the purchase data and viewing data

with households by using an index prepared by a third party who had access to the

transactions' personally identifying information, but not behavioral information

(the double-blind match).  The analyst could then manually remove extraneous

information and calculate the advertising metric to be sold to end users.  A

computer certainly makes this process a great deal more efficient, but the

underlying abstract idea remains unchanged.[70]

       TRA's patents are directed towards a patent-ineligible abstract idea.

---

[69]    *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015) (citing *buySAFE*, 765 F.3d at 1353). *Accord DietGoal Innovations LLC v. Bravo Media LLC,* 33 F. Supp. 3d 271, 278-79 (S.D.N.Y. 2014), *aff'd*, 599 Fed. App'x 956 (Fed. Cir. 2015) (finding claims that "recite steps that, although computer-implemented by virtue of the patent application, could be performed in the human mind, or by a human using a pen and paper" were directed towards an abstract concept).

[70]    *See OIP Techs., Inc.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent-eligible.").

This Court therefore turns to step two of the *Alice* test to determine whether the claim contains elements sufficient to transform the underlying abstract idea into a patent-eligible application.

## 2.    *Alice* **Step Two: Inventiveness**

Because TRA's claim is directed to an abstract idea, it must include an "inventive concept" in order to be patent-eligible.  No such inventive concept is present here.  Instead, claim 71 of the '940 patent recites only "well-understood, routine, [or] conventional activities"[71] such as data collection, data storage, and routine "post-solution"[72] activities (activities performed on the data following the double-blind match) that are insufficiently inventive to render TRA's claims patentable.  Indeed, the remaining limitations in the claim do little more than implement the core concept of TRA's claims — the digital double-blind match of household data.  As the Supreme Court noted in *Alice,* "if a patent's recitation of a computer amounts to a mere instruction to implemen[t] an abstract idea on . . . a computer, . . . that addition cannot impart patent eligibility."[73]

"Nothing in the asserted claims 'purport[s] to improve the functioning

---

[71]    *Alice*, 134 S.Ct. at 2359.

[72]    *DietGoal*, 33 F. Supp. 3d at 288.

[73]    134 S.Ct. at 2358 (internal quotation omitted).

of the computer itself' or 'effect an improvement in any other technology or technical field.'"[74]  Nor are the claims tied to a "particular machine or apparatus."[75]  To the extent TRA argues that its claims "allowed a massive scale up of tracking the efficacy of advertising without the burden and expense of installing supplemental data collection devices in people's homes and without an invasion of consumer privacy," these hypothetical benefits are not recited in TRA's actual patent claims.[76]  Such unclaimed features cannot render an ineligible claim patent-eligible.[77]  Because the asserted claims are directed to an abstract idea and nothing in the claims comprises an inventive concept, TRA's claims are patent-ineligible.

---

[74]   *Mortgage Grader*, 2016 WL 362415, at *7 (quoting *Alice*, 134 S.Ct. at 2359).

[75]   *Bilski*, 561 U.S. at 601.

[76]   TRA Mem. at 9.

[77]   *See Planet Bingo*, 576 Fed. App'x at 1008-09.

## VI.    CONCLUSION

For the foregoing reasons, counterclaim-defendants' motion for

summary judgment is GRANTED as to all patent claims, on the grounds of patent

invalidity.  The Clerk of the Court is directed to close this motion (Dkt. No. 122).

A conference is scheduled for March 15, 2016, at 4:00 p.m.

                                        SO ORDERED:

                                        Shira A. Scheindlin
                                        U.S.D.J.

Dated:        New York, New York
              February 22, 2016

                                        -38-

**- Appearances -**

**For Defendant and Counterclaim-Plaintiff TRA:**

Christopher Colvin, Esq.
Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-7799

Jay Lefkowitz, Esq.
John Paul Del Monaco, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4970

Richard Doyle, Esq.
Jaime Herren, Esq.
Janssen Doyle LLP
140 Brookwood Road, Suite 102
Orinda, CA 94563
(925) 295-1800

Perry Mark Goldberg, Esq.
Tanya Acker, Esq.
Goldberg, Lowenstein & Weatherwax LLP
11400 West Olympic Blvd., Suite 400
Los Angeles, CA 90064
(310) 203-9222

**For Plaintiffs and Counterclaim-Defendants the WPP Companies:**

Marc Rachman, Esq.
Andrew Keisner, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, NY10019

(212) 468-4800

Michael A. Albert, Esq.
John Strand, Esq.
Charles Steenburg, Esq.
Eric Rutt, Esq.
Robert Abrahamsen, Esq.
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Ave.
Boston, MA 02210
(617) 646-8000