```
                                                    ┌─────────────────────────────────┐
                                                    │ USDC SDNY                       │
                                                    │ DOCUMENT                        │
UNITED STATES DISTRICT COURT                        │ ELECTRONICALLY FILED            │
SOUTHERN DISTRICT OF NEW YORK                       │ DOC #: _____         │
-----------------------------------------------X    │ DATE FILED: January 18, 2017    │
                                                    └─────────────────────────────────┘
```

TIVO RESEARCH AND ANALYTICS,          :
INC. (d/b/a TRA, INC.),               :
                Plaintiff,            :
                                      :
            -v-                       :
                                      :
TNS MEDIA RESEARCH LLC (d/b/a         :
KANTAR MEDIA AUDIENCES) and           :
CAVENDISH SQUARE HOLDINGS, B.V.;      :
WPP PLC; WPP GROUP USA, INC.;         :          11-cv-4039 (KBF)
KANTAR GROUP LTD; KANTAR RETAIL       :
AMERICA, INC.,                        :          OPINION & ORDER
                                      :
                Defendants.           :
-----------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Before the Court is a motion by TNS Media Research LLC ("Kantar") for

summary judgment on non-patent damages claims of TiVo Research and Analytics,

Inc. ("TRA"). (ECF No. 282.) Defendants' argument is principally that the form in

which this damages theory is offered—through the testimony of TiVo's CEO Naveen

Chopra—is inadmissible.[1] In the absence of admissible evidence to support this

theory, defendants argue, summary judgment is warranted.

      The Court sets forth the background to the motion below. Support for non-

patent damages (or the lack thereof) has been raised in prior motion practice. Most

notably, the Court previously precluded plaintiff's proposed damages expert

supporting this theory; that ruling was affirmed by the Federal Circuit. Plaintiff

---

[1] TiVo acquired TRA in July 2012, a year after the commencement of this action.

has argued that it can support such damages through other evidence, and specifically the lay testimony from TiVo's CEO, Chopra.  Following orders by this Court to present such evidence, plaintiff provided a calculation of damages and, eventually, Chopra was deposed on it.  As it turns out, however, Chopra lacks the most basic qualifications to support TRA's non-patent damages theory.  He certainly believes there are such damages, but he lacks requisite first-hand knowledge of the alleged damages (including knowledge he could have obtained with careful preparation).

Plaintiffs' time to support this theory is up.  The history on this issue is too long and tortured.  They cannot now seek to fix that which was repairable but left broken.

For the following reasons, Kantar's motion for summary judgment is GRANTED.

I.      BACKGROUND

The question raised by this motion—whether there are any admissible facts to support non-patent damages—has a complicated procedural history.  It is necessary to walk through this history in some detail to understand the parties' positions on the current motion, as well as the Court's conclusion.

TRA asserts entitlement to significant damages (between $60 million and $196 million) due to Kantar's alleged misconduct diminishing the value of TRA's business.  It uses certain valuations associated with financing offerings to support its ex ante valuation, and the acquisition price paid by TiVo to support the ex post.

TRA's assumed valuation occurred in connection with the following rounds of financing: In 2007 TRA raised $5 million, in 2009 it raised $13 million, and in 2010 it raised $18 million.  (See TRA Rule 56.1 Counterstatement ("TRA 56.1") ¶ 21, ECF No. 287.)  Kantar itself participated in each of these rounds through its investment arm, Cavendish Square Holding B.V.[2]  In May 2010, Montgomery & Co. (the financial institution retained by TRA to assist it with obtaining financing) prepared a valuation of TRA of $54 million.  (See id. ¶ 41.)  Notably, no investor was prepared to invest in this round. Two years later TiVo acquired TRA for $20 million.  (Id. ¶ 44.)

TRA alleges that the successful financings between 2007 and 2010, along with its bankers' proposed valuation in 2010, support the proposition that the value of its business was on an upward trajectory; according to TRA's argument, but for the intervention of Kantar's acts, this higher valuation would have been realized. Instead, TRA asserts, Kantar used TRA's propriety information and trade secrets to release an infringing product ("RaPidView").  As a result, customers who would have used TRA's product turned instead to this infringing product.  This resulted in diminished expectations for TRA, and eliminated—or "froze"—additional access to financing.  TRA was unable to raise sufficient capital in its fourth financing round and therefore sold itself to TiVo at a significantly diminished value.  TRA further asserts that this lawsuit also contributed to a decrease in its value.

---

[2] As part of its participation, Kantar also obtained the right—which it exercised—to appoint a representative to TRA's board.  During this time, Kantar and TRA were also engaged in merger discussions.  Those talks ended soon after Kantar acquired a TRA competitor, TNS Media Research ("TNS").

TRA initially attempted to support was is now referred to as its "frozen-market" damages theory (also known as its "non-patent damages") with proposed expert testimony of Melissa Bennis.  Bennis opined that approximately 70% of TRA's reduction in value between its 2010 financing round and its 2012 sale to TiVo was attributable to the alleged wrongful acts of Kantar.  (Bennis Rpt., Ex. 20-9, ECF No. 141-20.)  She referred to investors declining to participate in the fourth round due to a "[lack of] revenue traction," "[in]ability to hit projections," and "lack of profitability."  (Id.)  Bennis concluded that "[t]o the extent that TRA's inability to meet revenue and profit expectations were exacerbated at the time of the Series D round, it is reasonable to believe it was caused by [Kantar's] alleged actions, which disrupted the market with a new product and froze the market with respect to overall sales[.]"  (Id.)  Bennis relied, in part, on testimony from TRA's co-founder Mark Lieberman.  Lieberman testified at his deposition that Kantar's actions "led to confusion in the marketplace, [Kantar] misappropriating our trade secrets, infringing our patents, signaling to the marketplace that an investor of ours was now copying what we were doing, affected our ability to raise capital, affected valuation conversations around the value of the company[.]"  (Strand Dec. Ex. E, Lieberman Dep. at 168:23-169:6, ECF No. 285-5.)

On June 5, 2013, Kantar moved for summary judgment on all TRA counterclaims, arguing, inter alia, that TRA failed to show causation for non-patent damages.  (ECF Nos. 122, 123.)  Kantar argued that TRA's proposed expert relied on "speculation" to support a causal relationship between Kantar's alleged wrongful

acts and the amount of damages claimed, and that her opinion failed to meet the requirements of Federal Rule of Evidence 702.  (ECF No. 123 at 2, 11.)  Kantar also argued that TRA's proposed expert ignored alternative explanations for TRA's inability to raise funds on its fourth financing round, such as investors' concerns about TRA's lack of revenue despite three successful financing rounds.  (Id. at 17-18.)

On November 25, 2013, the Honorable Shira A. Scheindlin, then presiding over this action, granted Kantar's motion as to non-patent damages.  TNS Media Research, LLC v. TRA Global, 984 F. Supp. 2d 205, 240-42 (S.D.N.Y. 2013).  Judge Scheindlin held that Bennis's testimony failed to "satisfy the requirements of Rule 702."  Id. at 241.  In addition, Judge Scheindlin excluded the testimony Lieberman's testimony as "rest[ing] on speculation."  Id. at 242.[3]

The Federal Circuit affirmed the exclusion of TRA's proposed expert.  TNS Media Research LLC v. TiVo Research Analytics, Inc., 629 F. App'x 916, 934-35 (Fed. Cir. 2015).  However, the Federal Circuit reversed Judge Scheindlin's holding that TRA was precluded from supporting its frozen-market theory with other evidence, including admissible lay testimony.  Id. at 933-35.  The appeals court observed that "TRA had lay witness testimony from its own CEO, Mark Lieberman, and TiVo's CEO, Naveen Chopra, to support its claim for damages."  Id. at 935.

---

[3] On a subsequent motion by Kantar to limit TRA's remedies (ECF No. 166), Judge Scheindlin held that the frozen-market theory was the only theory of compensatory damages properly presented by TRA and, therefore, "TRA is not entitled to compensatory damages under any theory."  TNS Media Research, LLC v. TRA Global, Inc., No. 11-cv-4039, 2014 WL 1370279 at *2-3 (S.D.N.Y. Apr. 7, 2014).  This limitation was affirmed by the Federal Circuit.  TNS Media Research LLC v. TiVo Research Analytics, Inc., 629 F. App'x 916, 935-36 (Fed. Cir. 2015)

"Because TRA was able to cite to other evidence in the record indicating that Kantar's actions led to confusion in the marketplace and affected TRA's market position and ability to raise capital, it was inappropriate for the district court to prohibit TRA from pursuing a claim for damages premised on its contention that Kantar's actions had a deleterious effect on its market value." Id.  It was therefore possible for TRA to "pursue a theory for compensatory damages" relying upon lay witnesses or, if permitted, supplemental expert testimony.  Id. at 935 nn.3 & 4.  The Federal Circuit did not address Judge Scheindlin's evidentiary ruling regarding Lieberman: that his testimony was based on speculation.

At a status conference following remand, Judge Scheindlin stated that although "[t]here's a strong argument [TRA] waived damages years ago," she would be "very generous" and "allow[] [TRA] to" submit a damages computation "several years late." (Mar. 15, 2016 Status Conf. Tr. at 8-9, ECF No. 233.)  She required TRA to submit its non-patent damage calculations "based on the lay testimony of its CEO [Lieberman] or any other lay witness" by March 29, 2016, and required that the deposition of any lay witness supporting that calculation be completed by April 12, 2016.  (ECF No. 227 at 2.)

On March 29, 2016, TRA submitted a supplemental damages calculation but did not name a supporting witness—including Lieberman—at that time.  (Strand Dec. Ex. A; ECF No. 271 at 26.)  TRA's submission stated that the "first part of the calculation [is] the amount TRA would have been worth had Kantar complied with its legal obligation," which TRA estimates to have been "approximately $110 million

as of July 2012" because "TRA believes its valuation would have continued on a similar trajectory [as the first three financing rounds] but for the bad acts." (Id. at 3.)  It continued, the "second part of the calculation—TRA's dramatically reduced valuation as a result of Kantar's misconduct—is established by the sale of TRA for $20 million in July 2012." (Id. at 4.)  Although TRA estimated the appropriate damages level at $90 million based on "TRA['s] belie[f]," id. at 3, it stated that a jury could find a slower growth rate (e.g., half the rate of the prior rate) to result in damages of $60 million or a faster growth rate (e.g., the "same exponential growth rate that TRA experienced between Series B and Series C") to result in damages of $196 million. (Id. at 4.)  This calculation exceeded the damage amounts discussed in Bennis' report by tens of millions of dollars.

By letter dated March 30, 2016, Kantar objected to the failure of TRA to offer a lay witness in support of its damages calculation and asked that Judge Scheindlin preclude TRA from seeking damages under Federal Rule of Civil Procedure 37. (ECF No. 271 at 20-23).  On April 1, 2016, TRA proffered Chopra—TiVo's CEO—as its supporting witness. (TiVo acquired TRA in 2012—two years after Kantar's release of its allegedly infringing product and a year after TRA's failed fourth round of financing, (TRA 56.1 ¶¶ 34-44.)).  The parties then sparred over Chopra's deposition, resulting in a ruling by Judge Scheindlin on April 4, 2017, that the deposition of Chopra would proceed but that "it [was] unclear whether TRA's computation of damages is in fact sufficient to satisfy Rule 26[.]" (ECF No. 235 at 2.)

Chopra testified in support of this damages calculation on April 11, 2016. (Strand Dec. Ex. G. ("Chopra Dep."), ECF No. 285-7.)  Chopra acknowledged at his deposition that prior to the acquisition he "was not the guy responsible for, you know, every single thing that was going on at TRA," (Chopra Dep. at 50:6-13), that he had never held a management position at TRA, (id. at 34:13-19; 88:24-89:1), had never served on TRA's board, (id. at 25:5-7), had never participated in setting TRA's budget, had never participated in hiring TRA's employees, and had never signed agreements for TRA, (id. at 86:9-19.)  (See also Pl. Responses to Def. Rule 56.1 Statement of Material Facts ¶¶ 1-6, ECF No. 287.)  Chopra admitted that he could not recall ever having been to TRA's offices prior to its July 2012 acquisition by TiVo.  (Chopra Dep. at 87:13-20.)

Chopra admitted at his deposition that he had not even seen TRA's damages calculation until the day before the deposition.  (Id. at 8:13-15.)  He testified further that he had not been personally involved in developing Montgomery & Co.'s valuations of TRA in connection with actual and proposed financing rounds and that were being proffered by TRA as support for its valuations (including the $110 million in projected value for the fourth round), he had neither firsthand knowledge as to the basis for those valuations, nor had he investigated the assumptions underlying those valuations.  (Id. at 57:15-61:14.)  He also admitted that TiVo based its valuation of TiVo prior to the acquisition on projections that TRA provided.  (See id. at 66:15-67:2.)  In addition, Chopra conceded he lacked firsthand knowledge as to the reasons why potential investors chose not to participate in the fourth round,

8

(id. at 74:23-79:5), and he was unaware of documents supporting TRA's assertions that Kantar's release of its RaPidView product played a role in those decisions, (id. at 85:13-86:2).

This case was reassigned to the undersigned on May 10, 2016, following Judge Scheindlin's retirement from the bench.  On June 24, 2016, certain claims were reinstated, reviving the possibility that TRA could support its theory of compensatory damages with admissible evidence.[4]  (ECF No. 269.)  This Court invited briefing on that issue, (ECF No. 270), and on August 30, 2016, Kantar filed the present motion for summary judgment on TRA's non-patent damages, (ECF No. 282).

II.    PRINCIPLES OF LAW

A.  Summary Judgment

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party

---

[4] The question of whether Chopra's testimony was sufficient to support its supplemental damages calculation and frozen-market theory had previously been mooted by an order dismissing those claims.  TNS Media Research, LLC v. TiVo Research & Analytics, Inc., 183 F. Supp. 3d 435, 435 (S.D.N.Y. 2016).  That order was subsequently vacated, leading to this motion.  (ECF No. 269.)

lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.

In reviewing a motion for summary judgment, a court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)).  Once the movant has met its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, citations and alterations omitted).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks, citation, and alterations omitted).

B.  Federal Rule of Evidence 701

Federal Rule of Evidence 701 provides that the testimony of a witness "not testifying as an expert" must be "in the form of an opinion . . . limited to one that is," inter alia, "rationally based on the witness's perception."  Fed. R. Evid. 701(a). "The rational-basis requirement 'is the familiar requirement of first-hand

knowledge or observation.'" <u>United States v. Rea</u>, 958 F. 2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701 advisory committee's note to 1972 amendment). This "foundational requirement goes to the admissibility of evidence, not merely its weight, because a 'witness <u>may not</u> testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'" <u>United States v. Garcia</u>, 291 F.3d 127, 140 (2d Cir. 2002) (quoting Fed. R. Evid. 602) (emphasis in original).  However, a lay witness may testify to "specialized knowledge" "as long as it [is] based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise." <u>United States v. Mavashev</u>, 455 F. App'x 107, 112 (2d Cir. 2012) (quoting <u>United States v. Rigas</u>, 490 F.3d 208, 224 (2d Cir. 2007)).

"The question[] of whether the proffered opinion is rationally based on the witness's knowledge . . . [is], like all preconditions to the admissibility of evidence, [a] determination[] to be made by the trial judge." <u>Rea</u>, 958 F.2d at 1216.  Thus, a lay witness "must base his opinion on his own personal knowledge, which must be established to the court[.]" <u>Garcia</u>, 291 F.3d at 140. <u>See also</u> <u>Bernstein v. Village of Wesley Hills</u>, 95 F. Supp. 3d 547, 559 (S.D.N.Y. 2015) ("While the Court does not doubt that [the proffered witness] is aware of at least some of the assertions in his Affirmation, they remain inadmissible if not based on personal knowledge.").  If a lay witness cannot establish that personal knowledge forms the basis of his or her opinion, the testimony is inadmissible.  <u>See, e.g.</u>, <u>Village of Freeport v. Barella</u>, 814 F.3d 594, 612 (2d Cir. 2016) (holding that a district court's admission of lay opinion

testimony without basis in personal knowledge was error); United States v. Kaplan, 490 F.3d 110, 119 (2d Cir. 2007) (same); United States v. Garcia, 413 F.3d 201, 211-13 (2d Cir. 2005) (same); United States v. Grinange, 390 F.3d 746, 749-50 (2d Cir. 2004) (same).

Rule 701 authorizes "the owner or officer of a business to testify to the value or projected profits of the business without the necessity of qualifying the witness as an accountant, appraiser, or similar expert."  Fed. R. Evid. 701 Advisory Comm. Notes, 2000 Amendments.  However, "owners can give lay opinion evidence only on matters that are within their personal knowledge and experience."  Washington v. Kellwood Co., No. 05-cv-10034, 2016 WL 4619207 at *5 (S.D.N.Y. Sept. 6, 2016). When the business owner or officer does not have "an established track record" with the business or the industry, he or she lacks the basis in personal knowledge necessary to testify to the company's value.  See id.; see also Compania Embotelladora Del Pac., S.A. v. Pepsi Cola Co., 650 F. Supp. 2d 314, 321 n.4 (S.D.N.Y. 2009) (excluding plaintiff's former General Manager and Chief Financial Officer as a damages witness because "nothing in his declaration indicates that his purported lay testimony concerning [plaintiff's] claimed damages are based on his own personal knowledge or 'rationally based on his perception'"); Ho Myung Moolsan, Co. v. Manitou Mineral Water, Inc., No. 07-cv-7483, 2010 WL 4892646 at *10 (S.D.N.Y. Dec. 2, 2010) ("When offering testimony helpful to the jury and based personal knowledge, company management may express lay opinions regarding the

existence and the amount of lost profits.  At the same time, the witness must be able to point to objective bases for his opinions.") (internal citation omitted).

## III.   DISCUSSION

The key issue on this motion is whether the lay testimony proffered by TRA is sufficient to support TRA's frozen-market theory and computation of non-patent damages under Federal Rule of Evidence 701.  It is not.

TRA relies upon the supplemental testimony of Chopra to establish a causal nexus connecting Kantar's alleged wrongdoing to TRA's loss in valuation between its third financing round and its sale to TiVo, and to calculate a range of compensatory damages.[5]  While Chopra testifies to the frozen-market theory of causation, he lacks the personal, firsthand knowledge required by Rule 701(a).  See Rea, 958 F. 2d at 1215.

TRA's supplemental damages calculation claims that its "valuation would have continued on a similar trajectory [as its first three financing rounds] each year but for the bad acts" of Kantar, resulting in a projected counterfactual valuation of "approximately $110 million as of July 2012."  (Strand Dec. Ex A at 3.)  While acknowledging that a jury might reach higher or lower projections, TRA set its expected damages calculation at $90 million ($110 million less the $20 million July 2012 purchase price) plus pre-judgment interest.  (Id.)

---

[5] TRA argues in opposition to Kantar's motion that "throughout the years of litigation, TRA has both produced and obtained a substantial amount of discovery in support of its loss of valuation damages theory," that Chopra "is simply one of the witnesses available to testify about facts that support TRA's damages theory," and that "TRA intends to prove part of its damages case through Kantar witnesses[.]"  (TRA Brief in Opp. at 16, ECF No. 286 at 22.)  TRA does not, however, cite any document in support of this statement or name any witness other than Chopra.

Chopra does not provide any detailed information as to the factual support for this projection, and he fails to provide any facts supporting a causal connection to Kantar's alleged wrongdoing.  See Fed. R. Evid. 701(a); Rea, 958 F. 2d at 1215. When questioned about the basis for his position that Kantar's entry into the market decreased TRA's valuation between May 2010 and July 2012, Chopra cited hearsay[6] or simply restated TRA's frozen-market theory.  (Strand Dec. Ex. G., Chopra Depo. at 44:6-17 ("I had had a lot of discussions . . . with a lot of the salespeople at TRA and the management of TRA . . . [a]nd one of the most common answers we got from the salespeople was, you know, it's really hard to get clients to step . . . because there's all this uncertainty about what is going to come from [Kantar]."); id. at 46:8-9 ("That's correct [that I heard it from salespeople that clients were waiting for Kantar's product].  I also heard it from Mark Lieberman as well."); see also id. at 39:18-23 ("And the biggest thing that changed . . . between . . . 2010 to 2012 [] was the fact that all of a sudden we had the industry behemoth with 20-plus billion dollars worth of revenue trying to compete with us that didn't exit prior to that."); id. at 43:8-11 ("[T]he primary reason [TRA was] running into those [capital-raising] issues were the bad acts of [Kantar].  And the reason [TiVo was] able to get [TRA] for 20 million was because they didn't have any way of raising capital.")).

---

[6] The Court notes that the Montgomery & Co. valuations are hearsay—and would need to be supported by a witness who could establish an exception.  No such foundation has been proffered on this motion.  There is no legal basis to allow Chopra to transform hearsay in nonhearsay without a proper foundation.  He is not an "expert" who may rely on hearsay.

Indeed, Chopra's deposition demonstrates his lack of personal knowledge of either TRA's damages computation or the alleged causal link between Kantar's entry into the market and TRA's loss in valuation. TRA's supplemental damages calculation cites the pre-money valuation of Montgomery & Co. for TRA's fourth financing round, which valued TRA at $90 million, to establish a projection of $110 million in value for that round but for Kantar's alleged wrongdoing. (Strand Dec. Ex. A at 3-4.) Yet when asked about this at his deposition, Chopra admitted that he was not personally involved with developing that valuation. (Id. at 57:15-19.) Chopra also could not cite any document in TRA or TiVo's possession of which he is personally aware that discusses this valuation upon which TRA relies other than the report from Montgomery:

> Q: . . . Are you aware of any other documents in TRA's possession or TiVo's possession that discuss the pre-money valuation of 90 million?
>
> A: I don't know one way or the other if there are or are not additional documents.
>
> Q: Same question for the pre-money valuation of 60 to 75 million. Are you aware of any other documents in TRA's or TiVo's possession that discuss that valuation?
>
> A: Same answer. I don't know.

(Id. at 83:24-84:9.) He also admitted that TiVo has not performed any valuation of TRA since its acquisition in 2012, (see id. at 92:1-12), and that TiVo had not participated in TRA's first or third financing rounds, (id. at 23:19-21, 48:10-13.) Chopra's testimony therefore does not establish his firsthand, personal knowledge

of the facts that form the basis for the damages computation in TRA's supplementary damages calculation.  See Garcia, 291 F.3d at 140.

It is not always the case that the CEO of an acquiror will lack the first-hand personal knowledge of a target's value necessary to satisfy Rule 701 in a case such as this.  As the Federal Circuit explained in reversing Judge Scheindlin's conclusion that the frozen-market theory could not be supported with lay testimony, "[a] CEO with personal knowledge of his business is certainly capable of providing evidence regarding the impact of a new competing product and estimating the losses attributable to this new product."  TNS Media Research, LLC, 629 F. App'x at 935. Chopra could have developed such firsthand personal knowledge with careful and rigorous investigation of the facts about which he testifies either before or after TiVo acquired TRA.  An employee may provide lay opinion testimony "as long as it [is] based on his investigation and reflected his investigatory findings and conclusions and was not rooted exclusively in his expertise." Rigas, 490 F.3d at 224 (internal quotation marks omitted).  However, there is nothing in Chopra's testimony to support the conclusion that he performed such an investigation or otherwise developed personal knowledge of these facts.

Chopra's deposition also shows that he did not acquire first-hand knowledge of the alleged causal link between Kantar's entry into the market and TRA's diminished value.  He admits he did not discuss or does not recall discussing with potential investors why they did not participate in the fourth financing round:

Q: Did you personally talk to anyone at Intel about why they didn't want to invest in a Series D?

A: I spoke to Intel. . . . I can't recall whether I spoke to them about Series D.

. . .

Q: Did you talk to Black Rock about why they did not want to invest in a Series D?  When I say "you," I mean you, Mr. Chopra.

A: I don't think I did.

Q: Did you, Mr. Chopra, talk to anyone at Arbitron about why they did not invest in a Series D?

A: Again, I had some conversations with Arbitron.  I can't recall today exactly what point in time that happened, and so whether it was in relation to Series C or D I can't recall.

. . .

Q: In your dialogue with Intel, did they ever discuss Kantar in the marketplace?

A: In honestly don't recall whether than came up or not.

. . .

Q: And did  you ever discuss with Kodiak—and here I want to be specific again, just you, Mr. Chopra—discuss with anyone at Kodiak Venture Partners why they didn't invest in Series D?

A: My answer is the same.  I do recall at some point having a conversation with someone at Kodiak.  But again, it could have been in relation to one of the earlier stages of funding.

Q: To your memory during these discussions, did they ever bring up Kantar's role in the marketplace?

> A: I don't recall.
>
> . . .
>
> Q: You don't remember discussing with Arbitron Kantar having an adverse effect on the marketplace on TRA?
>
> A: I don't recall specific discussions.

(Id. at 74:23-79:5.)  His also admitted that he has no firsthand knowledge of any document from an investor indicating they would not participate in the fourth financing round due to Kantar's entry into the market:

> Q: Are you aware of a single note, memorandum, email, letter, any kind of correspondence evidencing that any company would not invest in a Series D because of Kantar's role in the marketplace?
>
> A: If there were such a thing, I am not sure I would necessarily be privy to it, so I don't have a way to know the answer to that.
>
> Q: Same question.  Are you aware of any document of any kind evidencing that a company would not purchase TRA because of Kantar's role in the marketplace?
>
> A: Same answer.  If there was such a thing, not something TRA would have shared with me at the time.

(Id. at 85:13-86:2.)  Chopra has not, therefore, established the personal knowledge required by Rule 701 for admission of his testimony regarding TRA's damages computations or the causal element of the frozen-market damages theory.  See Fed. R. Evid. 701(a).

Because Chopra has provided no basis for this Court to determine that his testimony regarding TRA's damages computation or frozen-market theory is grounded in personal knowledge, his testimony is inadmissible under Rule 701(a). <u>See</u> <u>Garcia</u>, 291 F.3d at 140 (A lay witness "must base his opinion on his own personal knowledge, which must be established to the court[.]").  As a result, TRA cannot support its damages computation under the frozen-market theory of compensatory damages on its non-patent claims.

## VI.  CONCLUSION

For the reasons set forth above, Kantar's motion for summary judgment on TRA's non-patent damages claims is GRANTED.

The Clerk of Court is directed to terminate the motion at ECF No. 282.

SO ORDERED.

Dated:      New York, New York
            January 18, 2017


                                    _____
                                        KATHERINE B. FORREST
                                        United States District Judge